## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

_____ )
PATRICK KENNEDY,               )
      Petitioner              )
                             )
                             )     Civil Action No. _____
vs.                            )
                             )
                             )     Section _____
BURL CAIN,                  )
      Respondent         )
_____)

# PETITION FOR WRIT OF HABEAS CORPUS
# UNDER 28 U.S.C. § 2254

G. Ben Cohen, La. Bar # 25370
Cecelia Trenticosta, La. Bar # 32736
Capital Appeals Project
636 Baronne Street
New Orleans, Louisiana 70113
(504) 529-5955

*Counsel for Petitioner*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 4

JURISDICTION ...................................................................................................... 5

VENUE .................................................................................................................... 5

TIMELINESS .......................................................................................................... 5

EXHAUSTION......................................................................................................... 6

STATEMENT OF FACTS ....................................................................................... 7

PROCEDURAL HISTORY.................................................................................... 12

CLAIMS FOR RELIEF ......................................................................................... 26

   I.   RACE AND GENDER DISCRIMINATION IN THE SELECTION OF GRAND JURY FOREPERSONS VIOLATED MR. KENNEDY'S RIGHT TO EQUAL PROTECTION OF THE LAW........................................................................................................ 27

      A.   Procedural History................................................................... 27

      B.   Mr. Kennedy Proved Purposeful Discrimination in the Selection of Grand Jury Forepersons in Jefferson Parish ................................................... 28

      C.   The State Failed to Rebut Mr. Kennedy's Prima Facie Case ..................... 42

      D.   The State Court's Opinion Rested on an Unreasonable Determination of the Facts in Light of the Evidence and an Unreasonable Application of Clearly Established Federal Law 46

      E.   Discrimination in the Selection of Grand Jury Forepersons Is a Structural Defect that Requires the Reversal of Mr. Kennedy's Conviction ........................................ 52

   II.   THE DEATH QUALIFICATION OF THE JURY IN A CASE WHERE THE DEATH PENALTY WAS UNCONSTITUTIONAL VIOLATED MR. KENNEDY'S RIGHT TO A FAIR TRIAL AND AN IMPARTIAL JURY ....................................................................... 52

   III.   THE STATE'S UNTIMELY DISCLOSURE OF EXCULPATORY AND IMPEACHMENT EVIDENCE PREJUDICED THE DEFENSE AND VIOLATED DUE PROCESS ........................................................................................................ 55

      A.   Connecticut Lab Reports ........................................................... 57

      B.   Videotape of L.H. .................................................................... 60

   IV.   MR. KENNEDY RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL .......... 62

      A.   Failure to Introduce Exculpatory Phone Records...................................... 68

      B.   Failure to Introduce October 1999 Video................................................. 71

      C.   Failure to Impeach Carolyn Kennedy....................................................... 72

      D.   Failure to Object to the Introduction of the Hearsay Photograph of the Caller I.D. Box 79

E.     Failure to Cross-Examine Madere ............................................................. 87

F.     Stipulation to Inadmissible Videotape ...................................................... 89

G.    Failure to Impeach Lee and Subpoena Messina ...................................... 97

H.    Failure to Request a Taint Hearing ........................................................ 100

I.      Failure to Call Favorable Witnesses ....................................................... 106

J.      The Effect of Counsel's Unprofessional Errors Must be Viewed Cumulatively Along With the Untimely Disclosure of *Brady* Evidence ........................................ 108

V.     THE ELECTION OF JUDGES TRANSFORMED MR. KENNEDY'S PROCEEDING FROM A TRIAL AND APPEAL INTO A PLEBISCITE DENYING HIM DUE PROCESS OF LAW ........................................................................................................ 109

VI.    PASSION AND PREJUDICE INFLAMED THE JURY WHEN IT WAS FORCED TO ENDURE WATCHING THE VICTIM CRY FOR LONG PERIODS OF TIME, AND THE TRIAL COURT ERRED IN SUSTAINING THE PROSECUTOR'S OBJECTION TO THE COURT'S PROPOSED INSTRUCTIONS TO THE JURY TO CONFINE ITS ATTENTION TO THE EVIDENCE ....................................................................................... 110

VII.   THE INTRODUCTION OF GRUESOME PHOTOGRAPHS VIOLATED MR. KENNEDY'S PRESUMPTION OF INNOCENCE ........................................... 114

VIII.  PROSECUTORIAL MISCONDUCT VITIATED THE VALIDITY OF THE JURY'S VERDICT .............................................................................................. 117

IX.    THE TRIAL COURT ERRONEOUSLY ALLOWED THE STATE TO ELICIT "EXPERT" TESTIMONY ON GRASS DISCOLORATION ................................... 120

X.     EXCLUSION OF CITIZENS FROM JURY SERVICE BASED UPON A PRIOR PARDONED FELONY CONVICTION VIOLATES THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION .................................................... 122

XI.    CUMULATIVE ERROR REQUIRES REVERSAL OF MR. KENNEDY'S CONVICTION ............................................................................................... 124

MR. KENNEDY IS ENTITLED TO AN EVIDENTIARY HEARING .................................... 125

**CERTIFICATE OF SERVICE** ............................................................................ 127

# INTRODUCTION

L.H. was brutally raped on March 2, 1998.  For the next eighteen months, she insisted that she was raped by two teenage boys.  The State arrested Patrick Kennedy based upon a claim that he had made phone calls to his work and a carpet cleaner prior to calling 911.  The State also claimed that blood on the victim's mattress established that the victim was raped in her bedroom, rather than outside as L.H. and Mr. Kennedy asserted.  During these eighteen months, the State held Patrick Kennedy in custody, did not disclose favorable scientific evidence indicating that the blood stain was irrelevant to this case, and did not disclose phone records reflecting that Mr. Kennedy had made no such phone calls.

Defense counsel secured a videotape of L.H., in October of 1999, in which L.H. and her mother made clear that they were being pressured by the State to identify Patrick Kennedy as the perpetrator, and that he was not.  Defense counsel failed to cross-examine either L.H. or her mother concerning statements made on the tape, or seek to introduce the tape at trial.  Instead of granting the defense a hearing on its *Brady* and *Ineffective Assistance of Counsel* claims, the State court simply denied them on the pleadings.  The court confected a newly minted rule, singularly applied to Mr. Kennedy, that in order to get a hearing in state court a petitioner not only had to allege facts which if proven true would warrant relief, but also had to introduce the actual evidence proving he is entitled to relief.[1]  Petitioner, Mr. Kennedy, moves through counsel for an evidentiary hearing to address the claims identified in this Petition.

---

[1] There is no discussion of how one introduces evidence prior to a hearing.

## JURISDICTION

Jurisdiction is proper under the Antiterrorism and Effective Death Penalty Act ("AEDPA") if the petitioner is "in custody" under the conviction he is attacking. 28 U.S.C. § 2254(a). Mr. Kennedy is confined at the Louisiana State Penitentiary in Angola, under a conviction for aggravated rape and sentence of life imprisonment which he is attacking through this Petition. Accordingly, this Court has subject matter jurisdiction over Petitioner's claims for relief.

## VENUE

An action under 28 U.S.C. § 2254 may be filed in either "the district court for the district wherein such person is in custody or in the district court for the district in which the petitioner was convicted." Mr. Kennedy was convicted in the 24th Judicial District Court; thus, venue is proper in the Eastern District of Louisiana.

## TIMELINESS

Generally, AEDPA requires that a state prisoner bring his § 2254 claims within one year of the date on which his conviction became final. Pursuant to 28 U.S.C. § 2244(d)(1)(A), Mr. Kennedy's one-year limitation period for seeking federal habeas corpus relief commenced running on the date the judgment "became final by the conclusion of direct review or the expiration of the time for seeking such review." After Mr. Kennedy's sentence was reversed by the United States Supreme Court on direct appeal, the Louisiana Supreme Court remanded the case to the district court for resentencing. The district court sentenced Mr. Kennedy to life without benefit of parole, probation, or suspension of sentence on January 7, 2009. At the resentencing, the district court stated that Mr. Kennedy had thirty days—until February 6, 2009—within which to appeal his sentence. Thus, because Mr. Kennedy did not appeal his sentence, on February 7, 2009, AEDPA's one-year statute of limitations began to run. *See Butler*

5

*v. Cain*, 533 F.3d 314, 317 (5th Cir. 2008) ("a conviction becomes final when the time for seeking further direct review in the state court expires.") (quoting *Roberts v. Cockrell*, 319 F.3d 690, 694 (5th Cir. 2003)); *Burton v. Stewart*, 549 U.S. 147 (2007) (in criminal case, judgment includes conviction and sentence, so the AEDPA "limitations period did not begin until both his conviction and sentence 'became final by the conclusion of direct review or the expiration of the time for seeking such review,'"); La. C. Cr. P. art 914 (providing 30 days to file a notice of appeal in a criminal case)

315 days later, on December 17, 2009, Mr. Kennedy timely filed an Application for Post-Conviction relief.  The AEDPA statute of limitations is tolled for the period during which a properly filed application for state post-conviction relief or other collateral review attacking a conviction or sentence is pending in state court.  *See Roberts v. Cockrell*, 319 F.3d 690, 694 (5th Cir. 2003).  So at the point the Application for Post-Conviction Relief was filed, the clock was stopped with 50 days remaining.  Mr. Kennedy's state post-conviction relief proceedings remained pending until the Louisiana Supreme Court denied writs on April 1, 2011.  Mr. Kennedy had until May 21, 2011, to file this Petition for Writ of Habeas Corpus with this Court.  Accordingly, this Petition is timely.

## EXHAUSTION

Mr. Kennedy has exhausted available state remedies as required by AEDPA.  Under AEDPA, a state prisoner must first exhaust his remedies in state court before seeking habeas relief from the federal courts.  Exhaustion requires that a petitioner fairly present the substance of his claim to the state courts.  "The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court, either through direct appeal or state habeas proceedings." *Goodrum v. Quarterman*, 547 F.3d 249, 256 (5th Cir. 2008).

Each claim presented herein was fairly presented in Mr. Kennedy's applications for writs of certiorari and review to the Louisiana Supreme Court, in briefing on direct appeal, and/or in his Application for Post-Conviction Relief and application for writs following its denial. Accordingly, Mr. Kennedy has satisfied AEDPA's exhaustion requirement.

### STATEMENT OF FACTS

At 9:18 a.m., on March 2, 1998, Patrick Kennedy called 911 to notify the authorities that his step-daughter L.H. had been raped.  Deputy Michael Burgess arrived at the scene between 9:20 and 9:30 a.m.  He immediately went to the side of the house where he observed a pool of blood in the grass.  R. 4501.

Deputy Burgess then went into the house where he observed Mr. Kennedy on the phone, clearly distraught, discussing what happened to his step-daughter.  Mr. Kennedy brought the deputy to his step-daughter, and attempted to answer all of his questions.  L.H. reported that two teenage boys approached her while she and her younger brother were selling Girl Scout cookies in the garage, and that they took her out of the garage and around the side of the garage and raped her.  R. 4510, 4528.  The younger brother, though afflicted with a speech impediment, took Deputy Burgess around the side of the garage and pointed to the site of the rape, where Deputy Burgess and detectives found spots of blood on the grass.  R. 975 ("So, I took him [step-son] downstairs and he took me between the two houses and showed me where it happened, where upon arrival on that spot I found a spot of blood. I dug it up . . ."); R. 4530.

The State proceeded to secure four separate search warrants and seized numerous items, including carpet samples, a bedspread, blankets, grass and sod, and other material.  The mattress pad from the underside of L.H.'s bed and a number of carpet samples had blood on them.

When L.H. was taken to the hospital, she again reported that she was raped by two teenage boys after being led from the garage and into the corridor between the houses.[2]  R. 4777. L.H. reported the same description of the perpetrators the next day.  *See* R. 4879.  She repeated the same chronology to the detective several more times.  R. 4929.  A few days after the offense, she told a psychologist and social worker the same version of events.  R. 4936.

In the meantime, Sheriff Harry Lee made numerous statements to the public that he would do everything it takes to obtain an arrest in this case as soon as humanly possible, including resorting to racial profiling.  Without authority, he offered prosecutorial immunity to one of the two rapists who turned the other in.  Tara Young, *Witness Sought in Rape of Girl Lee Offers Cash and Immunity*, TIMES PICAYUNE, March 5, 1998, at A1.  He instructed law enforcement agents that "every black male who has been in the neighborhood . . . is a suspect." Tara Young, *Black Men Debate Sheriff's Tactics Civic Group Backs Lee in Rape Case*, TIMES PICAYUNE, March 7, 1998, at A1.  He made a similar statement the next day: "*I'm going to catch that bastard, and when I catch him, he is going to be black*," Lee said. "I just don't give a damn what people think about me anymore."  Lolis Eric Elie, *Lee Exploits White Fears*, TIMES PICAYUNE, March 13, 1998, at B1.

After L.H.'s attorney instructed the Sheriff's Office not to have any further contact with the girl until a full psychological examination was performed, Lee stated that "We will absolutely talk to this little girl again."  Tara Young, *Saints Raise Money for Rape Victim*, TIMES PICAYUNE, March 13, 1998, at B1.

---

[2] Dr. Benton noted that "after two days the swelling is gone" and that the genital area came "back to normal in two weeks."(R. 5744).  Office of Community Services records also reflect that L.H. did "not have any problems resulting from the abuse."  OCS Records, at 9.

Within days of the crime and despite L.H.'s assertion that she was raped by two neighborhood teenagers, the Jefferson Parish Sheriff's Office concluded that Mr. Kennedy was the perpetrator.  Tara Young, *Stepdad Suspect in Rape of Girl in Jeff House Searched after 2 Lie Tests*, TIMES PICAYUNE, March 6, 1998, at A1.  The Sheriff's Office sent the evidence seized at the scene of the rape to Henry Lee of the Connecticut Laboratory to be tested, but before test results came back, Lee was already convinced that Mr. Kennedy had committed the rape.  Tara Young, *Carpet in Raped Girl's Home Seized, Sheriff: Stepdad is Main Suspect*, TIMES PICAYUNE, March 8, 1998, at B1.  Mr. Kennedy was arrested before the Sheriff's Office received even preliminary analyses of the carpet samples and clothing from the lab.  Nevertheless, Harry Lee stated to the media that Henry Lee had "called him and confirmed his suspicions that the stepfather, who booking sheets list as 6 feet 4 inches tall and 375 pounds, had lied."  Tara Young, *Stepdad Arrested in Rape, Evidence Destroyed in Cover-Up, Lee Says*, TIMES PICAYUNE, March 11, 1998, at A1.

The Child Protection Services were engaged on April 7, 1998, and L.H. was removed from her mother's home.  *See* Department of Social Services, Referral Form of 4/7/1998, at 1. The investigating officer observed that the reason for the removal was that "Mrs. Kennedy believes the story that her daughter tells her about two strangers dragging her from the garage and raping her on the side of their house.  Mr. Kennedy repeats the same story except that the physical and forensic evidence do not support that story."  *Id.* at 4.[3]  Department of Social Services social workers identified the problem that required the initiation of "treatment" and removal from home as:

---

[3] On the contrary, no physical or forensic evidence linked Mr. Kennedy to the rape.

> allegations of sexual abuse by step-father; mother is denying abuse; child has
> alleged other perpetrators, however evidence points to step-father.  Child removed
> from home to protect her from negative influences.

Department of Social Services, June 18, 1998, pg. 1.[4]

At the time of these interviews, the JPSO Detectives believed that the rape had occurred in L.H.'s bedroom, by Mr. Kennedy, based upon their discovery of blood evidence on the underside of L.H.'s mattress.  As lead detective testified at the preliminary hearing, this biological evidence—sent to the Connecticut Crime Laboratory—formed the basis for the detectives' belief that Mr. Kennedy had committed the rape.  R. 866.  At that time there was no evidence beyond the conjecture of the investigating officers that "pointed to her step-father."

The Department of Social Services laid out three goals that Mrs. Kennedy needed to achieve before she could secure custody of her daughter again: "1) Enable Ms. Kennedy to support child emotionally; 2) enable Ms. Kennedy to be objective concerning evidence; 3) enable Ms. Kennedy to become more independent."  *See* Department of Social Services, Quarterly Report Dated June 15, 1998, at 1.   Plainly, the Department of Social Service workers were informed by the Jefferson Parish detectives investigating the case, that the physical evidence demonstrated that Mr. Kennedy committed this offense.

The Department of Social Services, OCS worker's report dated June 15, 1998, reflected that Mrs. Kennedy was able to regain custody of her daughter by making the following progress toward her the completion of her goals:

---

[4] Office of Community Services records reflect that L.H. also appeared to recover quickly from the emotional trauma, with L.H. indicating no fear or psychological disturbance:

> appeared to be a very active and friendly 8 year old.  She did not appear distraught,
> depressed or in any way saddened by the event of the rape.

Department of Social Services, Child Protection Records, CPI Referral Form 4/7/1998, at 2.

    1. *Ms. Kennedy has been able to tell her child that she believes that her step-father molested her,* initially Ms. Kennedy supported her husband over her child. She now feels he is probably the one who molested the child even though the child still states that young boys were the rapist.

    2. Ms. Kennedy has yet to see the evidence which the District Attorney has; she feels that Mr. Kennedy is capable of committing the crime because of his behavior since he was incarcerated.

Department of Social Services, Quarterly Report Dated June 15, 1998, at 2. While Mrs. Kennedy emphatically disputed at trial that the Department asked her to "change her views" on the evidence, or communicate her new views to her daughter, the documents reveal otherwise.[5] R. 5386. Mrs. Kennedy was never impeached with the documentary evidence that established that "changing her views" on the offense was a prerequisite to regain custody of her daughter.

    Despite her mother's efforts, L.H. continued to insist that she was raped by two young boys. She then reported the same to defense counsel and his investigator. R. 4422, 5819. Indeed for over a year and a half, including the time during which she was taken from her home and placed in state custody, L.H. insisted that she was raped by two unknown teenagers. R. 5820.

    In October of 1999, defense counsel and an investigator went to Mrs. Kennedy's home and, with her consent, conducted a videotaped interview of L.H. and Mrs. Kennedy. The videotape reveals that L.H. continued to maintain that Patrick Kennedy did not commit the rape, that prosecutors and OCS workers were pressuring L.H. and Mrs. Kennedy to identify Patrick as the rapist, and revealed Mrs. Kennedy's view that the prosecutors in the case had exhibited no care or concern for her daughter. It was turned over to the state as part of the defense discovery

---

[5] Just one month earlier, Mrs. Kennedy had told the press that she stood by L.H.'s story that "two men grabbed her from her front yard, where she was sorting Girl Scout cookies with her brother, and took her to the back yard of a vacant house next door, where one man raped her." Tara Young, *Rape Victim in State Custody, 8-Year-Old Taken From Mother*, TIMES PICAYUNE, April 16, 1998, at A1.

obligation.    Significantly, this videotape—which contained compelling evidence of Mr. Kennedy's innocence and the abuse of process engaged in by the Jefferson Parish Sheriff's Office—was never introduced at trial.

As soon as this tape was turned over to the prosecution, Mrs. Kennedy was brought into custody and was once again threatened with the removal of her daughter.  L.H. then gave a taped statement to OCS investigators, for the first time asserting that Patrick Kennedy had committed this offense.

A victim-advocate working with the Sheriff's Office and District Attorney's Office was present throughout the process.  Neither Mr. Kennedy nor his counsel were present during the taking of the statement, which was ultimately introduced at trial to bolster L.H.'s testimony.

During this period, the State justified the detention of Mr. Kennedy on the physical evidence taken from the crime scene and the allegation that he made several phone calls between 6:15 and 8:00 a.m., to his work indicating he was unavailable because of his daughter's first menstrual cycle and to a carpet cleaning agency concerning the need to remove stains from his carpet. While much of the State's claims of guilt were predicated on these phone-calls, records from Bell South reflect that neither call was made.  *See* Phone records.

Ultimately, there was no physical evidence connecting Mr. Kennedy to the crime.  Based on the videotaped accusation of L.H. and testimony from the recipients of the alleged phone calls, Mr. Kennedy was convicted of Aggravated Rape of a victim under 12, and sentenced to death.

## PROCEDURAL HISTORY

Patrick Kennedy was arrested and charged with aggravated rape on March 10, 1998. R. 121.  Mr. Kennedy immediately insisted upon his innocence and moved for a speedy trial.  R. 2, 90. A Jefferson Parish grand jury indicted Mr. Kennedy on May 7, 1998, for "aggravated rape

upon a female juvenile under the age of 12 years" in violation of La. R.S. § 14:42.  R. 83.  The two primary bases for the arrest and indictment were (1) discrepancies in the timing of events and phone calls made before Mr. Kennedy called 911, and (2) blood found on the underside of the mattress in L.H.'s room.  Indeed, the State specifically identified Mr. Kennedy as the perpetrator by reference to results of tests performed on physical evidence.

For the first eighteen months after the offense, L.H. repeatedly informed the State that she was raped not by her step-father but by two unknown teenage boys. The State secured at least one videotape detailing that statement, taken on March 6 and 7 of 1998.   The State, however, for much of the pre-trial period claimed that no such videotape existed. Indeed the prosecutor at one point vociferously claimed that L.H. had never done an interview in March of 1998:

> Prosecutor:    And like I said . . . I know this little girl did not go to the Child Advocacy Center in March of 1998 and give – the only interview that she had was in December of 1999.

R. 1168.    The prosecutor's claim that no exculpatory videotape existed was ultimately proved untrue, and the State finally acknowledged the existence of the initial videotape and agreed to provide a copy to the defense.  However, the State had resisted giving that exculpatory videotape to the defense until well after L.H. had changed her story.

**Late Disclosure of Exculpatory Evidence**

The State also failed to timely turn over physical evidence for defense testing, and to turn over exculpatory reports of testing performed by the Connecticut Crime Laboratory. As indicated in the State's Response to the Defense Request for Bill of Particulars, discussed below, the State initially attempted to identify Mr. Kennedy as the perpetrator by reference to tests performed on physical evidence. These claims were necessary because, at the time of the offense and for the next eighteen months, L.H.'s statements made clear that Mr. Kennedy was not involved.  On July

17, 1998, the defense filed an initial motion for discovery. R. 111. One of the critical questions in the Bill of Particulars concerned the manner in which the State identified appellant as the perpetrator.  The defense inquired:

> Identification of the Defendant . . .14. a.   If said identification was by real, demonstrative or tangible evidence, such as, but not limited to look, hair, fingerprints, clothing, etc, where, when and by whom was said evidence obtained?

R. 117.  On August 26, 1998, the State's response indicated that Mr. Kennedy was identified as the perpetrator by the physical evidence seized at his residence, specifically pointing to the testing of Dr. Henry Lee.  The State's response was:

> 14. a.  See reports of forensic analysis by Dr. Henry Lee provided. Reports of forensic analysis by the Jefferson Parish Sheriff's Office will be provided upon receipt by the District Attorney.

R. 137.  *See also* R. 140 (State's Response to question no. 53).  While the State did in fact turn over some of the reports generated by the Connecticut Crime Laboratory, if failed to turn over the key reports.

At the time of the State's response, the Connecticut Crime Laboratory had in fact conducted tests on blood from the mattress pad.  But unlike the representation in the State's response to the Bill of Particulars, those results indicated that the blood on the mattress *pad did not match the victim or the defendant*.  The results of this testing were not included in the reports turned over to the defense until after trial began.

The defense repeatedly tried to secure access to the reports. R. 948-1048  (hearing of November 12, 1999 concerning discovery); R. 1091 (noting in hearing on January 20, 2000, that State had promised to provide discovery of certain documents but had failed to do so; State given ten days to comply with discovery);  R. 21 (minute entry of hearing of February 11, 2000, noting discovery is now due March 15, 2000).

With a trial setting less than two months away, and the defense without complete discovery, the trial court—on April 7, 2000—specifically ordered the State to review its discovery and ensure that the defense had all of the reports relevant to the case within ten days. R. 1137 ("It's rather odd that I'm having to remember somewhere in one of those professionalism lectures; what we ought to do, and now I find myself in a position of having to order it. I'm ordering so. . . . I can't order the State to be professional, nor can I order the -- Well, I can, but I'm not inclined to do so.").    The exculpatory Connecticut Crime Laboratory documents were still not disclosed.

The trial court became increasingly frustrated, noting that the "certificates of service" were "cavalierly" being placed on motions and notices. *See, e.g.,* R. 1135. When the State repeatedly indicated that it did not know whether information had been turned over to the defense, the trial court recalled:

| | |
|---|---|
| The Court: | I'm recalling a program called Hogan's Heros. You remember Hogan's Heros. Is there anybody in this Courtroom other than the bailiff who is old enough? There was a rather large German corporal in that program, what did he use to say? |
| Prosecutor: | Sgt. Schultz? |
| The Court: | Sgt. Schultz. |
| Prosecutor: | I know nothing. |
| The Court: | I don't know nothing. Your words remind me of his dialogue. |

R. 1379.

Well prior to trial, the defense again moved for disclosure of blood spatter reports and all scientific test results. See Motion for Production of Reports, filed September 12, 2001. R. 412. The matter ultimately came for a show-cause hearing on Thursday, September 20, 2001, where the trial prosecutor stated: "I have not yet had a chance to check with Dr. Lee in the Connecticut

State Police, as well as Lt. Buras to determine whether or not any reports were generated." R.
1880.  The trial court again specifically ordered the State to disclose all test results by the
following Tuesday, September 25, 2001.  *Id.*  Again this was not done.  At trial—over defense
objection—the State introduced the testimony of Dr. Henry Lee, on issues of blood spatter and as
well on the significance of the apparent grass blade breakage rate where Mr. Kennedy indicated
that the offense occurred.  No report concerning this analysis was ever provided to the defense.

Not only did the State fail to turn over the exculpatory reports, but the State also resisted
providing the defense access to the actual physical evidence.  It took the defense three years and
two separate threats of contempt of court to secure independent testing of the physical evidence,
including the mattress pad.  *See* R. 34, R. 1831 ("The Court:  Milton Dureau. Can't wait to hear
how the director of the lab gets to interpret orders that are rather straight forward on their face.
Get him here."); R. 1846 (noting State had not sent evidence at least one month after it had
received order to do so); R.1848 (indicating that trial court did not place the JPSO Lab Director
under oath concerning his failure to transmit evidence based upon his desire not to have to "send
[him] back to the correctional center" for a "vacation.").  Over this period, again and again the
State had withheld its own exculpatory testing results that indicated that the blood found on the
mattress pad did not belong to the defendant or victim in this case. During this lengthy interval,
L.H.'s version of events transformed from a detailed exculpatory statement into a generic
accusation against Mr. Kennedy.  The State's delay in turning over the evidence required the trial
court to continue the September 10, 2001, trial date.

On January 14th, 2002, the State moved for a continuance claiming surprise at the
independent findings—that the blood on the mattress pad did not match the defendant or victim.
Unbeknownst to the defense or the trial court, the Connecticut Laboratory had conducted tests on

16

the mattress pad that was consistent with the defense's testing—reflecting that the rape had *not* occurred on L.H.'s mattress, and that Mr. Kennedy had *not* attempted to conceal the evidence by reversing the mattress.  Nonetheless, the court granted the State's continuance.

On July 23, 2003, the State again filed a motion to continue the trial due to the unavailability of witnesses from the Connecticut State Police Forensic Science Laboratory, including Dr. Debra Messina.  *See* R. 54.  The matter was rendered moot when the defense agreed to stipulate to the authenticity of the reports attached to the motion for a continuance. Notably, the one report that reflected the State's unsuccessful efforts to match the blood on the mattress pad to the victim or the defendant was not included with those attachments. With no knowledge of the Messina report, the defense agreed to stipulate to the authenticity of the documents.

When the case finally came to trial on August 15, 2003, the defense in opening statements made its theory of the case crystal clear:

> They found a mattress, it was the mattress on Lavelle's bed and it had blood on it, and it was turned over so that the blood was on the bottom side. Lord, they found their man, they found their man, because guess what, that didn't match up to the story about her being raped outside, she was raped in her own bed, right?

> Her story is, she was raped outside, his story is, she was outside. Now they have their man because he's lying, right? Well guess what they never bothered to do, they never bothered to test the blood and find out if it was really hers. Well, we tested it, and it was not hers, there was not any chance that it's hers. And you're going to hear testimony about that. You're going to hear testimony from her, at this point, today–not today, but in this trial, that she was raped in that bed, but that blood is not hers.

R. 4420-21.

Midway through the trial proceedings, defense counsel was able to view mattress pad for the first time.  The State concurred that the defense had been prevented from looking at the mattress pad until after the trial began but claimed it wasn't intentional.  R. 4972 ("The State: . . .

There was nothing intentionally being hidden"). When the defense looked at the mattress pad, it became clear that the State had conducted its own tests on the mattress pad but failed to inform the defense of the results.

The defense's motion for mistrial, or in the alternative to recess the trial so that counsel could secure witnesses from out of state concerning the prosecutor's fidelity to their Brady obligations, interrupted the trial and took several days. During this hearing, the trial court encapsulated the State's peculiar explanation concerning the absence of these scientific witnesses:

> What counsel has informed the Court, . . and this may or may not be on the . . . record . . . was that a) no subpoenas had ever been issued to Dr. Lee's laboratory, to Dr. Lee or any of his assistants at any time during the past five years. Secondly, . . . Dr. Messina, it would seem was the lead analyst in this case, the forensic scientist and that her presence would have to be here. All the State indicated to this Court was [] that some emergency surgical procedure or some surgical procedure had to be performed, the nature of which was not disclosed, you don't know it. Secondly, I sure don't know what it is.  Thirdly, I don't even know if it was elective or not. As a matter of fact, I got the impression that there was something secretive about this and nobody is supposed to know the circumstances of that. Fourthly, nobody told me when this surgery was to occur. The next thing the State informed me of was that, and I might say with some frustration, Mr. Rowen, that the District Attorney's Office was informed by Dr. Lee that he couldn't come because he was to be out of the country. I think it was the Philippines. And then we of course, we look at the, is it the Fox News cite? And we discover that, in fact, he's in California involved in the Lacy Peterson case.

R. 5269-70.  Nevertheless, the trial court denied the motion for mistrial and a recess; the State was able to secure the helpful (to the State) testimony of Dr. Henry Lee and Mr. Abramowitz; however, the defense was unable to present the testimony of Dr. Messina, who approved the exculpatory report and apparently would have been responsible for transmitting the results to the prosecution. The trial court also denied the defense request for an additional opportunity to make opening statements at the outset of the defense's case, as a remedy for the State's discovery violations.

**Grand Jury Discrimination**

On August 20, 2001, the defense moved to quash the indictment due to the history of race and gender discrimination in the selection of grand jury forepersons in Jefferson Parish. R. 403. The defense also filed a subpoena ducus tecum requesting records of the race and gender of the grand jury forepersons from 1959 to the present. R. 414. At a hearing on September 20, 2001, over defense objection, the trial court ruled that the subpoena would be limited to grand jury records for a period of ten years prior to and including the one that indicted Mr. Kennedy. R. 1876. The defense filed a motion to reconsider the ruling, and cited numerous grand jury discrimination cases which considered "a significant period of time" at least 16 years and as much as "a lifetime," but the motion was denied. R. 434. Five months passed and several hearings were held on the topic of who had the records before the records were finally provided to the defense. See R. 1913-2004. At the hearing on the Motion to Quash, the defense presented evidence that in a parish that was approximately 20% African American and 50% female, only 2 African Americans and 9 women were selected as grand jury foreperson in the last 36 grand juries empaneled. The defense further presented expert testimony establishing that the chances of only 9 women being selected foreperson in 36 grand juries was approximately 1 in 70,000. In other words, the expert testified, the likelihood of there being no unconstitutional gender discrimination was less than the probability of being struck by lightning. R. 2099. The trial court found a prima facie case of discrimination. R. 2122. The State then presented a former prosecutor (now judge), who testified in that any minorities or women who were selected foreperson were only selected because of affirmative action policies in which race and gender were taken into account during selection. R. 2128. The trial court, satisfied with the State's "rebuttal," ultimately found no race or gender discrimination. R. 2144.

On writs, the Louisiana Fifth Circuit acknowledged that the trial court's finding that the State had rebutted the prima facie case had been incorrect.  However, the court reversed the initial finding of a prima facie case.  The court based this reversal on its consideration of a shorter period of time than was presented at the hearing, and included in its analysis the grand jury that was convened *after* Mr. Kennedy was indicted in order to include the African American who served as foreperson of that grand jury.

**Gruesome Photographs**

Prior to trial the defense moved to exclude gruesome photographs. R. 623. The defense indicated that it would stipulate that L.H. was raped and would accept the use of diagram drawings. The trial court ultimately limited the State to a specific number of five-by-seven photographs. At trial, the State, over defense objection, introduced a series of additional photographs, two of which were approximately eight-by-ten close-up pictures of L.H.'s genitalia.

**The State's Case at Trial**

Jury selection began on August 8, 2003. R. 55. Opening statements were made on August 15, 2003, and the trial began the next morning.  The defense had moved prior to trial to assess the competence of L.H. to testify, R. 626-28, but the trial court refused the request.  R. 2470.   At trial, cross-examination of L.H. was made near impossible based upon her lack of memory of preceding events, as she repeatedly indicated that she could not remember what she had occurred or what she had said previously.

L.H. was brought to the stand by the State and left for a period of five minutes in front of the jury, crying, before the second prosecutor appeared and began questioning.  The trial court chastised the prosecution for engineering this display, but denied the defense request for a mistrial.  The entirety of the State's questioning of L.H. concerning the offense is below:

Q. And you're here because something happened to you in back in 1998, you understand that?

A. Yes.

Q. Do you remember what happened to you in 1998?

A. Yes.

Q. I want you to tell the ladies and gentlemen over here, I know as hard as it is, tell them what happened to you back then.

A. I woke up one morning and Patrick was on top of me and --

R. 5336-37.  L.H. then broke into tears, and the prosecution requested a recess.  The defense unsuccessfully requested a mistrial again based upon the continued dramatic interplay and emotional outbursts.

Thereafter the prosecution played a videotape recording of L.H.'s prior statement.  R. 5344.  At the end of the tape, the trial court acknowledged: "Obviously this is an emotional moment in this trial and I'm saying this to counsel for both sides as well as everybody in the spectator's seats, alright."  R. 5344.  As defense counsel noted after the playing of the tape:

The record needs to reflect that during the entire twenty-three or twenty-four minute tape, the victim was on the witness stand crying. I am certainly not impugning, I'm not suggesting anything other than it was prejudicial.

R. 5346.  In response to the defense motion for a mistrial, and the repeated emotional outbursts that occurred, the trial court indicated that it would instruct the jury that

I'm going to instruct this jury on the record to disregard anything they've seen on the witness stand in terms of, if they saw any emotional displays or outbursts, okay, and confine their attention to the evidence presented and nothing more.

R. 5351-5352.  The State objected to the instruction.  R. 5352. At the State's behest, the trial court decided not to give the instruction. R. 5353.  The prosecutor then completed its questioning of L.H.:

BY MR. PACIERA: You're alright?

21

A:      Yes.

Q:      Okay, when we looked at that tape, that was I think from December of 1999. You were a lot younger then?

A:      Yes.

Q:      And that was almost a year and a half after this happened to you, is that right?

A:      Yes.

Q:      So when this happened to you, you were even smaller and younger?

A:      Yes.

R. 5454.   The court then admonished the prosecution to stop leading the witness.

L.H. then testified that she had initially told the police that "two black boys had raped me." R. 5355.  She indicated that that was not true.  Thereafter, the prosecutor turned to events that occurred after the rape:

Q:      Who was home the day that this happened?

A:      Me, my brother and Patrick.

Q:      And where had your mom gone?

A:      To work.

Q:      Was it still early morning or mid day or do you remember what time this happened?

A:      Morning.

Q:      After this happened to you, what did Patrick do?

A:      He got up, I'm not sure where he went but he left my room and he came back.

Q:      Did he have anything when he came back?

A:      No.

Q:      Was he carrying anything?

A:      No.

Q:      Okay, was there some point when he came in and he was carrying anything?

A:      Yes.

Q:      What was he carrying?

A:      A cup of orange juice and pills chopped up in it.

Q:      And what did he do with the orange juice with the chopped up pills?

A:      He gave it to me.

Q:      Now after this happened to you, did it injure you, did you bleed? Not the orange juice, when you were raped.

A:      Yes.

R. 5359-5360.  After the State introduced the word "rape" into the discourse, the prosecutor then

proceeded to ensure that the witness identified Mr. Patrick Kennedy as the perpetrator:

Q:      The person, Patrick, that you said did this to you, I want you to point to him right now.

MR. PACIERA:      Please let the record reflect that the witness is pointing to the defendant, Patrick Kennedy

MR. PACIERA:      Is everything that you're saying in this courtroom today the truth?

A:      Yes.

Q:      Did you hear yourself when you were on that tape from December of 1999?

A:      Yes.

Q:      Is everything you heard on the there the truth?

A:      Yes.

Q:      That this person raped you?

A:      Yes.

Q:      Nobody else?

A:      Nobody else.

Q:      In your room?

A:      In my room.

R. 5363.   When defense counsel attempted to cross-examine L.H. she indicated that she could not remember what had happened or what she had said at least sixteen times during a six page cross-examination.[6]

The jury was then left to decide whether L.H. initial statements to the police, psychologists, and lawyers over the first 18 months after the rape were the truth, or whether her testimony fraught with mis-rememberences, devoid of detail, and prompted by the leading questions of the prosecutor, was accurate.  The State was able to bolster her testimony with her prior videotaped statement, and with the testimony of her mother (Mr. Kennedy's ex-wife) who reported, over defense objection, out-of-court statements made by L.H. several years after the offense.

The defense was able to present some evidence that the Department of Social Services had placed pressure on L.H. and her mother to name Patrick Kennedy as the perpetrator, but was not able to elicit evidence from the lead detective that another suspect had made statements against penal interests. R. 4909, see also R. 5279.  The State did not correct Mrs. Kennedy's

---

[6] See e.g. R. 5365 ("Not at that time, I don't."), R. 5365 (doesn't remember Mr. Armato coming to see her); R. 5366 (doesn't remember Mr. Armato at her house): R. 5366 (doesn't remember telling him somebody else did it.); R. 5366 (doesn't remember giving another videotaped statement); R. 5366 (doesn't remember talking to another therapist); R. 5366 (doesn't remember talking to Ms. Renee, one of the police officers on the case); R. 5366 (doesn't remember Detective Kelly); R. 5367 (doesn't remember going with policemen to a doctor's office); R. 5367 (doesn't remember when Patrick was in jail) R. 5368 (remembers "some of it" about the time that she first said that it was Patrick that did this to her); 5368 (doesn't remember how long ago that was); R. 5368 (doesn't remember if talking to her mom was "right before" making tape with Ms. Amalee); R. 5369 (doesn't remember first time she met with D.A.s); R. 5369 (doesn't remember whether she met with D.A.s around the time she made the tape); R. 5370 (doesn't recognize Defense No. 5).

assertion that she was never pressured into encouraging her daughter to identify Patrick Kennedy as the perpetrator.  Indeed, Mrs. Kennedy testified:

> Q.     Okay, now up until when she told you this, did you all talk about the incident, the rape?
>
> A.     Never, never.
>
> Q.     Okay, did anyone pressure you or your daughter to say that Patrick Kennedy did this?
>
> A.     No.

R. 5378. Moreover she claimed: "Me and her never discussed what happened to her."  R. 5381.

> Department of Social Services records reflect:
>
> Since the last hearing on June 2, 1998, Mrs. Kennedy has continued to make progress.  She has actively participated in weekly individual therapy sessions with Deanna Miles CSW at Center for Change.  According to Ms. Miles' report, Mrs. Kennedy was able to tell her daughter that she believes that her step-father molested her.  This discussion took place during a family visit on May 19, 1998, the child listened to her mother, but maintained her story of being attacked by two boys.

June 18, 1998 progress report letter to Judge Janzen, p. 2 of 3.

Without this evidence, the jury proceeded to deliberate at 4:47.  The minutes reflect that the jury presented a note to the court.  The transcript does not reflect how this was addressed. *See* R. 5908.  At 6:25 p.m. on August 25, 2003, the jury returned with a guilty verdict. R. 5909

Less than 24 hours later, the jury returned a death verdict based upon two aggravating circumstances: (1) that the defendant committed aggravated rape, and (2) that the victim was under the age of twelve. R. 82. On October 2, 2003, the trial court formally sentenced Mr. Kennedy to death.  R. 6068.

### Appeal

The Louisiana Supreme Court affirmed Mr. Kennedy's conviction and death sentence on direct appeal on May 22, 2007.  *State v. Kennedy*, 05-1981 (La. 5/22/07), 957 So. 2d 757.  The

United States Supreme Court subsequently granted certiorari and held that the Eighth Amendment does not permit the State to impose the death penalty as punishment for the rape of a child. *Kennedy v. Louisiana*, 554 U.S. 407 (2008). The State's *Application for Rehearing* was denied on October 1, 2008. *Kennedy v. Louisiana*, 129 S. Ct. 1 (2008). After the Louisiana Supreme Court remanded the case for resentencing, *State v. Kennedy*, 05-1981 (La. 11/21/08), 994 So. 2d 1287, the district court sentenced Mr. Kennedy to life imprisonment on January 7, 2009.

**State Post-Conviction**

Mr. Kennedy, through counsel, timely filed an Application for Post-Conviction Relief with the 24th Judicial District Court on December 17, 2009. In the Application, Mr. Kennedy asserted six claims for relief and expressly requested an evidentiary hearing to present evidence and resolve contested questions of fact that directly relate to his claims. On December 29, 2009, the district court ordered the State to respond with an answer within thirty days. The State filed a response on March 15, 2010, disputing many of Mr. Kennedy's factual assertions, but the district court refused to grant a hearing, in violation of La. C. Cr. P. art. 930 (providing that an evidentiary hearing "*shall be ordered* whenever there are questions of fact which cannot properly be resolved [by dismissal upon the pleadings]"). The district court denied all of Mr. Kennedy's claims on April 28, 2010. On July 6, 2010, the Louisiana Fifth Circuit Court of Appeals denied review of the district court's denial of his Application for Post-Conviction Relief. The Louisiana Supreme Court likewise denied review, on April 1, 2011.

This Petition timely follows.

## CLAIMS FOR RELIEF

I.  **RACE AND GENDER DISCRIMINATION IN THE SELECTION OF GRAND JURY FOREPERSONS VIOLATED MR. KENNEDY'S RIGHT TO EQUAL PROTECTION OF THE LAW**

The State of Louisiana unconstitutionally discriminated against women and African Americans in the selection of grand jury forepersons in Jefferson Parish at the time Mr. Kennedy was indicted in May of 1998.  Mr. Kennedy's indictment by a grand jury was infected with racial and gender bias, in violation of his right to equal protection under the Sixth Amendment to the United States Constitution.  Mr. Kennedy raised this issue pretrial in a motion to quash the indictment, which was denied after the trial court found that he had satisfied his burden of making out a prima facie case of discrimination.  The decision of the district court denying the motion to quash, and the subsequent decision of the appellate court reversing the prima facie case finding, were unreasonable applications of clearly established federal law and must be accorded no deference by this Court.  Mr. Kennedy's conviction and sentence must be reversed and a new trial ordered.

A.  **Procedural History**

Mr. Kennedy was indicted by a Jefferson Parish grand jury on May 7, 1998.  Mr. Kennedy filed a Motion to Quash the Indictment on the basis of race and gender discrimination. In it, he alleged that the foreperson of the grand jury that indicted him was a white male; that the procedure for selecting grand jury forepersons was susceptible to abuse; and that there was intentional, discriminatory, and systematic exclusion of blacks and women from the position of grand jury foreperson in Jefferson Parish.  Over defense objection, the state trial court ordered that the relevant time period for purposes of statistical evidence of discrimination would be ten years.  R. 1876.  Counsel for Mr. Kennedy obtained data, however, that spanned the nineteen years prior to, and including, Mr. Kennedy's indictment.  The data was presented at an evidentiary hearing held January 14, 2002.  The defense presented the testimony of an expert in

Quantitative Sociology, as well as a report that outlined the data and statistical analysis.  Based on the defense's evidence, the trial court found a prima facie case.  R. 2122.  The State presented the testimony of Judge Marion Edwards, a former Jefferson Parish prosecutor who had witnessed the selection of grand jury forepersons.  R. 2123-36.  At the conclusion of the hearing, the trial court found that the State had successfully rebutted the prima facie case.

On writs, the Louisiana Fifth Circuit Court of Appeal reversed the trial court's finding of a prima facie case, and the Louisiana Supreme Court denied review over the dissent of Justice Johnson.  *State v. Kennedy*, 02-214 (La. App. 5 Cir. 6/26/02), 823 So. 2d 411, *writs denied*, 02-2088 (La. 1/24/03), 836 So. 2d 43.  On direct appeal, the Louisiana Supreme Court held in the unpublished appendix that "[t]he court of appeal correctly found that the defendant failed to establish a prima facie case of discrimination in the selection of the grand jury foreperson. The instant appeal adds no new considerations for review."  *State v. Kennedy*, 05-1981, unpub. appx. p. 1 (La. 5/22/07), 957 So. 2d 757.  When the claim was raised in post-conviction, the trial court and the Fifth Circuit Court of Appeal both declined to address the merits.  *State v. Kennedy*, No. 98-1425, at 4 (24th J.D.C. April 28, 2010) (order denying post-conviction relief); *State ex rel. Kennedy v. Cain*, 10-418, slip op. at 12 (La. App. 5 Cir. 5/18/10).  The Louisiana Supreme Court denied review of this claim.

### B. Mr. Kennedy Proved Purposeful Discrimination in the Selection of Grand Jury Forepersons in Jefferson Parish

In *Castaneda v. Partida*, 430 U.S. 482 (1977), the United States Supreme Court held that substantial underrepresentation of an identifiable group violates equal protection if it results from purposeful discrimination.  430 U.S. at 493.  *Castaneda* set forth a three-part test for claims of grand jury discrimination.

> The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied. .

> . . Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as [foreman], over a significant period of time. . . . This method of proof, sometimes called the 'rule of exclusion,' has been held to be available as a method of proving discrimination in jury selection against a delineated class. . . . Finally . . . a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing.

*Id.* at 494.  The Court then held, in *Rose v. Mitchell*, that racial discrimination in the selection of grand jury forepersons violates the Equal Protection Clause.  *Rose v. Mitchell*, 443 U.S. 545 (1979).  Such discrimination mandates the reversal of a criminal conviction and sentence.  *Id.* at 551; *see Vasquez v. Hillery*, 474 U.S. 254 (1986).  As is shown in this case, the Court noted in *Castaneda* that, "[s]ometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face."  *Id.*   The Supreme Court stated in *Rose*:  "where sufficient proof of discrimination in violation of the Fourteenth Amendment has been made out and not rebutted, this Court uniformly has required that the conviction be set aside and the indictment returned by the unconstitutionally constituted grand jury be quashed."   443 U.S. at 551; *see Guice v. Fortenberry,* 661 F.2d 496, 499 (5th Cir. 1981).

Louisiana courts have a long history of resisting the Supreme Court's mandates in this field.  *See Campbell v. Louisiana*, 523 U.S. 392 (1998); *Johnson v. Puckett*, 929 F.2d 1067 (5th Cir. 1991); *Guice v. Fortenberry*, 722 F.2d 276 (5th Cir. 1984); *Alexander v. Louisiana*, 405 U.S. 625 (1971); *Eubanks v. Louisiana*, 356 U.S. 584 (1958); *Pierre v. Louisiana*, 306 U.S. 354 (1939).  In *Campbell v. Louisiana*, the Court made clear that Louisiana's (former) grand jury foreperson selection procedure is both subject to the dictates of the Equal Protection Clause and susceptible to abuse:

> In Louisiana, . . . the judge selects the foreperson from the grand jury venire before the remaining members of the grand jury have been chosen by lot . . . (Ohio, Oklahoma, Tennessee, and Virginia use procedures similar to Louisiana's).

> In addition to his other duties, the foreperson of the Louisiana grand jury has the
> same full voting powers as other grand jury members. As a result, when the
> Louisiana judge selected the foreperson, he also selected one member of the grand
> jury outside of the drawing system used to compose the balance of that body.
> These considerations require us to treat the case as one alleging discriminatory
> selection of grand jurors.

*Id.* at 396-97. As a result of the continued discriminatory practices of judges in the selection of grand jury forepersons, Louisiana amended the procedure to instead provide for random selection in 1999. The grand jury that indicted Mr. Kennedy was empaneled in March of 1998; a white male was selected as foreperson. Mr. Kennedy satisfied *Castaneda*'s three part test to prove discrimination in his case. First, African Americans and women are distinct classes that have been singled out for discrimination; both groups are treated the same for grand jury discrimination purposes. *See Rose*, 443 U.S. at 555-56; *Taylor v. Louisiana*, 419 U.S. 522, 530 (1975).

Second, Mr. Kennedy showed substantial underrepresentation over a significant period of time. Jefferson Parish had an average black population of 19.17% between 1979 and 1998.[7] The average black voter registration in Jefferson Parish was approximately 15%. Only **two** out of the **thirty-six** grand jury forepersons chosen during that period (5.5%), however, were black. Women constituted, on average, 52% of the population in Jefferson Parish between 1979 and 1998. Women made up 54% of registered voters in Jefferson Parish during that time period. Only **nine** out of the **thirty-six** grand jury forepersons were women.

Finally, as established in previous cases, the selection procedure has been abused. *See*, *e.g.*, *Johnson v. Puckett*, 929 F.2d 1067 (5th Cir. 1991). The grand-jury-foreman-selection process in Louisiana, in which the district judge appointed the foreman on the basis of his or her

---

[7] Jefferson Parish's black citizens made up 16.68% of the population according to the 1980 census, 17.63% according to the 1990 census, and 23.9% according to the 2000 census.

own subjective criteria after having access to data concerning the race and sex of the grand jury

panel members, is susceptible to discriminatory application.  *Campbell v. Louisiana*, 523 U.S.

392, 396-97 (1998).  A conclusion that Mr. Kennedy did not present a prima facie case must be

unreasonable under clearly-established law as interpreted by the Supreme Court.

1.  **Token Inclusion of Black Citizens of Jefferson Parish Cannot Satisfy the Equal Protection Clause**

At the time Mr. Kennedy was indicted, it is most likely that only three blacks had *ever*

served as foreperson of a Jefferson Parish grand jury.  At the hearing, evidence presented to the

state district court established that between 1979 and March of 1998, there were 36 grand jury

forepersons chosen in Jefferson Parish.  Of these,

- 26 were white men;

- 8 were white women;

- 1 was a black man; and

- 1 was a black woman.

The U.S. census indicates that over this period of time African-Americans made up on average

19.17% percent of the population, and that women made up on average 52% percent of the

population. Furthermore, public records show that during the twenty years preceding this period

(1959-1979), forty-one grand jury forepersons were selected in Jefferson Parish.  All but three

were white men; one was a black man, two were white women, and thirty-eight were white men.

This stark underrepresentation is not surprising, however. Prior to 1959, Louisiana courts

operated under the precarious footing of *State v. Eubanks*, 94 So. 2d 262 (La. 1957), *rev'd*, 356

U.S. 584 (1958), and *State v. Pierre*, 180 So. 630 (La. 1938), *rev'd*, 306 U.S. 354 (1939).  In

*State v. Pierre*, the Louisiana Supreme Court conceded that no blacks had served on local grand

juries since at least 1896, but asserted that four blacks were included on the 300-man venire from

which the defendant's grand jury had been chosen.  *Id.* at 632.  Assuming (based on its notions

of black intelligence) that black illiteracy levels in the parish were well over 90%, the court

declared that four out of 300 was a reasonable proportion.  *Id.* at 633.  The court also held that it

was reasonable for grand jury commissioners to select members of their own race—"[i]t is not

their duty to search the parish for members of the colored race who possess the proper

qualifications merely in order that there be the names of such persons on the roll."  *Id.*  The

United States Supreme Court's reversal of *Pierre* apparently had no real effect on the Louisiana

Supreme Court's method of analyzing claims of grand jury discrimination, however.  In *State v.*

*Eubanks*, where a venire of 750 people in a parish that was 30% black somehow only included

six black individuals, none of whom were chosen to serve, the Louisiana Supreme Court

remarked that "[t]he only reason Negroes were not selected to serve was that the Judge selecting

the Grand Jury thought that the white persons selected were better qualified."  94 So. 2d at 265.

Accordingly, it is no overstatement to assume that prior to 1959[8] no black person was chosen to

serve as a grand jury foreperson in Jefferson Parish.

To analyze these figures, the Supreme Court has applied four types of statistical analyses:

binomial distribution, standard deviation, absolute disparity, and comparative disparity.  *See*

*Berghuis v. Smith*, 130 S. Ct. 1382 (2010) (absolute and comparative disparity); *Castaneda*, 430

U.S. at 496, n. 17 (binomial distribution and standard deviation); *Alexander*, 405 U.S. at 630 n. 9

---

[8] It should be noted that following the Louisiana Constitution of 1898, black citizens effectively lost the
right to vote due to a combination of malicious tactics, including white democratic primaries, intelligence
tests, grandfather clauses, the requirement of having two white men "identify" black registrants, not to
mention horrific beatings and murder.  As grand jury rolls are determined based on voter registration, it is
unlikely that blacks were represented in any accurate sense on the grand jury rolls in Jefferson Parish.
Moreover, from the time women gained suffrage in 1920 until *Taylor v. Louisiana*, 419 U.S. 522, was
decided in 1975, Louisiana operated under an opt-in policy that required women to affirmatively register
for jury service.  This resulted in women being starkly underrepresented in the jury rolls.  *See Taylor*, 419
U.S. at 525-26.

(binomial distribution); *Whitus v. Georgia*, 385 U.S. 545, 552 n. 2 (1967) (binomial distribution). The different methods of analysis are each appropriate for different types of cases.  Binomial distribution analysis, also called statistical decision theory, calculates what the probability of this result occurring by chance; in this context, it measures how likely it is that there was no intentional discrimination.  This analysis is the most appropriate methodology to examine the underrepresentation of a group in the selection of grand jury forepersons.  Although the Supreme Court in *Castaneda* did reference absolute disparity analysis, it explained in a lengthy footnote the methodology for determining whether the difference between two population percentages that would be mathematically significant to a statistician and thus most relevant and informative to the courts.  *Id.* at 496-97 n. 17.  Subsequently, the Court explained and adopted the reasoning of this footnote: "A precise method of measuring such statistical disparities was explained in *Castaneda v. Partida*.  It involved the calculation of the 'standard deviation' as a measure of the predicted fluctuations from the sample."  *Hazelwood School District v. United States*, 433 U.S. 299, 309 n. 19 (1977) (internal citations omitted).

Absolute disparity measures the difference between the percentage of the group in the community and the percentage of that group among those selected (either in the pool of potential grand jurors, the actual grand jury, or as foreperson, depending on the case).  The use of absolute disparity analysis in jury selection claims has been criticized as misleading and unhelpful.  *See Moultrie v. Martin*, 690 F.2d 1078 (4th Cir. 1982) ("[W]e reject the petitioner's and district court's method of evaluating discrimination through the comparison of straight racial percentages. Such methodology is mathematically incorrect, and we are of opinion that it has been rejected by the Supreme Court."); *United States v. Shinault*, 147 F.3d 1266, 1273 (10th Cir. 1998) (pointing out that with absolute disparity, total exclusion of group comprising small

33

percentage of population would result in figure appearing insignificant).  It is most appropriate in cases where there is considerable representation of the group in the population at large and disfavored when the percentage of persons in the group is relatively small.  *See United States v. Rioux*, 97 F.3d 648, 656 (2d Cir. 1996) ("the absolute numbers/absolute disparity method [is] of questionable application when the minority population is a tiny percentage of the entire population").  In such instances, absolute disparity analysis tends to be skewed erroneously against a finding of substantial underrepresentation.  *State v. Gibbs*, 758 A.2d 327, 336 (Conn. 2000).

Comparative disparity is calculated by subtracting the percentage of the group among those selected from the percentage of the group in the whole population (absolute disparity), and then dividing that amount by the percentage of the group in the population.  It is applied to show what percent less (or more) likely the group is to be selected as compared to the rest of the community.  *United States v. Shinault*, 147 F.3d 1266, 1272 (10th Cir. 1998).  Comparative disparity analysis has also been criticized as "distort[ing] reality,"—it tends to artificially inflate the size of the disparity as the group's percentage of the population decreases, and artificially *deflate* the disparity when the group is a more substantial size.  *See United States v. Whitley*, 491 F.2d 1248, 1249 (8th Cir. 1974); *Smith v. Yeager*, 465 F.2d 272, 279 n.18 (3d Cir. 1972).  Accordingly, both absolute disparity and comparative disparity measurements, the Supreme Court has recognized, "can be misleading when members of the distinctive group compose only a small percentage of those eligible for jury service."  *Berghuis*, 130 S. Ct. at 1393 (internal quotations omitted); *accord Thomas v. Borg*, 159 F.3d 1147, 1150 (9th Cir. 1998); *United States v. Rioux*, 97 F.3d 648, 656 (2d Cir. 1996); *but see Mosely v. Dretke,* 370 F.3d 467 (5th Cir. 2004)

("if the distinctive group at issue makes up less than 10% of the population, comparative disparity may be used").

To demonstrate further, absolute and comparative disparity analysis may tell us something, or may tell us very little, about the probability of observing a particular pattern. Disparity analysis does not take into account the size of the sample. If there are ten blacks in a pool of 100 people, for example, and yet a jury of twelve is all white, this is an absolute disparity of 10%, and a comparative disparity of 100%. However, the probability of an all-white jury being selected by chance is 0.28, or 2-in-7. This is not necessarily "significant" in statistical terms. Then, consider the selection of a jury pool of 10,000 persons, all of which turned out to be white. Again, assume that the black population was 10% of the total population, but zero were selected in the 10,000 names. This would again produce an absolute disparity of 10%, and a comparative disparity of 100%. But this time the result would be extremely improbable. For this reason, then, disparity analysis is used virtually exclusively with respect to jury composition challenges, where it provides a useful approximation that substitutes for serious statistical analysis.

Finally, standard deviation analysis is appropriate for large sample groups, such as in *Castaneda*, but not for smaller groups, because by its very nature it rests on the assumption that each selection made is replaced into the group prior to the next selection. The Supreme Court has accordingly recognized, when applied to smaller groups, that binomial distribution analysis (as used by Professor Devine in this case) is more accurate.[9] *Hazelwood School District*, 433 U.S. at 311 n. 17; *accord*, *Castaneda*, 430 U.S. at 496 n. 17.

---

[9] The standard distribution analysis for Mr. Kennedy's gender discrimination claim is provided herein for this Court's reference, to show that although the selected group is small (36 people), the underrepresentation of women is so substantial that even standard deviation analysis raises a red flag.

### Binomial Distribution

Applying a binomial distribution analysis, the probability of only two forepersons out of thirty-six being black is 17.83%.  To find binomial distribution, the probability of this outcome occurring is calculated by the following equation:

$$P(X) = \frac{n!}{r!(n-r)!} \quad \cdot \quad \pi^{r}(1-\pi)^{n-r}$$

where:

$n$ = the number of trials;

$r$ = the number of occurrences of the outcome event;

$!$ = the factorial solution; and

$\pi$ = the probability associated with the occurrence of an event in a single trial.[10]

In this case, Mr. Kennedy presented evidence to the state trial court that while black citizens comprised 16.63-23.9% of the population, that number was culled-out to 15% when only registered voters were considered; that number was then further cut to 9.9% when looking at the percentage of grand jurors actually selected during 1979-1998.[11]  Thus, using 9.9% as the probability of selecting a black grand juror as foreperson at random,

$$P(2) = \frac{36!}{2!\,(34!)} \text{ x } .099^2 \,(.901)^{34} = 630 \text{ x } 0.09801 \text{ x } 0.02831 = 0.1783418$$

Therefore, statistically, there is an 82.17% chance that African Americans were intentionally discriminated against in foreperson selection in Jefferson Parish between 1979 and 1998.

---

[10] For example, the probability of "heads" occurring in a single coin flip is 0.5.

[11] Out of a total of 211 grand jurors selected, 21 were black.

A probability of 82.17% that intentional discrimination occurred is far beyond a preponderance of the evidence—or even clear and convincing—standard. Supreme Court jurisprudence has never required a defendant to prove beyond a shadow of a doubt that intentionally discrimination occurred. All that is required under *Castaneda* is some evidence of intentional discrimination. *Castaneda*, 430 U.S. at 494-95; *see Batson v. Kentucky*, 476 U.S. 79, 96.

The Fifth Circuit and the Louisiana Supreme Court found that a prima facie case is shown where the black population of the community was 21-23% but the percentage of black grand jury forepersons during that period was 7%. *Guillory v. Cain*, 303 F.3d 647 (5th Cir. 2002); *State v. Langley*, 95-1489, p. 5-6 (La. 4/3/02), 813 So. 2d 356, 361-62. The court in *Langley* applied binomial distribution analysis and considered forty-six grand jury forepersons chosen during a twenty-two-year period that ended at the defendant's indictment. Three of those forty-six (6.9%) were black. The numbers in this case are comparable to the numbers in *Langley*, where the Louisiana Supreme Court and Fifth Circuit found discrimination. Using binomial distribution, rather than merely assessing comparative and absolute differences, the trial court in this case also properly found evidence of discrimination.

In a separate case arising out of the same parish, during the same time period, the Louisiana Supreme Court reversed the trial court's finding of no prima facie case and remanded for further hearings.[12] *State v. Jacobs*, 02-2087 (La. 08/30/02), 823 So. 2d 942. The State chose to re-indict rather than attempt to rebut the prima face case. Ironically, the defendant in *Jacobs* presented, as his prima facie case, the transcript of the hearing in *this* case—including the State's "rebuttal." The fact that Patrick Kennedy's claim was denied, even though it was based on the

---

[12] Indeed, the case of race discrimination in *Jacobs* was less compelling than in this case; it was 2 out of 33 forepersons rather than, as here, 2 out of 36.

*exact same facts* as *Jacobs*, speaks to the unfortunate truth that in Louisiana justice does not apply equally to those accused of the worst crimes.[13]

### Absolute and Comparative Disparity

The average absolute disparity between voting-eligible black citizens in Jefferson Parish and black citizens selected as foreperson on Jefferson Parish grand juries between 1979 and 1998 is 13.5%, with a range of 11.13%-18.4%.   The comparative disparity in this case is 71%, meaning that blacks were 71% less likely to be chosen as grand jury foreperson than the rest of the population.[14]   Although the Supreme Court has declined to set a bright-line rule regarding the lowest absolute disparity that establishes a prima facie case, the Fifth Circuit has found prima facie cases where the absolute disparity exceeded 10%.  *See, e.g.*, *Guillory v. Cain*, 303 F.3d 647 (5th Cir. 2002) (15.5%); *Rideau v. Whitley*, 237 F.3d 472, 486 (5th Cir. 2000) (13.5%).

There is no Supreme Court rule that an absolute disparity of below 10% may not, as a matter of law, make out a prima facie case, however.  *See Alexander v. Louisiana*, 405 U.S. 625, 629-30 (1972).  In *Alexander*, the pool of grand jurors was 14% African American, from which a grand jury list including only 7% of African Americans was culled.  Ultimately, there were only 5% African Americans in the pool from which Alexander's grand jury was selected.  This was an absolute disparity of 9% from the original pool, but a comparative disparity of 64.3%—in other words, two-of-three African Americans were denied the chance at jury service.  The Court's most recent opinion on the issue suggests that it is inappropriate to set an arbitrary threshold

---

[13] Mr. Kennedy had a "substantial and legitimate expectation" that his case would be treated the same as *Jacobs*, as both rested upon the same facts.  *See Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980).  Due to this inequity, the State has arbitrarily deprived Mr. Kennedy of a liberty guaranteed by State law in violation of the Due Process Clause.  *Id.*

[14] This figure is provided for this Court's reference, as courts generally do not apply a comparative disparity analysis unless the population of the group in question is below 10% of the community.  *See United States v. Butler*, 615 F.2d 685, 686 (5th Cir. 1980).

below which a prima facie case may never be made, *Berghuis*, 130 S. Ct. at 1394 n. 4, which contradicts the Fifth Circuit's previous rule that "absolute disparities of 10% or less are insufficient to establish statistical discrepancies worthy of relief." *Mosley v. Dretke*, 370 F. 3d 467, 479 (5th Cir. 2004). In other cases, the Supreme Court has found disparities of between 10% and 16% sufficient to establish "substantial underrepresentation." *See Jones v. Georgia*, 389 U.S. 24, 25 (1967) (14.7%); *Hernandez v. Texas*, 347 U.S. 475, 480-81 (1954) (14%). Thus the statistics presented in this case—11.13-18.4% absolute disparity—are strong enough, as a matter of clearly established federal law, to establish a prima facie case.

## 2.   A Woman in Jefferson Parish was More Likely to be Struck by Lightning *Twice* than to be Chosen as Grand Jury Foreperson in Jefferson Parish

Mr. Kennedy presented evidence establishing that the probability that women are not the victims of discrimination when the foreperson is selected by a male judge in Jefferson Parish is roughly 1-in-70,000; in other words, she is twice as likely to killed by a bolt of lightning. *See* R. 2096-97. At the evidentiary hearing, Mr. Kennedy presented comprehensive statistical evidence, with the help of Professor Joel Devine. Mr. Kennedy presented evidence that although women made up 51% to 52% of the Jefferson Parish population between 1979 and 1998. Out of the total figures of grand jurors *randomly* selected to serve on Jefferson Parish grand juries during that time period, 103 out of 212 (51.8%) were female—a figure highly representative of the female population. These numbers do not correspond, however, with the number of female grand jury forepersons selected at the same time. Only nine out of thirty-six forepersons (25%) were female. Furthermore, four of those nine were chosen by female judges. **Male** judges chose females as foreperson a mere **15.6%** of the time. Dr. Devine testified that the probability "that male Judges would pick only five women, when 52.5% of the population is women, out of thirty-three choices, is approximately one in 69,970." R. 2096-97. Dr. Devine testified that a woman

was almost twice as likely to die from lightening, than to be selected grand jury foreperson by a male judge. R. 2099. Even including the female judges, Dr. Devine testified that the probability that there was no discrimination leading to only nine women being selected foreperson was only 1-in-1,226.

Mr. Kennedy satisfied the second prong of the *Rose* test by introducing statistical evidence of the under-representation of women in the foreperson selection process. Under any methods of statistical analysis, the underrepresentation is substantial and the only reasonable explanation is that women were not chosen because of their sex.

### Binomial Distribution

Applying a binomial distribution analysis, the probability of only nine forepersons out of thirty-six being female is 0.08%. That is, there is a 99.92% chance that there was gender discrimination in the selection of forepersons in Jefferson Parish. Considering all judges' selections, the equation is:

$$P(9) = \frac{36!}{9! \, (27!)} \times .514^9 \, (.486)^{27} = 94,143,280 \times 0.0025042 \times 3.4608\text{-}09) = 0.0008159^{15}$$

Thus the probability of the actual outcome occurring by chance (i.e., without gender discrimination) is 1-in-1,226. If only the male judges' selections are taken into account, the equation is

$$P(5) = \frac{33!}{5! \, (28!)} \times .514^5 \, (.486)^{28} = 2.3734\text{+}05 \times .035877 \times 1.682\text{-}09 = .0000143$$

The probability of the male judges' selections occurring by chance is even lower: 1-in-69,970.

---

[15] A (P) value below .05 is generally considered to be statistically significant, i.e., when there is less than a 5% probability that the disparity was due to chance.

As a general rule of statistics, if the difference between the expected value and the observed number is greater than two standard deviations, then the hypothesis that the selection was random "would be suspect to a social scientist." *See Castaneda*, 430 U.S. 496, n. 17. Given that 52% of the population was female, the expected number of women among the thirty-six people chosen as forepersons over the time period is approximately nineteen. The actual number is nine. Under a standard deviation analysis,[16] the actual result departs by over three standard deviations from the expected result. Using only the male judges' choices for foreperson, the actual result (5) departs by over *four* standard deviations from the expected result (approximately 17). The likelihood of these results occurring by chance is so negligible that discriminatory intent must be inferred.[17]

## Absolute Disparity

The absolute disparity between the population of women in Jefferson Parish and the percentage of women actually chosen to serve as foreperson is **27%**. This figure is sufficient statistically to establish the degree of under-representation required to present a prima facie case of discrimination. *Jones v. Georgia*, 389 U.S. 24 (1967) (14.7% absolute disparity is significant); *Sims v. Georgia*, 389 U.S. 404, 407 (1967) (19.7% and 14.6% absolute disparities are significant); *Whitus v. State of Georgia*, 385 U.S. 545, 550 (1967) (18% absolute disparity is significant); *Hernandez v. Texas*, 347 U.S. 475, 480-81 (1954) (14% absolute disparity is

---

[16] Whereby, the standard deviation is equal to: the square root of the product of the total number (36), the probability of selecting a female foreperson (0.52) and the probability of selecting a male foreperson (0.48). In this case the standard deviation for all choices for foreperson is approximately 3 (2.99). Taking into account only the choices of male judges, the standard deviation is still approximately 3 (2.86).

[17] It must be noted here that Mr. Kennedy's burden of proving a prima facie case requires only a showing "a degree of underrepresentation . . . over a significant period of time." *Sosa v. Dretke*, 370 F.2d 467, 469 (5th Cir. 2004). Here, Mr. Kennedy has clearly shown underrepresentation in that where women made up 52% of the venire but only 25% of the selected forepersons. While Mr. Kennedy has taken the analysis a step further and established a high probability of intentional discrimination, the relevant jurisprudence does not require such a showing.

significant); *United States v. Rodriguez-Lara*, 421 F.3d 932 (9th Cir. 2005) (14.55% absolute

disparity is significant); *Rideau*, 237 F.3d at 486 (13.5% absolute disparity is significant);

*Jefferson v. Morgan*, 962 F.2d 1185 (6th Cir. 1992) (12.6% absolute disparity is significant);

*United States v. Hafen*, 726 F.2d 21 (1st Cir. 1984) (26.2% absolute disparity is significant); *See*

*Langley*, 813 So. 2d at 363 (25.7% absolute disparity sufficient to present prima facie case of

gender discrimination).

### C.  The State Failed to Rebut Mr. Kennedy's Prima Facie Case

"Once a prima facie case of invidious discrimination is established, the burden of proof

shifts to the State to rebut the presumption of unconstitutional action by showing that permissible

racially neutral selection criteria and procedures have produced the [inequitable] result."

*Alexander v. Louisiana*, 405 U.S. 625 (1972).  Affirmations of good faith in making individual

selections are insufficient to dispel a prima facie case. *Id.* at 632.  Instead, the State must it show

that the pattern of underrepresentation was the result of a racially neutral selection procedure.

*Guice v. Fortenberry*, 722 F.2d 276, 280 (5th Cir. 1984).

Here, the State did just the opposite.  After the state trial court properly found that Mr.

Kennedy had carried his burden of proving race and gender discrimination in the selection of

grand jury forepersons, the State was ordered to put on a rebuttal.  R. 2122.  Instead of presenting

evidence that, for example, the white male foreperson of the grand jury that indicted Mr.

Kennedy was selected pursuant to non-discriminatory criteria, the State offered testimony that

race was routinely taken into account during grand jury selection in Jefferson Parish.

Specifically, the State presented evidence that the assistant district attorney engaged in race-

based selection of potential forepersons, who were then sent to the judge to make the final

selection.  Marion Edwards, the former assistant district attorney, testified that

> **I certainly was aware that these figures were going to be looked at at some point in the future; and I did everything in my power to ensure that we had as much minority participation as we possibly could.**

R. 2133.  "Everything in his power" included pulling certain grand jurors back to the judge's chambers for the judge to interview for the position of foreperson.  R. 2128.  After asking for volunteers from the venire as a whole, Edwards testified that during his years as ADA, he would specifically add names of minority members of the venire to the list of potential forepersons to be submitted to the deciding judge for interviewing.

> I would customarily go back over the list and try to find other minorities that should be interviewed and included in the potential Forepersons of the Grand Jury. And **I would almost always include some additional minorities** that didn't raise their hands to volunteer.

This evidence—presented by the State—proves that racial and gender quotas were used in the selection of grand jury forepersons.  The two black grand jurors and nine women who were ultimately selected as forepersons were likely only selected because of the assistant district attorney's dabbles with affirmative action.

The analysis of government-instituted racial quota systems is a simple one.  First, whenever a state actor relies upon a racial classification in making a decision, this action is subject to strict scrutiny under the Equal Protection Clause.  In *Adarand Constructors, Inc. v. Pena*, the Supreme Court held that "any person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny." 515 U.S. 200, 224 (1995).

Second, for a government action to withstand strict scrutiny it must "serve a compelling governmental interest, and must be narrowly tailored to further that interest." *Adarand*, 515 U.S. at 235.  Although remedying past discrimination may be a compelling government interest, no court has found that the use of race in jury selection is ever constitutionally permissible.  *See*

*Batson v. Kentucky*, 476 U.S. 79, 89 (stating that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race").  Indeed, in order to be narrowly tailored to remedy the past wrong, there must be clear findings that this procedure is the only way to go about it.  The Government (here, the State) must prove that "the discrimination that the State seeks to remedy must be specific, 'identified discrimination'; second, the State 'must have had a 'strong basis in evidence' to conclude that remedial action was necessary, 'before it embarks on an affirmative action program.'" *Bush v. Al Vera*, 517 U.S. 952, 982 (1996) (citations omitted).

In this case, there has been no showing made of any attempt to remedy any past discrimination.  The only explanation that Edwards offered for his race-based selection process was that he was mindful that the figures would be under scrutiny at some time in the future.  R. 2133.  In other words, he was aware that the total nonexistence of any African American forepersons—and the paucity of female forepersons—looked bad, and he wanted to immunize the past discrimination from judicial backlash.  There is no case which holds that such awareness is to be considered a sufficiently compelling interest under the Equal Protection analysis.

Even if an awareness that the figures were to be looked at in the future was a sufficiently compelling governmental interest to justify making race conscious decisions in the selection process, the next step that the State would have to take in order to justify this procedure would be to demonstrate careful consideration of alternative remedies that might vitiate the effects of past discrimination:

> Proper findings in this regard are necessary to define both the scope of the injury and the extent of the remedy necessary to cure its effects.  Such findings also serve to assure all citizens that the deviation from the norm of equal treatment of all racial and ethnic groups is a temporary matter, a measure taken in the service of the goal of equality itself.  Absent such findings, there is a danger that a racial

classification is merely the product of unthinking stereotypes or a form of racial politics.

*City of Richmond v. Croson Co.*, 488 U.S. 469, 510-11 (1989).

Here, the State cannot pretend that the Jefferson Parish hand-selection method was "narrowly tailored" to meet prior discrimination.  To meet this test, the careful consideration of all other alternatives must be done before the race-conscious process is put in place: the State "must have had a 'strong basis in evidence' to conclude that remedial action was necessary '*before* it embark[ed] on [the race-conscious] program.'"  *See Bush v. Al Vera*, 517 U.S. at 982, 116 S. Ct. at 1962-63 (citations omitted; emphasis in original).

The State cannot show that this was the case.  Indeed, here the Jefferson Parish hand-selection method has now been replaced by a random, computer selection method for the selection of Grand Jury Forepersons.  By definition, random selection would ensure that a representative number of minorities appear as foreperson, so long as the selection pool is representative.  This, in turn, shows that Edwards' old method of choosing minorities was not the only method to ensure that there was a well-balanced representation of the population of Jefferson Parish in the makeup of the Grand Jury Forepersons.

Accordingly, this case must be treated identically with cases where there was no representation of the cognizable group at all.  In cases such as *Guice v. Fortenberry*, where zero of the 31 foremen selected were African American, rebuttal cases focused on the allegation that there was no intentional discrimination have been found insufficient.  Noting the lack of "objective criteria or guidelines" for selecting foremen, the Fifth Circuit held in *Guice* that the testimony of the selecting judge (that he had not intentionally excluded African Americans) was inadequate to overcome the presumption of discrimination. *Id.* at 281.  To be sure, the issue was not whether the State's rebuttal evidence was *credible*, but whether, as a matter of clearly

established federal law, the State had carried its burden of showing neutral selection criteria.  *See Alexander*, 405 U.S. at 632.  Similarly, in *Johnson v. Puckett*, 929 F.2d 1067, 1073 (5th Cir. 1991), the petitioner had established a prima facie case by showing that all 42 forepersons during a twenty-year period had been white.  The State's case in rebuttal consisted of testimony that the judges never indicated that they selected foremen based on race. *Id.* at 1067.  Because this evidence failed to advance any objective non-discriminatory criteria used by the judges, the Fifth Circuit held that it was insufficient and reversed the district court's denial of habeas relief.  *Id.* at 1073.

Here a handful of African Americans and women have been selected, in contrast to the cases with zero representation.  But here as well, the State has affirmatively admitted to using race-and-gender-based selection criteria.  It is no stretch to infer that, had the ADA not used affirmative-action policies in jury selection, the representation of African Americans and women would have been much closer to zero.  Moreover, intentional "token inclusion" of a group cannot rectify the problem. *Rideau*, 237 F.3d at 487.  Because the State failed to prove that "permissible racially [and gender] neutral criteria and procedures" were used to select forepersons in Jefferson Parish, its rebuttal case was insufficient as a matter of clearly established federal law.  *Alexander*, 405 U.S. at 632.

D.   **The State Court's Opinion Rested on an Unreasonable Determination of the Facts in Light of the Evidence and an Unreasonable Application of Clearly Established Federal Law**

The state courts in this case tailored the time period to include the greatest amount of African Americans possible.  Mr. Kennedy originally sought to use data from 1959 to May of 1998, which would have shown that only three African Americans had served as foreperson during the thirty-nine years and seventy-seven grand juries leading up to Mr. Kennedy's indictment.  Only one African American was chosen as foreperson between 1959 and 1993, and

46

then two more were chosen in 1994 and 1996, respectively.  The Fifth Circuit,[18] however, disregarded the decades in which no African Americans were selected at all, only looked at the ten year period with the greatest amount of female and African American representation, and inexplicably included the foreperson from the grand jury empaneled *after* Mr. Kennedy was indicted.

1.  **The State Court's Inclusion of the Grand Jury Convened after Mr. Kennedy was Indicted in Calculating the Disparity was Unreasonable and Tainted the Data**

Not one Supreme Court case dealing with grand jury discrimination has ever included a grand jury empaneled *after* the one that issued the indictment as being in any way relevant to the analysis.  But the Louisiana Fifth Circuit evidently marches to the beat of a different drummer, as it decided to include the grand jury selected in *September* of 1998 in its analysis.  Why would the court include a grand jury empaneled six months after Mr. Kennedy was indicted?  Because the foreperson of *that* grand jury was African American.  As a result, the court was able to find that there had been three African-American forepersons during the period it found relevant, rather than two.

The Fifth Circuit's analysis in this instance is completely unsupported.  Courts simply do not consider the racial makeup of grand juries (and forepersons) selected after the one that issued the challenged indictment.  *See*, *e.g.*, *Vasquez v. Hillery*, 474 U.S. 254, 256 (1986) (stating that the court considered the grand juries empaneled during the seven years before, and including, the one that indicted Hillery); *Hobby v. United States*, 468 U.S. 339 (1984) (considering evidence that "period prior to petitioner's indictment none of the 15 grand juries empaneled had had a

---

[18] It should be noted at the outset that the Fifth Circuit applied a legally incorrect standard of review to the trial court's finding of a prima facie case.  Under longstanding Louisiana law, an appellate court reviews a trial court's ruling on whether a prima facie case has been made for abuse of discretion.  *State v. Duncan*, 99-2615 (La. 10/16/01), 802 So. 2d 533.  The Fifth Circuit, however, reviewed the ruling "to determine if the result was correct."  R. 479.  The court cited no law supporting this erroneous standard of review.

Negro or female foreman"); *Castaneda*, 470 U.S. at 486-89 (considering an eleven-year period

ending with the grand jury that indicted Partida); *Rideau*, 237 F. 3d at 487 (considering the time

period between 1948 and March of 1961, when Rideau was indicted); *United States v. Gault*, 141

F.3d 1399, 1402 (10th Cir. 1998) ("When analyzing jury composition challenges, the court must

look to the relevant Qualified Juror Wheels."); *United States v. Sneed*, 729 F.2d 1333, 1336 (11th

Cir. 1984) (considering the 48 forepersons selected between 1970 and "July 28, 1981, when the

grand jury indicting defendant was empaneled"); *Guice v. Fortenberry*, 722 F.2d 276, 278 (5th

Cir. 1984) (considering the forepersons selected from 1963 "until the impanelling of the grand

jury that indicted the petitioners"); *Labat v. Bennett*, 365 F.2d 698, 719 (5th Cir. 1966) (where

petitioners were indicted by a grand jury empaneled in March of 1953, considering the period of

January 1948 until March 1953 in fair cross-section claim).   The inclusion of the September

1998 grand jury foreperson in the analysis artificially inflated the percentage of African

Americans chosen as foreperson during the relevant time period and constitutes an unreasonable

determination of the facts in light of the evidence presented.[19]

## 2. The State Courts Unreasonably Cherry-Picked a Time Period that Had the Maximum Number of Blacks and Women

The trial court's decision to limit the "significant period of time" under *Castaneda* to less

than ten years was an unreasonable application of federal law.   First, it served as smoke and

mirrors to divert attention away from the history of discrimination.   The State attempted to

disguise its past discrimination by limiting scrutiny to a truncated period in which two African

Americans and seven women were selected foreperson, but the truth remains that in the two

___

[19] Although Dr. Devine's report included a table that showed the number of grand jury forepersons selected through September 1998, it made clear that that information was provided as reference, and directly below the report listed the relevant time periods for the *Jacobs* case and this case, respectively. Devine Report, at 3.  The defense presented the relevant time period for this case as "**1979-3/98**".  *Id.*

48

decades before that period, only one African American and two women were selected.  Jefferson Parish may "not erase its earlier failure to adhere to federal constitutional requirements merely by . . . complying with [federal law] for five years."  *See Johnson*, 29 F.2d at 1072.  It is not relevant that a shortened time period creates the illusion that there has been no underrepresentation of African Americans and women, nor is it relevant that an African American served as foreperson after Mr. Kennedy was indicted.  *See id.*  The relevant facts are that between 1979 and March of 1998, 36 grand jury foremen were chosen, and only two were African American and nine were women.  As a matter of clearly established federal law and on the basis of the evidence presented by the defense, Mr. Kennedy made out a prima facie case of invidious discrimination "with his proof of a long continued disproportion in the composition of the grand juries" in Jefferson Parish.  *Castaneda*, 430 U.S. at 491; *see also Guice v. Fortenberry*, 722 F.2d 276, 280 (5th Cir. 1984) ("Absent stronger evidence that the selection process has been materially changed, we have no trouble holding that the two periods of time [1963 to 1976 and 1976 to 1979] should not be treated separately for the purpose of determining a prima facie case."); *Allen v. Cain*, 64 F. App'x 416, at *2 (5th Cir. 2003) (rejecting district court's conclusion that substantial underrepresentation between 1976 and 1992 was cured by adequate representation over five years preceding indictment).

Second, the limitation of the time period to only eighteen grand jury forepersons was both statistically unsound and goes against the grain of the vast majority of foreperson-discrimination cases.  A figure of eighteen does not give enough information to form an accurate picture of the substantial underrepresentation of African Americans and women.  It is true that some grand jury discrimination cases have considered a time period of ten to fifteen years, but grand jury composition and fair cross-section cases rely on markedly different facts than

foreperson discrimination cases.  For example, the Court in *Castaneda v. Partida* considered an eleven-year period of grand jury selection.  Because the claim was based on grand jury composition as a whole, however, the numbers analyzed included a comprehensive 870 individuals.  *Castaneda*, 430 U.S. at 89.  The same applies to the Fifth Circuit in *Rideau v. Whitley*—because it was a grand jury composition claim, thirteen years of data yielded 144 grand jurors to analyze.  *Rideau*, 237 F.3d at 488.  Furthermore, each foreperson discrimination case must be evaluated based on the specific grand jury procedures in that district.  In *United States v. Sneed*, 729 F.2d 1333 (11th Cir. 1984), the time period was eleven years; however, grand juries were empaneled more often than in Louisiana, so the data included 48 forepersons.  No Fifth Circuit case that has found a prima facie case of grand jury foreperson discrimination has considered data of less than 31 forepersons.  *Guillory v. Cain*, 303 F.3d 647 (5th Cir. 2002) (49 forepersons); *Johnson v. Puckett*, 929 F.2d 1067 (5th Cir. 1991) (42 forepersons); *Guice v. Fortenberry*, 722 F.2d 276 (5th Cir. 1984) (31 forepersons); *see also Campbell v. Louisiana*, 523 U.S. 392 (1998) (assuming a prima facie case had been made out; 35 forepersons).[20]  To limit the defense to data including only eighteen forepersons was to unfairly suppress Mr. Kennedy's opportunity to present a full case of underrepresentation over a significant period of time, as required by *Castaneda*.

Even using the unreasonably small number of eighteen forepersons, however, Mr. Kennedy successfully presented a case of gender discrimination.  Under the Louisiana Fifth Circuit's analysis on writs, women were chosen as foreperson in 36% of the eighteen grand

---

[20] In the State's writ response to the Fifth Circuit in this case, it cited several cases as indicating that a ten-year period was sufficient.  However, the State's cases reveal the consideration of much higher numbers of forepersons than eighteen.  *See State v. Young*, 569 So. 2d 570 (La. App. 1 Cir. 1990) (30 forepersons); *State v. Thomas*, 609 So. 2d 1078 (La. App. 2 Cir. 1992) (25 forepersons); *State v. Guillory*, 97-179 (La. App. 3 Cir. 3/11/98), 715 So. 2d 400 (30 forepersons).

juries. R. 476. As women comprised 54% of the registered voters in Jefferson Parish, the absolute disparity would be **18%**, with a range of 13% to 18% depending on the comparison figures used.[21]   The United States Supreme Court has found sufficient underrepresentation to constitute a prima facie case as a matter of law where the absolute disparity was at or below 18%. *Jones v. Georgia*, 389 U.S. 24 (1967) (14.7%); *Sims v. Georgia*, 389 U.S. 404, 407 (1967) (19.7% and 14.6%); *Whitus v. State of Georgia*, 385 U.S. 545, 550 (1967) (18%); *Hernandez v. Texas*, 347 U.S. 475, 480-81 (1954) (14%). Accordingly, even applying the shorter time period, the Fifth Circuit "confront[ed] facts that are materially indistinguishable from a relevant Supreme Court precedent and arrive[d] at [an opposite result]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Moreover, the Fifth Circuit's finding that the trial court had only based its decision on the ten year period was an unreasonable determination of the facts. The Fifth Circuit states at the outset of its opinion that "the trial court only considered the 10-year period as the relevant time period." R. 474. However, nothing in the trial court's oral judgment indicates that it did not consider the full 19-year period presented by the defense, as it gave no basis or reasons for its finding. At the time Mr. Kennedy filed the Motion to Quash due to grand jury discrimination, the trial court signed a defense subpoena directed at the Clerk of Court for all of the race and gender data for Jefferson Parish grand jury forepersons from 1959 until March of 1998. The Clerk filed a motion to quash the subpoena, and a hearing on that motion was held on September 20, 2001. R. 1873. The attorney for the Clerk argued at the hearing that 39 years of grand jury foreperson data would be "too voluminous."[22] *Id.* Although counsel for Mr. Kennedy offered to

---

[21] E.g., voter registration lists, census figures, or individuals actually selected to serve on grand juries.

[22] This assertion seems specious in light of the fact that only 77 forepersons served during that time period; to fulfill the subpoena, the Clerk only had to provide the race and gender of these 77 individuals.

amend the subpoena to include only the data that was readily available on the computer system (1980-March 1998), the trial court ruled that the subpoena would be limited to "ten years."  R. 1876.  Nevertheless, defense counsel was also able to procure race and gender data for the forepersons selected between 1979 and March of 1998, the court allowed the defense to present that evidence at the subsequent hearing on the Motion to Quash.  *See* R. 2096.  When the trial court ruled that the defense had successfully presented a prima facie case, it did not give reasons. R. 2122 ("THE COURT: Let me save you some time. I find that they've made a prima facie case. Go forward with your case.").  There is therefore no factual basis for the Fifth Circuit's finding that "the trial court only considered the 10 year period as the relevant period."  R. 474.

### E. Discrimination in the Selection of Grand Jury Forepersons Is a Structural Defect that Requires the Reversal of Mr. Kennedy's Conviction

The United States Supreme Court has recognized that "intentional discrimination in the selection of grand jurors is a grave constitutional trespass, possible only under color of state authority, and wholly within the power of the state to prevent."  *Vasquez v. Hillary*, 474 U.S. 254, 262 (1986).  Because "discrimination in the grand jury undermines the structural integrity of the criminal tribunal itself, [it] is not amenable to harmless error review."  *Vasquez*, 474 U.S. at 264.  This Court must reverse Mr. Kennedy's conviction due to the unconstitutional grand jury foreperson discrimination in this case.

### II. THE DEATH QUALIFICATION OF THE JURY IN A CASE WHERE THE DEATH PENALTY WAS UNCONSTITUTIONAL VIOLATED MR. KENNEDY'S RIGHT TO A FAIR TRIAL AND AN IMPARTIAL JURY

A man named K. is indicted for the robbery and beating of a ninety-year-old woman, who survived the crime and identified him as the perpetrator.  Maintaining that the identification was false, K. pleads not guilty and proceeds to trial.  To his chagrin, the prosecutor asks the venire of potential jurors whether they are in favor of the death penalty for those who beat old ladies, and

proceeds to remove all those who have scruples with imposing the death penalty in cases where the victim did not die.  K. is tried by a jury of twelve men and women who voiced their approval for capital punishment in his case, even though it would violate the Eighth Amendment to impose sentence K. to death for this crime.  Not surprisingly, the jury returns a verdict of guilty.

Now what is K.'s remedy?  Were these jurors predisposed to vote for a guilty verdict based on their expressed readiness to impose the death penalty for a non-capital crime?  Were these jurors unfair or biased against K. merely because he was accused of beating an elderly woman?  He certainly doesn't have a *Witherspoon* claim, as he was sentenced to life imprisonment and not death.

The answer lies in the Supreme Court's clearly established jurisprudence.  In *Lockhart v. McCree*, the Court acknowledged that death-qualified juries are "somewhat more 'conviction-prone' than 'non-death-qualified' juries."  476 U.S. 162, 173 (1986).  In *Buchanan v. Kentucky*, the Court again assumed that accumulated scholarly studies demonstrate that death-qualified juries are abnormally prone to convict.  483 U.S. 402, 415 n. 16 (1987) (citing *McCree*, 476 U.S. at 169-70). Recognizing the serious problem with a death-qualified jury, the Supreme Court has narrowly permitted such a jury to try a capital defendant, *McCree*, 476 U.S. at 173-85, and to jointly try a non-capital defendant together with a capital defendant, *Buchanan*, 483 U.S. at 414-25.  The Court was not without difficulty in permitting the use of death-qualified juries even in these limited circumstances, however, and went out of its way to justify the decision in each case by articulating compelling government interests.

In a capital case, according to the Court, the government's decision to "death-qualify" a jury is justified by two important interests.  First, to obtain a single jury that could decide all of the issues in the case (both whether the defendant is guilty and whether he deserves to be put to

death); and second, to allow the defendant to benefit at the sentencing phase of the trial from the jury's "residual doubts" about the evidence presented at the guilt phase. *McCree*, 476 U.S. at 180-81. Of course, the government has an interest in not having a juror who opposes the death penalty sit on a jury whose duty includes administering the death penalty. As to non-capital defendants *in joint trials with capital defendants*, they may be tried before a death-qualified jury because of the strong state interest in having a joint trial. *Buchanan*, 483 U.S. at 418-20.

None of those government interests exists in a non-capital case involving a single defendant. In a non-capital case such as Mr. Kennedy's, death-qualification serves instead to inflame the jurors against the defendant and produce a jury of conviction-prone individuals. *See McCree*, 476 U.S. at 173. The State has no interest in ensuring that the jury is ready and willing to impose a death sentence on the defendant when the defendant stands accused of a non-capital crime or a crime for which the death penalty is unconstitutional.

If this case is upheld, what stops the State from defining any crime as capital, then death-qualifying all juries for the trial of those crimes although any death sentence would surely be unconstitutional? Why not make second-degree murder capital and then death-qualify all juries called to try second-degree cases? What stops a prosecutor in a child molestation case from asking the jury if they believe in the death penalty for child molestation, and then striking all those who state their opposition? "If we permit a death-qualified jury to try a non-capital defendant, neither the Constitution nor logic provides a non-arbitrary stopping point." *Story v. Kindt*, 26 F.3d 402, 411 (3d Cir. 1994) (Cowen, J., dissenting). Indeed, a prosecutor's dream jury in any rape case would be a jury of twelve individuals who believe in the death penalty for rape.

Compounding the unfairness of Mr. Kennedy's trial, prospective jurors were repeatedly removed from the trial of this case for espousing views that coincide with the United States

Supreme Court.[23]   The law simply does not sanction the removal of jurors because they express opposition to the death penalty.[24]   A fortiori, the law should not allow the removal of jurors because they express a view that coincides with the Eighth Amendment—that the death penalty should not be imposed for rape.

The state court's decision denying this claim is contrary to this clearly established federal law, as a result, this Court must review this claim de novo.

## III.   THE STATE'S UNTIMELY DISCLOSURE OF EXCULPATORY AND IMPEACHMENT EVIDENCE PREJUDICED THE DEFENSE AND VIOLATED DUE PROCESS

The prosecution deliberately withheld exculpatory and impeachment evidence from the defense until it obtained enough inculpatory evidence to go to trial.   This delayed disclosure of exculpatory evidence ensured that the State had sufficient time to procure evidence necessary to support a conviction and death sentence.   As the trial court recognized in response to one of the State's myriad delays:

> This Defendant does not deserve to languish in prison until the State decides it's ready to move its case.

R. 1113.   But languish Mr. Kennedy did, until there was sufficient evidence for the State to proceed to trial.   At that point, the State finally disclosed two strong pieces of exculpatory evidence to the defense.   A third item has still yet to be fully disclosed.

---

[23] *Compare*, *e.g.*, R. 2922-23 (Juror Subramanian struck for cause because of his statement that he considered the death penalty a "disproportionate punishment, for rape, albeit a minor's rape") *with Kennedy v. Louisiana*, 128 S. Ct. at 2664-65 (holding that "the death penalty is not a proportional punishment for the rape of a child").

[24] *Witherspoon v. Illinois*, 391 U.S. 510, 519-20 (1968) (footnote omitted) ("A man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State and can thus obey the oath he takes as a juror."); *Lockhart v. McCree*, 476 U.S. 162 (1986); *Wainwright v. Witt*, 469 U.S. 412 (1985); *Adams v. Texas*, 448 U.S. 38 (1980) (So long as a venireperson can abide by the court's instructions, "[h]e need not himself favor the penalty under any circumstances.").

First, the State withheld the results of forensic analysis that excluded both Mr. Kennedy and the victim as the source of the blood found underneath the mattress.  Defense counsel was taken by surprise when, two days into trial, the prosecution disclosed the fact that the mattress pad had been tested by the State's laboratory and did not indicate that the blood matched the victim.  Second, the State suppressed a videotape in which the victim gave a detailed statement that Mr. Kennedy was not the perpetrator and that two teenage boys had raped her.  This videotape was kept hidden until the State secured an inculpatory videotaped accusation over eighteen months later.  Finally, the State continues to withhold Mrs. Kennedy's criminal record from the defense.  These cumulative manipulations of the evidence by the prosecution have deprived Mr. Kennedy of due process.

*Brady* and its progeny hold that the state violates due process when it suppresses material evidence favorable to the defense.  Evidence is "material" if, in light of the nondisclosure, the reviewing court's confidence in the guilty verdict is undermined.  *Jones v. Butler*, 864 F.2d 348, 354 (5th Cir.1988), *cert. denied*, 490 U.S. 1075 (1989).  If the claim is for untimely disclosure of *Brady* material, courts in this circuit look to whether the defendant was prejudiced by the tardy disclosure.  *Powell v. Quarterman*, 536 F.3d 325, 335 (5th Cir.2008).  The defendant is prejudiced if the evidence is not received in time for its effective use at trial.  *Id.*  The prejudicial effect of the State's untimely disclosure must be evaluated in the context of the record as a whole.  *United States v. Agurs*, 427 U.S. 97, 112 (1976).  Over the course of the trial in this case, the State belatedly unveiled multiple pieces of exculpatory and impeachment evidence that it should have provided to defense counsel during discovery.   As a result, the defense was prejudiced and Mr. Kennedy's due process rights were infringed upon.

### A. Connecticut Lab Reports

Failure by the State to disclose exculpatory forensic reports from the Connecticut Crime Lab prejudiced Mr. Kennedy, and violated his Fourteenth Amendment right to due process.

The State's basis for holding Mr. Kennedy for the first year and a half after his arrest was its claim that scientific evidence linked Mr. Kennedy to the offense.  The State's Response to the Bill of Particulars made clear its claim that the State had identified Mr. Kennedy as the perpetrator through forensic analysis.  *See* R. 117, 137.  In response to the defense request for information concerning the manner in which Mr. Kennedy was identified, R. 117 (defense request for manner of identification of defendant), the State alleged that forensic reports by the Connecticut Crime Laboratory and the Jefferson Parish Sheriff's Office identified Mr. Kennedy as the perpetrator.  *See* R. 137 ("14. a. See reports of forensic analysis by Dr. Henry Lee provided. Reports of forensic analysis by the Jefferson Parish Sheriff's Office will be provided upon receipt by the District Attorney."); *see also* R. 140 (State's response to question no. 53).

In fact, the forensic reports showed that DNA testing excluded both Mr. Kennedy and L.H. as the source of blood found on the mattress pad in L.H.'s room.  At the time the State was representing to the defense and the court that forensic analysis linked Mr. Kennedy to the rape, the reports in the State's possession indicated otherwise.  These reports were not disclosed to the defense until after opening arguments at trial.  R. 4925; *see also* R. 4936 (during opening arguments, defense counsel told the jury that "They [the State] never bothered to test the blood.").

At the preliminary hearing, the lead detective recounted her belief that the blood on that mattress pad identified Mr. Kennedy as the perpetrator:

> We later, through the use of forensic analysis and chemicals, specifically Luminol (phonetic), detected the possible presence of blood on the mattress of the bed, which would have been turned downward on the box springs.

R. 866.  Defense counsel was therefore led to believe that the blood on the mattress belonged to the victim all the way up until trial.  Contrary to the detective's testimony, however, evidence that indicated that the blood on the mattress was not connected to the victim or defendant in this case.  *See* R. 5050 (indicating that JPSO had sent the mattress pad back to Connecticut Crime Laboratory because "we had determined that additional testing should be conducted on the mattress."); R. 5076 (quoting letter from JPSO indicating the evidentiary significance of the mattress pad); R. 5077 (noting correspondence from Colonel Gorman of the JPSO requesting further testing of relevant evidence:  "In speaking with Assistant District Attorney Debbie Villio, Lt. A. Ulmer and lab personnel concerning the evidence in the [L.H.] case, there are several pieces of evidence I would like Dr. Lee to further review. . . . As you will remember, when officers arrived at the scene, the victim's bed was made up and no blood was on the bedding. Later we learned the scene had been altered. On the reverse side of the mattress was what appeared to be a circular blood spot which tested positive for blood.").  The blood stain was highlighted as evidence supporting probable cause in the arrest warrant and the search warrant, and furthermore at the preliminary hearing.

When the State finally disclosed—after opening statements, and at least two days into trial—that it had for over five years critical exculpatory evidence which undermined the case against Mr. Kennedy, the defense moved for a mistrial, alternatively for a recess to secure additional witnesses, and then ultimately for other sanctions.  The trial court, while agreeing with the defense's characterization of the suppression of favorable evidence, denied the defense requests and overruled the defense objections.  R. 5261 (noting that "[t]he temporal aspect of this revelation, of the newly discovered reports does give me some trouble.").

This delay in disclosure severely prejudiced Mr. Kennedy.  Had the evidence been timely disclosed, the defense could have proceeded to trial in August of 1998, and at that point there would have been legally insufficient evidence to support a conviction.  Indeed, in 1998 L.H. had yet to change her story and accuse Mr. Kennedy.  Without an accusation by the victim, and lacking any physical evidence connecting Mr. Kennedy to the crime, it is clear that Mr. Kennedy would have been acquitted, or more likely, that his indictment would have been dismissed.  Delay by the State allowed them to illegally hold Mr. Kennedy for years, essentially biding time to obtain an accusation from the victim—the single piece of evidence that would have been sufficient to procure a conviction.

Furthermore, defense counsel was denied the ability to effectively highlight for the jury the troubling implications of the State's delayed disclosure.  Upon learning that the State had been sitting on exculpatory evidence, defense moved to supplement its opening statement in order to explain to the jury that the State had held Mr. Kennedy on false pretenses while waiting to put together sufficient inculpatory evidence.  The trial court denied this motion, effectively compounding the prejudice against Mr. Kennedy.  Consequentially, the State's delayed disclosure denied Mr. Kennedy not only a speedy trial that surely would have resulted in an acquittal, but also the ability to effectively argue the impact of that prejudice to the jury—the only way (other than a dismissal of the indictment) that the damage of the State's actions might have been remedied.

The Louisiana Supreme Court's treatment of this issue is based upon an unreasonable factual determination in light of the evidence presented.  The court found that the Connecticut lab results were not "favorable" because they were inconclusive, and therefore could not constitute *Brady* evidence.  *State v. Kennedy*, unpub. appx. at 25.  The trial court in this case, in

contrast, specifically found that the information in the Connecticut lab reports "does anything but prejudice the defense, *it enhances it, it bolsters it.*"  R. 5266 (emphasis added).  Expert testimony established that the Connecticut lab's inconclusive result could be consistent with the defense's lab's conclusive results that the blood did not belong to the victim.  R. 5215-16.   If the Connecticut lab's test results had indicated that L.H.'s blood was on the mattress pad, as the State had claimed previously, that result obviously would have called the defense's test into question.  But because the State's test results were scientifically consistent with the defense test results, the belatedly disclosed reports had the effect of bolstering the defense case.  R. 5266. Because the state court's factual finding that the Connecticut report was not exculpatory was unreasonable, this Court must review this claim de novo.

### B.  Videotape of L.H.

Arguably the most damaging evidence against Mr. Kennedy was a videotaped accusation by L.H. from December 16, 1999.  But prior to the creation of this videotape, there was no direct evidence inculpating Mr. Kennedy.   There was considerable exculpatory evidence in addition to the test results discussed above, which if provided to the defense would have resulted in a speedy trial or release.  Indeed, the defense asked for discovery of a much more detailed videotape taken in March of 1998.  The State's response was that the interview *never occurred*:

> I know this little girl did not go to the Child Advocacy Center in March of 1998
> and give – the only interview that she had was in December of 1999.

R. 1168 (statement of A.D.A. Richard Bates during pre-trial hearing, April 7, 2000).

For the majority of the pre-trial litigation, the State withheld an earlier—more detailed— videotape in which L.H. insisted that she was raped by two teenage boys.  The State delayed turning over this exculpatory tape until after it had secured a different, inculpatory version.

Without the exculpatory videotape, (and the Connecticut Crime Laboratory DNA-exclusion tests), the defense was forced to repeatedly continue the proceedings in order to initiate independent investigation.  This delay resulted in severe memory loss by both L.H. and Carolyn Kennedy.  Mrs. Kennedy—who initially vigorously supported Mr. Kennedy's innocence—had almost total memory loss concerning much of the exculpatory information that she previously maintained.  *See* R. 5379 (can't remember when she met with Mr. Armato); R. 5380 (same); R. 5380 ("I don't remember the conversation but I remember us talking to you. . . . I don't remember, I remember talking to you, I remember your face, but I don't remember exactly what we talked about."); R. 5380 (doesn't remember L.H. saying anything in her presence); R. 5381 ("I don't remember" whether L.H. insisted on Mr. Kennedy's innocence); R. 5382 (doesn't remember Dr. McDermott); R. 5383 (doesn't remember whether she told defense counsel personally that someone besides Mr. Kennedy committed the rape);  R. 5385 (can't remember telling Mr. Tucker that she was afraid that if she talked with defense counsel L.H. would be taken away); *id.* (can't remember refusing to talk to Mr. Tucker); *id.* (can't remember telling anyone she was scared for the police to take her daughter);  R. 5387 (doesn't remember talking to Manuel and Kathy Holmes regarding the removal of her daughter);  R. 5388 (doesn't remember card from L.H. to Patrick Kennedy); *id.* (doesn't remember hearings in November of 1999); R. 5390 (doesn't remember whether she met with prosecutor Richard Bates just prior to L.H. changing her story).  Moreover, L.H.'s memory loss was so severe that she was rendered effectively unavailable to testify.  At trial, she was completely incapable of explaining the dramatic change in her story—testimony that would have been critical for Mr. Kennedy to receive a fair trial.

The prejudice caused by this late disclosure is evident.  Ultimately the State's affirmative misrepresentation of the strength of its case, and its bungling of discovery, effectively ensured that Mr.  Kennedy would be forced to waive his speedy trial rights and acquiesce to the delay the case until such time as there was sufficient evidence to proceed to trial.  Had the State disclosed the March 1998 videotape at the time it was made, Mr. Kennedy would have gone to trial then, and the State would have been forced to prosecute its case with no victim accusation and no physical evidence linking Mr. Kennedy to the rape.  The Louisiana Supreme Court's opinion on this topic completely misses the mark.   The court acknowledged that the tape is "clearly exculpatory," but opined that because the defense obtained the tape years before trial, there was no prejudice.  Unpub. appx., at 28-29.  This was an unreasonable determination of the facts.  What the court missed is that the defense only received the exculpatory tape *after* L.H. recanted the statement she made therein.  If the State had disclosed the tape in a timely manner, the defense surely would have proceeded to trial as soon as possible.  By suppressing the tape until after L.H. recanted her statement, the State ensured that the content of the tape would be discredited and of futile use to the defense.  This Court must review this claim de novo.

## IV.    MR. KENNEDY RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL

Mr. Kennedy's counsel failed to adequately investigate several pivotal issues, dropped the ball during cross-examination and impeachment of a number of critical witnesses, allowed damaging inadmissible evidence to be presented without objection, and most significantly neglected to introduce strongly exculpatory (and impeachment) evidence.  These failures gravely prejudiced the outcome of the trial.  Counsel's ineffectiveness ultimately denied Mr. Kennedy his Sixth and Fourteenth Amendment right to effective assistance of counsel.  While the ineffectiveness claims are identified separately, and while Mr. Kennedy should prevail on any

single one of them, they must also be considered for their cumulative effect on the reliability and fairness of Mr. Kennedy's conviction.

During the pre-trial and trial period, Mr. Kennedy's main lawyer, Mark Armato, was involved in a significant personal crisis ultimately resulting in his suspension of his license by the Louisiana Supreme Court.   Mr. Kennedy's second counsel, Graham da Ponte, was in the midst of a serious physical crisis which implicated her ability to practice law, and which led this to be one of her last serious cases as a lawyer.   Undersigned counsel has the utmost respect for the personal integrity of Mr. Armato and Ms. da Ponte, and is of the firmest belief that conscientious counsel does not necessarily mean effective counsel.   Undersigned simply asserts that for reasons beyond the control of Mr. Kennedy, the representation that he received at trial was ineffective.   Mr. Kennedy's trial counsel had spent five years attempting to represent Mr. Kennedy, and was exhausted by the circumstances of the case, the volume of material collected by the government that counsel needed to weed through, and by the shifty disclosures made by the government that rendered preparation for trial all but impossible.

The United States Supreme Court has repeatedly recognized the "paramount importance of vigorous representation" by counsel.  *Penson v. Ohio*, 488 U.S. 75, 84 (1988).   "Of all of the rights that an accused person has, the right to be represented by counsel is by far the most pervasive, for it affects his ability to assert any other rights he may have." *United States v. Cronic*, 466 U.S. 648, 654 (1984) (quoting Walter v. Schaefer, *Federalism and State Criminal Procedure*, 70 HARV. L. REV. 1, 8 (1956)).

*Strickland v. Washington*, 466 U.S. 688 (1984) directs a two-pronged approach to the assessment of ineffective assistance of counsel claims.   First, it requires a showing that counsel's

performance fell below an objective standard of reasonably effective representation. *Id.* at 687-88.   Second, it must be shown that prejudice resulted from the ineffectiveness.   *Id.*

With regard to the first prong of the *Strickland* test, the Supreme Court has held that performance of counsel must be "reasonable considering all the circumstances."  *Strickland*, at 688.  The Court has stated that the American Bar Association's Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines") are "guides to determining what is reasonable." *Id.* at 688; s*ee also*, *e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) ("we long have referred [to the ABA Guidelines] as 'guides for determining what is reasonable'.").   While Counsel is presumed competent and tactical reasons can justify a departure from professional norms, incompetent advocacy is not a tactic or strategy. *Strickland*, 474 U.S. at 688-81; *State v. Francis*, 01-1667 (La. App. 4 Cir. 2/06/02), 809 So. 2d 1132, 1140 (affirming the trial court's ruling that a new trial should be granted on ineffective assistance of counsel and affirming the trial court's finding: "strategy could not be imputed to tactics uninformed by adequate investigation."); *Mullins v. State*, 46 P.3d 1222, 1226 (Kan. App. 2002) (reversing and granting a new trial on grounds of ineffective assistance of counsel, holding that "when counsel lacks the information to make an informed decision due to inadequacies of his or her investigation, any argument of 'trial strategy' is inappropriate") (citations omitted); *Jennings v. Woodward*, 290 F.2d 1006, 1018-19 (9th Cir. 2002) (reversing and granting a new trial on ineffective assistance of counsel and stating: "An argument based on trial strategy or tactics is appropriate only if counsel is fully informed of facts which should have been discovered by investigation"); *People v. Wiley*, 792 N.E.2d 1274 (Ill. 2001) (remanding for an evidentiary hearing on the ineffective assistance of counsel claim at sentencing when nothing on the record supported a claim of trial strategy: "Consequently, counsel's presentation of mitigation is not

deemed to be a legitimate strategy without a reasonable investigation into mitigating circumstances.").

The duty that capital defense counsel has to conduct a thorough pre-trial investigation is well established.  The "independent duty to investigate and prepare" is "[a]t the heart of effective representation," *Goodwin v. Balkcom*, 684 F.2d 794, 805 (11th Cir. 1982), and the adversarial system itself:

> Investigation is an essential component of the adversary process. "Because [the adversarial] testing process generally will not function properly unless counsel has done some investigation into prosecution's case and into various strategies . . . counsel has a duty to make reasonable investigations . . . ."

*Wade v. Armontrout*, 798 F.2d 304, 307 (8th Cir. 1986) (quoting *Kimmelman v. Morrison*, 477 U.S. 365 (1986) (quoting *Strickland*, 466 U.S. at 691)).

ABA Guideline 10.7(A) states that counsel has "an obligation to conduct thorough and independent investigations to the issues of both guilt and penalty," and such investigation must "begin immediately upon counsel's entry into the case".  ABA Guidelines, at Guideline 10.7.  This investigation must be thorough, "regardless of any admission or statement by the client concerning the facts of the alleged crime, or overwhelming evidence of guilt, or any statement by the client that evidence bearing upon guilt is not to be collected or presented." *Id.*

There is extensive precedent behind the ABA Guidelines. *Id.* at n. 195 (citing, inter alia, *Powell v. Alabama*, 287 U.S. 45, 57 (1932) (describing "thorough-going investigation" as "vitally important"); ABA Standards, Defense Function Standard 4-4.1, 4-6.1, in ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d Ed. 1993); Nat'l Legal Aid & Defender Ass'n, Performance Guidelines for Criminal Defense Representation, Guideline 4.1 (1997).).  Recent United States Supreme Court jurisprudence has also reinforced the importance of counsel's duty to thoroughly investigate every aspect of a defendant's case.

In 2003, the Court affirmed the principle that reviewing courts must not only examine the reasonableness of decisions that defense counsel makes but also whether the investigation supporting counsel's decision was itself reasonable. *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (holding that trial counsel was ineffective for failing to adequately prepare and present mitigation evidence of severe abuse, abandonment, sexual molestation and diminished capacity, and restating the authority of the ABA Guidelines). In *Wiggins*, the defendant claimed that his attorney's decision not to present mitigating evidence constituted ineffective assistance of counsel. *Id.* at 514. The State argued that defense counsel had carefully considered this decision and had strategically chosen not to present the evidence at issue. The Court rebuffed the State's assertion, holding that counsel's investigation was unreasonable in light of the then-existing standards and that counsel's failures prejudiced the defendant. *Id.* at 535, 538. The *Wiggins* Court further recognized that the scope of the investigation was also unreasonable "in light of what counsel actually discovered:"

> In assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. Even assuming [counsel] limited the scope of their investigation for strategic reasons, Strickland does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support the strategy.

*Id.* at 527.

Recently, in *Porter v. McCollum*, 130 S. Ct. 447, 558 U.S. __ (Nov. 30, 2009) (per curiam), the Court found ineffective assistance where counsel had failed to conduct a thorough investigation into the defendant's background. Counsel in *Porter* "ignored pertinent avenues for investigation of which he should have been aware," and as a consequence the jury did not hear evidence of the defendant's heroic and emotionally damaging military service. The Court

concluded that had the defendant's life history been presented, the jury and sentencing judge "would have struck a different balance."

With regard to the prejudice prong of the *Strickland* test, a defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  A reasonable probability is one that is "sufficient to undermine confidence in the outcome." *Id.* at 683.  This standard "is not a stringent one.  It is less demanding than the preponderance standard." *Hull v. Kyler*, 190 F. 3d 88, 110 (3d  Cir. 2003); s*ee also United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002) (stating that the appropriate standard requires "less than a preponderance of the evidence.").

Mr. Kennedy's counsel made eight serious errors that caused prejudice in this case such that the verdict is unworthy of confidence: (1) he forgot to introduce exculpatory phone records that would have negated some of the State's strongest evidence against Mr. Kennedy; (2) he omitted videotaped evidence from the defense's case that showed the victim stating that Mr. Kennedy was not the perpetrator; (3) he failed to impeach Carolyn Kennedy with clearly documented prior inconsistent statements; (4) he failed to object to the introduction of inadmissible and unreliable hearsay caller I.D. evidence; (5) he failed to effectively cross-examine Mr. Madere with evidence in his possession that severely undermined the testimony; (6) he stipulated to the introduction of inadmissible videotaped testimonial evidence; (7) he allowed Dr. Lee to give false testimony unchecked by any attempt at impeachment and failed to subpoena the technician who actually performed the lab tests; and (8) he failed to request a hearing to establish that L.H.'s changed story was tainted by the State.  These egregious errors standing alone, as well as the cumulative effect of the multiple deficiencies, undermined confidence in the outcome of Mr. Kennedy's trial.

### A.  Failure to Introduce Exculpatory Phone Records

At trial, the State attempted to prove that Mr. Kennedy made a number of incriminating phone calls on the morning of the incident before calling 911, in an effort to rebut the defense claim that Kennedy had called 911 immediately after the rape.  The State claimed that Mr. Kennedy called his employer, Alvin Arguello, between 7:00 and 7:30 a.m. saying that he could not come to work because his daughter had "become a lady."  Secondly, the State claimed that Mr. Kennedy called B&B Carpet Cleaners around 7:30 a.m., looking to get blood removed from his carpet.

Both witnesses were called by the State, and both testified to receiving the alleged phone calls.  R. 4470-90; 4736-65.  Mr. Kennedy's defense at trial was that these witnesses were mistaken about the time and date of the phone calls.  In response to a State subpoena, Bell South produced the telephone records showing all calls made to and from Mr. Kennedy's phone line on the date of the offense.  These records conclusively show that Mr. Kennedy did not make the alleged phone calls.  The state court did not allow Mr. Kennedy to introduce them as evidence during post-conviction proceedings because it denied a hearing.  Failure to introduce these phone records clearly constituted ineffective assistance of counsel.

### 1.  Failure to Introduce Exculpatory Phone Records Fell Below Objective Standards for Reasonable Performance

In order to satisfy the first prong of Strickland it is necessary to show that trial counsel's actions fell below an objective standard for reasonable performance.  Courts are "not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all."  *Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir. 1999).  The failure to introduce exculpatory evidence that contradicted two of the State's most significant claims

clearly falls below such standards. With no physical evidence linking Mr. Kennedy to the crime,

the phone calls allegedly made by Mr. Kennedy to Mr. Madere and Mr. Arguello were critical to

the State's case.  Indeed, in closing, the prosecutor emphasized that Mr. Arguello's testimony

was crucial:

> Alvin Arguello testified to you, didn't he, that he went to work and there was a message from the Defendant saying he wasn't going to come in. He then told you there was another callback. He said that it wasn't really at 7:30; it was earlier than that, because at 7:30 then his workers come in, that he needs to tell them where they need to go. He wouldn't have had time to handle the telephone call. He told you that the Defendant called him to tell him that his little girl had  become a woman; did he know how to get blood out of a carpet, and that's important ladies and gentleman because you know that a call doesn't go out until 9:18 of a rape in progress.  Said 'How do you get blood out of a carpet, I've been trying to do it for a while.'

R. 5832-33.  Nor was there any plausible trial strategic justification for allowing these decisively

incriminating claims to go unchallenged. The defense at trial was that Mr. Arguello was

mistaken about the time and date that the phone call occurred.  The State insisted that he was

correct on time and date.   The phone records were entirely exculpatory, and capable of

contradicting critical State evidence, and established that he was mistaken about the time and

date the phone call occurred.  There was no conceivable reason—beyond mere incompetence—

why counsel would have chosen not to use the phone records.

### 2.   Failure to Introduce Exculpatory Phone Records Prejudiced Mr. Kennedy

In order to show prejudice, it is necessary to demonstrate that "there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different."  *Strickland*, 466 U.S. at 694.  The failure to introduce the exculpatory phone

records clearly meets this burden.

Without physical evidence to connect Mr. Kennedy to the crime, the State relied on

circumstantial evidence of incriminating phone calls allegedly made before Mr. Kennedy

reported the incident to the police. The only evidence that the State presented was the testimony of two recipients of the alleged phone calls. Counsel for Mr. Kennedy, however, had in his possession direct and powerful evidence—records from Bell South—that showed that Mr. Kennedy did not make the phone calls alleged by the State. Had the defense introduced these records, it would not only have significantly undermined the credibility of the State's witnesses, but also strongly corroborated Mr. Kennedy's story. Presented with powerful evidence refuting two of the State's most central claims, there is, at the very least, a reasonable probability that a jury would have found there to be reasonable doubt of Mr. Kennedy's guilt.

### 3. The State Court's Adjudication of this Claim was Unreasonable

The state court's opinion on this issue constitutes an unreasonable application of clearly established federal law. In particular, the state court misstated the standard for prejudice under *Strickland*. In disposing of this element of Mr. Kennedy's ineffective assistance of counsel claim, the state courts speculated that there could have been other explanations for the mysterious absence of the two alleged telephone calls that the State used to convict Mr. Kennedy. Because the records did not "conclusively contradict" the State's evidence, the state court reasoned, failure to introduce the records was not ineffective. *State ex rel. Kennedy v. Cain*, No. 10-418, slip op. at p. 8 (La.App. 5 Cir. 7/6/10).

This holding is directly contrary to controlling Supreme Court precedent. Prejudice "is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome" and is less than a preponderance of the evidence. *Id.* at 693-94. The Supreme Court has never required a petitioner to prove "*conclusively*" that, had counsel performed effectively, the prosecution's case would have been irrefutably contradicted. The prejudice prong requires only that the petitioner show that

counsel's performance undermined confidence in the outcome.   Here, where the State's case rested substantially on the alleged phone calls to prove that Mr. Kennedy was guilty of raping his stepdaughter, counsel's failure to introduce evidence that the phone calls *did not happen* sufficiently undermines confidence in the jury's verdict.   If the state court's interpretation of the law were true, it would be virtually impossible for a petitioner to succeed in an ineffectiveness claim.   For example, in a rape case involving an adult woman victim, if defense counsel had results of a DNA test indicating that the semen found in the victim did not belong to the defendant and counsel forgot to present those test results to the jury, under the state court's interpretation the petitioner would be unsuccessful.   DNA testing is not 100 percent accurate, and the state could always argue that the victim had had consensual sex before the rape occurred, thus the evidence would not "conclusively contradict" the state's case.   But clearly, such test results would undermine confidence in the verdict under *Strickland*.   Because the state court unreasonably misapplied the *Strickland* standard, this Court must apply de novo review.

### B.   Failure to Introduce October 1999 Video

Defense counsel was patently ineffective for failing to introduce a videotape in October of 1999—18 months after the offense—which demonstrated Mr. Kennedy's innocence, impeached L.H. and Carolyn Kennedy's trial testimony, and established that the State had coerced L.H. into testifying against Mr. Kennedy.

There is no strategic purpose in forgetting to introduce this videotape, either as substantive evidence or as impeachment evidence.   Defense counsel received the videotape pursuant to a subpoena.   The videotape showed L.H. and Mrs. Kennedy maintaining that L.H. was attacked to two teenage boys.   L.H.'s statement was detailed and resolute, making it powerful impeachment to her spare and largely prosecution-led accusation at trial.   Further, the timing of the videotape would have been important to draw attention to at trial.   Soon after the

71

instant video was recorded, the State again removed L.H. from her home; less than two months

later, the State had procured a videotaped accusation from L.H.  The decision not to present this

videotape at trial "did not reflect reasonable professional judgment."  *Porter*, 130 S. Ct. at 453.

Had counsel introduced the October videotape, "there is a reasonable probability that . . .

the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  At trial,

the jury was presented with (1) a videotape that showed L.H. accusing Mr. Kennedy of the rape,

and (2) L.H.'s in-court testimony that Mr. Kennedy had raped her.  Counsel's attempts to

impeach L.H. by asking her if she had changed her story proved feeble due to L.H.'s lack of

memory.  *See* R. 5365-67.  The jury heard almost nothing that showed that L.H. had insisted

upon Mr. Kennedy's innocence for over a year and a half after the crime.  Therefore, the

introduction of L.H.'s detailed videotaped statement that Mr. Kennedy was innocent would have

been invaluable for the defense's case.

### C.  Failure to Impeach Carolyn Kennedy

At trial, Mr. Kennedy was faced with potentially fatal testimony of the victim accusing

him, and the victim's mother corroborating the victim's testimony.  Counsel for Mr. Kennedy,

however, had multiple lines of defense against this evidence.  They had spoken with Cathy

Holmes, a close friend of the family, who stated in no uncertain terms that Mrs. Kennedy had

been pressured by the Office of Child Services (OCS) and the Jefferson Parish Sheriff's Office

(JPSO) into persuading L.H. to change her story and accuse Mr. Kennedy.  Counsel also had

information that the OCS not only held L.H. in State custody but also threatened to take away

Mrs. Kennedy's son (L.H.'s younger brother) if she did not cooperate.   Finally, and most

importantly, counsel had in his possession records from the OCS that proved that the accusation

of Mr. Kennedy was a prerequisite to regaining custody of L.H.[25]  At stake was his client's life, but counsel inexplicably failed to subpoena Ms. Holmes and apparently left the OCS records at home.  Counsel's failure to attack Mrs. Kennedy's testimony sacrificed an opportunity to dismantle the victim's accusation. This deficient performance caused grave harm to the defense and constituted ineffective assistance of counsel.

On March 5, 1998, three days after the incident, the Office of Child Services "received a referral alleging sexual intercourse of [L.H.] by her stepfather, Patrick Kennedy."  OCS Records, at p. 6.  Although the investigation into Mr. Kennedy's involvement was in its nascent stage, OCS stated in internal documents that it independently "validated the allegation" after a "thorough police investigation."  *Id.*  On March 12, the JPSO "received information" from a "confidential informant" that Carolyn Kennedy was allowing contact between L.H. and Mr. Kennedy, although OCS had directed her not to do so.  *Id.*  Evidently this "information" was relayed to OCS, and L.H. was subsequently removed from Carolyn's custody.  *Id.*at 7.   OCS set four "goals" that Carolyn Kennedy was required to reach before she could regain custody of her child.  Among these goals were: (1) "Enable Ms. Kennedy to support child emotionally" and (2) "[E]nable Ms. Kennedy to be objective concerning evidence."  *Id.* at 20.

OCS case worker Deanna Miles authored a report stating that "good progress" had been made towards the first goal because "Ms. Kennedy has been able to tell her child that she believes that her step father molested her; initially Ms. Kennedy supported her husband over her child. She now feels that he is probably the one who molested the child even though the child still states the young boys were the rapists."  *Id.* at 21.  Regarding the second "goal," the report

[25] Prior to trial, the trial court reviewed the documents in camera and then gave copies to both parties.  R. 41.

stated that [Carolyn Kennedy] feels that Mr. Kennedy is capable of committing the crime…[s]he is no longer visiting or communicating with him." *Id.*

While couched in the neutral terms of helping Carolyn Kennedy to be "objective" and to "emotionally support" L.H., it is clear from this and other reports that in reality OCS was coercing Ms. Kennedy into acquiescing to the Sheriff's Office's initial assessment of the case. The requirement that Ms. Kennedy convince L.H. of Mr. Kennedy's guilt (over her continued protestations) in order to regain custody is anything but "objective;" indeed, for a mother whose family has just suffered a tragedy, such a dangling carrot thoroughly negates the possibility of objectivity.  During this time period, Carolyn Kennedy confided in Cathy Holmes—a friend of the family—that she was indeed being pressured by the police to implicate Mr. Kennedy.

At trial, defense counsel attempted to elicit an admission from Carolyn Kennedy that she had been coerced by OCS and the JPSO.  *See* R. 5386.  Despite questioning by defense counsel, Ms. Kennedy denied any such coercion occurred.    Because counsel left the OCS records at home, he was forced to give up and allow her denials to stand unchallenged.

## 1. Trial Counsel's Failure to Impeach Carolyn Kennedy Fell Below Standards of Reasonable Representation

In order to attain an objective standard of reasonable performance, trial counsel is under an affirmative obligation to cross-examine an adverse witness with readily available impeachment evidence.  *Beltran v. Cockrell*, 294 F.3d 730, 734 (5th Cir. 2002) (holding that it was unreasonable for defense counsel not to impeach witness); *Higgins v. Renico*, 470 F.3d 624 (6th Cir. 2006) (same); *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001) (finding ineffective assistance of counsel where counsel's failure to investigate prevented the impeachment of the prosecution's only eyewitness); *Berryman v. Morton*, 100 F.3d 1089, 1099 (3d Cir.1996) (finding deficient performance where counsel failed to raise the victim's prior inconsistent

identification testimony); *Reynoso v. Giurbino*, 462 F.3d 1099 (9th Cir. 2006) (finding deficient performance where counsel did not effectively cross-examine prosecution's only two witnesses). In this case, counsel's failure to impeach Carolyn Kennedy with OCS records clearly outlining a plan to "encourage" her to change her story clearly fell below this standard. The OCS records had "significant exculpatory value." *See Beltran*, 294 F.3d at 734. This failure to impeach could not have been a strategic choice, as it is evident from the cross-examination that did take place that counsel intended to elicit an admission from Ms. Kennedy that she had been coerced. The need for such impeachment was compelling. Counsel's error in failing to introduce evidence which would have damaged the credibility of one of the prosecution's key witnesses amounted to a significant dereliction of duty. Under *Strickland*, counsel's performance was clearly deficient.

**2.   The OCS Records Would Have Been Admissible.**

Although the state court opined without authority that "Petitioner fails to establish if the OCS reports would be admissible for impeachment purposes," *State v. Kennedy*, No. 98-1425, p. 2 (24th J.D.C. April 28, 2010) (denying post-conviction relief), the Louisiana Code of Evidence clearly states that "*extrinsic evidence to show a witness' bias, interest, corruption, or defect of capacity is admissible to attack the credibility of the witness.*" La. Code Evid. art. 607. In this case Carolyn Kennedy was questioned by defense counsel on both her coercion by the State and her statements to Cathy Holmes, thus laying a foundation for the introduction of the OCS records under the Code of Evidence. *See* La. Code Evid. art. 613 (stating that in order to introduce extrinsic evidence of bias, interest, or corruption, the proponent must first fairly direct the witness' attention to the matter alleged, and the witness must be given an opportunity to admit the fact and fail to do so). As such, the OCS reports could have been entered as extrinsic evidence of bias to impeach Mrs. Kennedy and attack her credibility as a witness.

Nor would either piece of evidence have been "inadmissible hearsay." The state court apparently interpreted the Code of Evidence as classifying the OCS records—reports of a public agency—as hearsay. This is an unreasonable view of the law. The OCS reports would have been admissible under the "public records" exception, under Louisiana Code of Evidence Article 803(8). Article 803(8) provides a hearsay exception for records or reports in any form, of a public office or agency, setting forth "matters observed pursuant to a duty imposed by law." La. CODE EVID. art. 803(8)(a). The OCS reports were made by a public agency (the Office of Child Services), pursuant to authority granted by law, and make observations regarding the *general* investigation into L.H.'s family situation and Ms. Kennedy's fitness as a parent. *See* La. Code Evid. art. 803, comment (i). Moreover, Ms. Kennedy's statements to Cathy Holmes are non-hearsay prior inconsistent statements under La. CODE EVID. art. 801(D)(1)(a), and would not have been offered for the truth of the matter asserted, but rather to demonstrate Ms. Kennedy's state of mind at the time. The relevant fact for the jury would have been that Ms. Kennedy felt that she was under coercion to change her story, as this would tend to prove her future biased actions. Under Article 803(3), such "then existing state of mind" evidence is admissible as a hearsay exception. La. Code Evid. art. 803(3).

### 3. Trial Counsel's Failure to Impeach Carolyn Kennedy Prejudiced Mr. Kennedy

Given the overall defense strategy of proving that Mr. Kennedy was unfairly targeted by the JPSO, evidence that both Carolyn Kennedy and L.H. were coerced into their accusations would have been critical. Failure by trial counsel to effectively establish that coercion clearly prejudiced Mr. Kennedy. While evidence that Ms. Kennedy was coerced by the State is not directly exculpatory, it is exceptionally corroborative of the defense's theory of the case. Carolyn Kennedy's overwhelming incentive to cooperate with the State's demands (the return of her child) decisively calls into question the credibility of her testimony. Moreover, evidence of

76

her coercion is directly linked to L.H.'s eventual accusation. Impeaching Carolyn Kennedy would have been an extremely effective way of proving both foul play by the State, and that L.H.'s accusation was devoid of credibility—an accusation without which the State would have been incapable of proceeding.

Courts have found that the failure to impeach a critical witness with available impeachment material in a case based primarily on circumstantial evidence and testimony is prejudicial to the defendant's Sixth Amendment right to counsel. In *Lee v. State*, 899 So. 2d 348 (Fla. App.), *review denied*, 914 So. 2d 955 (Fla. 2005), the defendant was accused of raping his ten-year-old stepdaughter. The prosecution was based on the testimony of the complainant and other family members, and the testimony of a physician that the complainant's hymen showed evidence of penetration. Trial counsel, however, failed to present impeachment evidence that the complainant had made other allegations of sexual abuse in the past. As a result, "defense counsel was left with the very difficult job of attempting to demonstrate that a sympathetic young child, crying on the stand, was lying." *Id.* at 355. Along similar lines, *Earls v. McCaughtry*, 379 F.3d 489 (7th Cir. 2004), held that in a child sexual abuse case, the failure to object to the prosecution's bolstering of the complainant's credibility was ineffective. *See also Barco v. Tilton*, 694 F. Supp. 2d 1122 (C.D. Cal. 2010) (counsel ineffective for failing to impeach a critical witness with evidence that the witness was biased and had the intent to retaliate against the defendant).

Beyond undermining both Ms. Kennedy's and L.H.'s credibility, had trial counsel effectively illustrated OCS's plan it would have become readily apparent to the jury that the State turned to coercive methods due to sheer lack of conclusive evidence against Mr. Kennedy, and their ongoing commitment to convicting him at all cost. Had the jury been able to hear

evidence of OCS's "goals" for reunification; had they heard confirmation of Ms. Kennedy's fear of losing her child if she did not cooperate; and had they seen her continued choice to lie on the witness stand about the pressure she was put under, it is clear that reasonable doubt would have been raised as to Mr. Kennedy's guilt. It is, at the very least, more likely than not that a jury could have decided that Ms. Kennedy and L.H. had been pressured into accusing Mr. Kennedy of a crime that he did not commit, thus calling into question the reliability of the outcome of his trial.

### 4.   The State Court's Decision on this Issue was Unreasonable

The OCS records were a crucial and damaging item of evidence that had the potential to destroy the credibility of both the child victim and her mother.  The entire defense case was based on the theory that, after initially supporting her husband's innocence, Ms. Kennedy was coerced into accusing him in order to get her kids back from state custody; further, Ms. Kennedy played an instrumental role in persuading L.H. to change her story.  The OCS records stood as powerful evidence that the OCS—a state agency—refused to return L.H. to her mother's custody unless and until she got on board with the State's prosecution of Mr. Kennedy.  Cathy Holmes' testimony that Ms. Kennedy told her of her attempts to change L.H.'s mind was far less compelling than the actual documents from the OCS.

The state court, however, provided two reasons why the failure to impeach Ms. Kennedy with the OCS records did not meet the *Strickland* standard.  First, without citing any law, the court reasoned that "the trial court may have ruled those records were impermissible for impeachment purposes."  *State ex rel. Kennedy v. Cain*, No. 10-418, slip op. at p. 10 (La.App. 5 Cir. 7/6/10).  This speculation, that the trial court might have disregarded the Code of Evidence and ruled the records inadmissible as impeachment evidence, is baseless.  OCS reports are routinely admitted in relevant cases.  *See*, *e.g.*, *State v. Bernard*, 09-1178, p.13 (La. 3/16/10) 31

So. 3d 1025, 1036; *State ex rel. C.M. v. Willis*, 41,908, p.2 (La. App. 2 Cir. 12/27/06), 946 So. 2d 316, 317.  *See also Simmons v. State*, 466 S.E.2d 205, 226-27 (Ga. 1996) (assuming that Department of Family Services report would have been admissible to show bias of a witness, had the proper foundation been laid) (overruled on other ground); *State v. Shadoan*, Slip Op., 2009 WL 690246 (Ohio App. 4 Dist., March 12, 2009) (holding that the state had violated *Brady* by withholding, inter alia, a Child Services report reflecting inconsistencies in the victim's allegations).  Second, the state court reasoned that "Petitioner does not include the OCS records in his application for postconviction relief. [Therefore,] Petitioner does not present any evidence in this application to prove actual prejudice."  *State v. Kennedy*, No. 98-1425, at 3 (24th J.D.C. April 28, 2010).  However, Mr. Kennedy requested an evidentiary hearing, at which he would have presented this evidence and testimony, and continued to assert that his case required a hearing in writ applications to the appellate and supreme court.  Indeed, under La. C. Cr. P. art. 930, the trial court "shall" order an evidentiary hearing whenever there are significant contested issues of fact.  As shown by the State's response to Mr. Kennedy's application for post-conviction relief, there were several contested issues of fact.  The state court cannot fault Mr. Kennedy for not presenting evidence where no opportunity to do so has been granted.   This Court must apply de novo review.

### D.  Failure to Object to the Introduction of the Hearsay Photograph of the Caller I.D. Box

Rodney Madere testified at trial that his caller I.D. box which displayed that he received a call from a "P. Kennedy" at 7:37 on the morning of the incident.  According to Mr. Madere, a man who identified himself as Patrick Kennedy made an appointment for 9:00 that morning to remove blood from his carpets.  The JPSO took photographs of the readout on the caller I.D. box.  At trial, the State entered one of these photographs in order to prove that Mr. Kennedy did

in fact call Mr. Madere to have his carpets cleaned at 7:37 on the morning of the incident.   As noted above, this phone call is not reflected in the telephone records.   The photograph was clearly inadmissible; however, defense counsel failed to make a timely objection on any grounds.

Realizing their mistake, counsel attempted to object to the introduction of the photo well after it had been admitted into evidence.   Noting that the defense never subpoenaed Mr. Madere, the judge overruled this objection.   Failure by defense counsel to make the proper, timely objection clearly constituted ineffective assistance of counsel.

### 1. Trial Counsel's Failure to Object to Caller I.D. Evidence Fell Below Objective Standards of Reasonable Performance

In order to satisfy the first prong of Strickland it is necessary to show that trial counsel's actions fell below an objective standard for reasonable performance.   Numerous courts have held that the failure to object to damaging inadmissible evidence falls well below such standards. *State v. Sanders*, 93-0001 (La. 11/30/94); 648 So. 2d 1272, 1292 (stating that  the failure to object to damaging, inadmissible testimony "presents textbook professional error"); *Byrd v. Trombley*, Slip Op., 08-2319, 2009 WL 3673099 (6th Cir. Nov. 5, 2009) (holding that counsel was ineffective and prejudicial for failing to object to arguably inadmissible evidence of a prior crime); *Delgadillo v. Woodford*, 527 F.3d 919, 928 (9th Cir. 2008) (stating that "trial counsel's failure to object to evidence which is inadmissible under state law can constitute deficient performance under Strickland"); *United States v. Williams*, 358 F.3d 956 (D.C. Cir. 2004) ("if . . . the attorney's failure to object [to hearsay evidence] reflected ignorance of the law, rather than a reasonable strategic decision . . . then the attorney's performance must be deemed deficient"); *Rayshad v. State*, 670 S.E.2d 849 (Ga. App. 2008) (holding counsel ineffective in armed robbery, assault, and kidnaping case for failing to object to inadmissible, prejudicial evidence).   Indeed, preventing the introduction of inadmissible evidence is one of a defense attorney's most

fundamental responsibilities.   In this case, defense counsel could have tendered any of four separate objections to the introduction of caller I.D. evidence:

•        The photograph did not display the information the State claimed it displayed;

•        Under settled case law, the proper foundation of reliability was not established;

•        Caller I.D. evidence is inadmissible hearsay; and

•        Caller I.D. evidence is testimonial, and its introduction violated the Confrontation Clause of the Sixth Amendment.

The failure to object to the caller I.D. evidence cannot be justified as a strategic decision. Not only is there no plausible reason to allow the introduction of such damaging evidence to go unchallenged, but defense counsel admitted their mistake themselves by attempting to object after the fact.   Mr. Armato confessed his error to the trial court, stating that "we, the defense should have objected not only to the photograph, but also to the testimony regarding the photograph."  R. 4709.  Ms. da Ponte also admitted on the record that there was no trial strategy involved in the defense's failure to object: "I'm sorry judge. We simply failed to make a contemporaneous objection . . . ."   R. 4710-11.   Accordingly, it is clear from the record that counsel's failure to object was due to professionally deficient performance and not trial strategy.

### a.  The Photograph was Inadmissible Because it Did Not Display the Information Alleged by the State

Most egregious of all defense counsels errors was the failure to notice that Mr. Madere's caller I.D. box did not display the information that the State alleged.  A cursory look at the photo of the readout of the caller I.D. box reveals that display showed "7:37 – 3 02 – 97."  The incident, however, took place on March 2, 1998.  Due to the fact that the evidence simply was not what the State purported it to be, it ought to have been deemed inadmissible.  *See State v.*

*Stuart*, 344 So. 2d 1106 (La. 1977) (mechanical reproduction of original is inadmissible if purported copy does not accurately reflect the original).

**b. Caller I.D. Evidence was Inadmissible Because the Proper Foundation of Reliability was not Established**

Not only was the reliability of the caller I.D. box never established, but several items of evidence seriously called its reliability into question.  As a result, counsel's failure to object to the admission of the caller I.D. evidence fell below reasonable professional standards.

The leading case on the issue is *Tatum v. Commonwealth*, 440 S.E.2d 133 (Va. App. 1994). In *Tatum*, the court likened caller I.D. evidence to "call trap" evidence.  The court held that "results may be admitted only after the particular device in question has been proved reliable." *Tatum*, 440 S.E.2d at 136 (quoting *Penny v. Commonwealth*, 370 S.E.2d 314 (Va. App. 1988)). In that case, the box was considered reliable because the owner testified that he recognized the number displayed on the caller ID as the defendant's home phone number.  He had previously received other calls from that same number when the defendant would identify himself and ask to speak to his daughter.  The owner was able to recall specific dates and times that he received telephone calls from the defendant and the same number appeared on his caller ID device.  *Id. See also Culbreath v. State*, 667 So. 2d 156 (Ala. App.1995) (holding that reliability of caller I.D. box needed to be established, but that this was accomplished through testimony in which owner stated that every time the same person called, the box displayed the same number); *State v. Lucier*, 887 A.2d 129 (N.H. 2005) (same); *Watlington v. Commonwealth*, slip op., No. 2332-99-3 (Va. App. Nov. 7, 2000) (same); *People v. Caffey*, 792 N.E.2d 1163 (Ill. 2001) (same); *State v. Duff*, 2001 WL 102258 (Ohio Ct. App. Feb. 8, 2001) (same); *Inglett v.*

*State*, 521 S.E.2d 241, 245 (Ga. Ct. App. 1999) (same); *State v. Schuette*, 44 P.3d 459 (Kan. 2002) (same); *State v. Carr-Poindexter*, 2005 WL 737371 (Ohio Ct. App. April 1, 2005) (same).

Common to all of these cases is the fact that the owner of the caller I.D. box was able to establish reliability by testifying that he independently recognized the voice of the caller and was able to match it with a consistent number over the course of multiple phone calls.  Furthermore, in all of the cited cases, caller I.D. evidence was used to prove the identity of the caller, not the time of the call.

In this case, such reliability was never established, nor could it have been.  Mr. Madere had never spoken with Mr. Kennedy before, nor did Mr. Madere recognize the number on his caller I.D. box.  R. 4473-74.  It would have been impossible for Mr. Madere to testify that Mr. Kennedy's voice "matched" the number displayed.  Moreover, while the procedure established by Tatum and its progeny might determine reliability for the purpose of identification, it does not speak to the reliability of timing.  If (as *Tatum* holds) the reliability of a caller I.D. box must be established before it can be used as evidence, then following *Tatum*'s logic some testimony would have been necessary in this case to demonstrate that the caller I.D. box was recording the correct time and date.  Given that the date on the box read 1997, it would have been impossible for Mr. Madere to testify both that the caller I.D. box correctly reflected the time and date, and that the call occurred on the date of the rape.

Beyond the responsibility to object to inadmissible evidence, defense counsel is also obliged to know the current state of relevant law.  *Flores v. Demskie*, 215 F.3d 293 (2d Cir. 2000), *cert. denied sub nom Keane v. Flores*, 531 U.S. 1029 (finding ineffective assistance of counsel where defense attorney failed to understand well established law); *Burley v. Cabana*, 818 F.3d 414 (5th Cir. 1987) (holding that counsel has a duty to make at least a basic

investigation into the applicable law). *See also Dixon v. Snyder*, 266 F.3d 693 (7th Cir. 2001) (finding ineffective assistance of counsel where defense attorney was ignorant of established rule of evidence).  Where an issue has yet to come before a court, trial counsel must perform research to determine how the issue has been resolved in other jurisdictions in order to make an effective argument.  Here, minimal research into caller I.D. jurisprudence would have revealed that Mr. Madere's box was inadmissible under well-established precedent of courts faced with the issue.

### c.  The Caller I.D. Evidence was Inadmissible Hearsay

Offered to prove that Mr. Kennedy did call Mr. Madere at 7:37 on March 2, the read-out of the caller I.D. box constituted inadmissible hearsay. The readout was ultimately an out of court statement offered in court to prove the truth of the matter asserted.

Historically, hearsay evidence has been excluded from trial because it lacks sufficient reliability.  Because the declarant is typically unavailable for cross-examination, hearsay evidence may only be introduced if it falls into a narrowly tailored exception that provides sufficient indicia of reliability in the absence of cross-examination.  In this case, the reliability of the caller I.D. box was certainly in question, indeed, as discussed above, it is well-settled law that the reliability of each specific caller I.D. box must be established before it can be used as evidence.  Moreover, if the caller I.D. box can be considered to have made a statement, then such statement was definitely made out of court and subsequently repeated at trial in order to prove the truth of the matter asserted.

The remaining question, then, is if a non-human can be a "declarant" who makes a "statement."  The Louisiana Code of Evidence defines a "statement" as "(1) An oral or written assertion; or (2) Nonverbal conduct of a person, if it is intended by him as an assertion."  La CODE EVID. Art. 801 (A). Although not "written" by a human, the readout created on the

84

screen of a caller I.D. box is "written" nonetheless, albeit with points of light rather than ink. More importantly though, is the fact that Louisiana law includes in the definition of "statement" nonverbal conduct so long as it is an "assertion."  If the legislature accepted such "nonverbal conduct" as "statements," then clearly, the crux of an action's identity as a "statement" lies in its "assertive" quality. See Comments to La. Code Evid. 801 (A) (stating that, in line with the Federal Rules, "'assertive conduct' (message intended) may be hearsay"); *see also United States v. Hutson*, 821 F.2d 1015, 1019-20 (5th Cir. 1987); *Capital Marine Supply, Inc. v. Thomas*, 719 F.2d 104 (5th Cir. 1974) (treating computer-generated data as hearsay).  A caller I.D. box clearly "asserts" insofar as it delivers information for the purpose of stating a fact.  As contemplated by the legislature, there was a "message intended."

Turning to the definition of "declarant," some courts have reasoned that computers cannot be considered "declarants" if they self-generate the data in question.  *See Tatum*, 440 S.E.2d at 136.    This argument, however, rests on the faulty presumption that self-generated computer data is inherently reliable.  Indeed, the Supreme Court flatly rejected that position in *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527 (2009).  In *Melendez-Diaz*, the Court held that self-generated results of a machine that tested substances for the presence of cocaine were testimonial, and required the technicians who performed the tests to be available for cross-examination in order to be admissible.

Moreover, the facts of this case ought to serve as a stark example of the unreliability of computer data, as Mr. Madere's caller I.D. box indicated that Mr. Kennedy called in 1997. Because even "self-generated" computer data is not inherently reliable, and is therefore no different that data provided by humans, this Court should read the definition of "declarant" to include the caller I.D. box in this case.

Ultimately, information provided by the readout of the caller I.D. box is an unreliable out of court assertion. It is exactly the type of evidence that hearsay rules were designed to omit in the absence of an exception or strong indicia of reliability. Counsel's failure to identify the caller I.D. evidence as hearsay, which would have required the State to provide a witness capable of testifying to the veracity of the date and time information, denied Mr. Kennedy his Sixth Amendment right to effective assistance of counsel and his right of confrontation. .

**2. Failure to Object to the Inadmissible Caller I.D. Evidence Prejudiced Mr. Kennedy**

The State's case lacked any sort of physical evidence linking Mr. Kennedy to the rape. All the State had was a blood stain that turned out not to be the victim's blood, and the allegations the victim made after asserting for over a year and a half after the rape that someone else had done it. Thus, evidence that Mr. Kennedy made incriminating phone calls on the morning of the rape would prove critically important to the State's ability to obtain a conviction in this case. The caller I.D. evidence was the strongest independent corroboration of the State's allegation that Mr. Kennedy made incriminating phone calls before calling 911.

The phone calls themselves were a cornerstone of the State's case. The State, in fact, had no other evidence linking Mr. Kennedy to the crime, other than the highly suspect accusation by the victim. Given that the Bell South phone records showed that Mr. Kennedy never made the alleged calls, had the caller I.D. evidence been excluded, or alternatively used to prove that Mr. Madere's records were inaccurate, that cornerstone would have crumbled. Provided with strong evidence that the incriminating phone calls were never made, or at least not necessarily made when the State alleged, there is at least a reasonable probability that the jury would have found reasonable doubt of Mr. Kennedy's guilt.

### E.  Failure to Cross-Examine Madere

Although Mr. Madere testified that Mr. Kennedy called him around 7:30 a.m. on March 2 to make an appointment to remove blood from his carpet at 9:00 a.m. that day, all of Mr. Madere's records indicated otherwise.   Defense counsel had a sheet from Mr. Madere's appointment log showing that Mr. Kennedy made his appointment on March 1.   Curiously, by the time Mr. Madere contacted the police, that date had been crossed out and replaced with March 2.   Also, as discussed above, Mr. Madere's caller I.D. box was clearly inaccurate, as it stated that Mr. Kennedy called in 1997.   Despite holding two pieces of evidence that severely undermined Mr. Madere's testimony, defense counsel mentioned neither on cross-examination.

### 1.  Trial Counsel's Failure to Effectively Cross-Examine Mr. Madere Fell Below an Objective Standard of Reasonable Performance

Failure by defense counsel to effectively cross-examine Mr. Madere fell below objective standards of reasonable performance, which satisfies the first prong of *Strickland*.   Trial counsel has an obligation to cross-examine an adverse witness with readily available impeachment evidence.   *Beltran v. Cockrell*, 294 F.3d 730, 734 (5th Cir. 2002) (holding that it was unreasonable for defense counsel not to impeach witness that provided damaging testimony); *Higgins v. Renico*, 470 F.3d 624 (6th Cir. 2006) (same); *Reynoso v. Giurbino*, 462 F.3d 1099 (9th Cir. 2006) (same).   In this case, Mr. Madere provided devastatingly inculpatory testimony that defense counsel could easily have undermined with an effective impeachment.   Nonetheless, counsel made no attempt to impeach Mr. Madere, either with the appointment sheet, or the caller I.D. photo.  R. 4480-89.  Rather than attempt to call into question the reliability of Mr. Madere's memory of when the phone call occurred, as any reasonable attorney would have done, the defense spent the entire cross-examination attempting to determine if Mr. Kennedy was "urgent" when he allegedly made his cleaning appointment—an ultimately irrelevant point.

There cannot possibly be any reasonable strategy behind counsel's failure to impeach Mr. Madere's assertion that the call occurred on the morning of the rape. Counsel possessed two documents that would have handily rebutted Mr. Madere's testimony, yet failed to put them to any use. Although counsel was unaware that the caller I.D. box read "1997"—unacceptable negligence in and of itself—the failure to question Mr. Madere about the altered appointment log remains incomprehensible. The state court's categorization of counsel's failure to cross-examine Mr. Madere as "strategic" is unfounded on any factual basis and constitutes an unreasonable determination of the facts. *See State v. Kennedy*, No. 98-1425, at 3 (24th J.D.C. April 28, 2010). Since the state court refused Mr. Kennedy's request for a hearing, there was no opportunity for Mr. Kennedy to call counsel as a witness and demonstrate that there was no strategy involved in this error. The only evidence before the state court was that the appointment log shows a March 1 appointment, and the caller I.D. showed a call made in 1997.

## 2. Trail Counsel's Failure to Effectively Cross-Examine Mr. Madere Prejudiced Mr. Kennedy

The failure by trial counsel to cross-examine Mr. Madere on the alterations to his appointment log or his inaccurate caller I.D. information prejudiced Mr. Kennedy. The fact that Mr. Madere contacted the police days after the incident and had altered his appointment log to match the date of the incident seriously calls his credibility into question. Had the defense elicited the suspicious and inaccurate nature of Mr. Madere's record-keeping through an effective cross examination, it is highly probable that his testimony would have carried less weight with the jury. As Mr. Madere's testimony was critically important to the State's case, it is reasonably probable that had Mr. Madere's credibility been called into question, a jury would have found that reasonable doubt of Mr. Kennedy's guilt existed.

**F.  Stipulation to Inadmissible Videotape**

On December 16, 1999, almost two years after the incident, L.H. provided a statement for the Jefferson Parish Sheriff's Office in which she—for the first time—accused Mr. Kennedy. Although this videotape constituted devastatingly inculpatory inadmissible hearsay evidence, defense counsel nonetheless stipulated to its admissibility under La. R.S. 15:440 et seq.  The tape, however, does not qualify for admissibility under this statute, because L.H. was not available to testify.  La. R.S. § 15:440.5 (A)(8).  At trial, the State introduced the videotape with no objection from the defense.  In this case, trial counsel's stipulation and subsequent failure to object to the admissibility of the videotape constituted ineffective assistance of counsel in violation of Mr. Kennedy's Sixth Amendment rights as counsel's deficient performance failed to meet an objective standard of reasonableness and prejudiced Mr. Kennedy, calling into question the reliability of the verdict.  *See Strickland*, 474 U.S. at 688.

**1.  Trial Counsel's Stipulation and Failure to Object to the Admissibility of the Videotaped Accusation of Mr. Kennedy by the L.H. Fell Below an Objective Standard for Reasonable Performance**

The Louisiana Supreme Court, on direct review, specifically refrained from addressing whether defense counsel's failure to object to this evidence, and to stipulate to its admissibility, was ineffective assistance of counsel:

> Thus, we do not consider whether lack of an objection constituted ineffective assistance of counsel and find that it does not provide grounds for us to consider defendant's unobjected to assignment of error.

*State v. Kennedy*, 957 So. 2d 757, 775 n. 19.  However, the court defaulted Mr. Kennedy for failing to raise L.H.'s competency on December 16, 1999 prior to trial:

> In addition, to the extent that the defendant now claims that he should have been allowed the opportunity to test the witness's competency prior to the admission at trial of the December 16, 1999, videotape, the defendant clearly waived that right as he did not request to at that time and instead freely stipulated to the admissibility of the tape. La. C.C.P. art. 841.

Unpublished Appendix at 24.  Although the state post-conviction court unreasonably claimed that "the Louisiana Supreme Court reviewed and rejected this claim," *State v. Kennedy*, No. 98-1425, at 3 (24th J.D.C. April 28, 2010), the Louisiana Supreme Court clearly did not rule on the merits of the claim due to counsel's waiver of the issue.  Defense counsel's erroneous stipulation and subsequent failure to test the competency of L.H. and object to the admissibility of the videotape clearly fell below an objective standard for reasonable representation.  "[F]ailure to object to the introduction of damaging, obviously hearsay testimony presents a textbook unprofessional error."  *State v. Sanders*, 93-0001 (La. 11/30/94); 648 So. 2d 1272, 1292.  *See also Sea v. State*, 49 So. 3d 614, 617 (Miss. 2010) (finding that although trial counsel defaulted the issue of whether it was error to play videotapes of the alleged victims' accusations, the failure to object was "instructive on the issue of his counsel's effectiveness.").

Counsel's stipulation to the admission of the videotape fell below reasonable standards of representation for four reasons.  First, the videotape embodies the definition of hearsay.  It is an out-of-court statement offered for the truth of that matter asserted (that Mr. Kennedy was guilty).  Beyond failing to object, however, trial counsel inexplicably stipulated to the admissibility of the videotape, even though it clearly failed to meet the requirements set out by Louisiana law.  Second, the statute under which the videotape was admitted, La. R.S. § 15:440.5 (A)(8), was under serious constitutional scrutiny at the time of trial and thereafter.   Third, the videotape was not even admissible under the statute.  La. R.S. § 15:440.5 (A)(8),  provides that if a videotaped statement of a child victim is to be offered in court, the child must be available to testify.  Due to L.H.'s lapsed memory, she was not available for purposes of the statute.  Fourth, because L.H. was unavailable and there was no opportunity to cross-examine her at the time the statement was

made, the video was both inadmissible and unconstitutional testimonial evidence against Mr. Kennedy.

Given the highly inculpatory nature of the videotape, there is no feasible scenario in which stipulating to the admission of this evidence could be part of a reasonable trial strategy. Incompetent advocacy is not a tactic or strategy. *Strickland*, 474 U.S. at 688-681. It is inconceivable that defense counsel would not make any attempt to suppress a direct accusation from the victim. Clearly, trial counsel erroneously believed that the videotape qualified for admissibility under La. R.S. § 15:440 et seq.—an error that could have been avoided with even a cursory glance at the requirements of the statute.

### a. The Videotape Constituted Inadmissible Hearsay

The videotaped statement made by L.H. was textbook hearsay. "'Hearsay' is statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." La. CODE EVID. art 801(c). In this case the statement was recorded out of court, and was offered for no other purpose than to prove the truth of the allegations made in the statement: that Mr. Kennedy was guilty. The fact that L.H. physically took the stand has no bearing on the admissibility of other out of court statements that she made prior to trial. Furthermore, the videotaped statement was not introduced pursuant to any exception to the hearsay rules (nor does it qualify for any), other than the statute discussed below. *See* La. CODE EVID. art. 804 (B).

### b. The Statute which Provided for the Videotape's Admission Was Under Constitutional Scrutiny

Counsel was ineffective for stipulating to the admissibility of the videotape, because the statute which provided for its admission was under constitutional scrutiny. On direct appeal,

counsel presented a substantial challenge to the constitutionality of the statute. The Court rejected the challenge because trial counsel stipulated of the admissibility of the videotape at trial.

### c. The Videotape Was Inadmissible Under La. R.S. § 15:440.5(A)(8) Because L.H. was Not Available to Testify

Even setting aside the constitutionality of the statute the admission of the videotape constituted a statutory violation of La. R.S. § 15:440, et seq., because L.H. was unavailable for cross-examination. A prerequisite to the admissibility of such a videotaped statement is that "the child is available to testify." La. R.S. § 15:440.5 (A)(8). In Louisiana, a witness is not available if they testify to a lack of memory concerning the subject matter of her statement. Indeed, the statutory "Definition of Unavailibility" specifically "includes situations in which the declarant: . . . (3) Testifies to a lack of memory of the subject matter of his statement." La. Code Evid. Art. 804.

On direct examination at trial, L.H. answered a series of leading questions. Although defense counsel objected to the leading questions, and the trial court instructed the State to stop., the State continued to lead L.H.'s testimony throughout its examination. The bulk of the inculpatory testimony came in response to leading questions, or as an endorsement of the hearsay videotape:

BY MR. PACIERA:

Q.     Is everything that you're saying in this courtroom today the truth?

A.     Yes.

Q.     Did you hear yourself when you were on that tape from December of 1999?

A.     Yes.

Q.      Is everything you heard on there the  truth?

A.      Yes.

Q.      That this person raped you?

A.      Yes.

Q.      Nobody else?

A.      Nobody else.

Q.      In your room?

A.      In my room.

R. 5363.  On cross-examination, however, L.H. claimed a lack of memory to any of the details

that might be relevant to assessing her credibility:

Q.      Do you remember Mr. Armato coming to see you about a year and a half
later?

A.      No.

Q.      You don't remember his coming to your house? Okay, and for the record,
you're shaking your head no, right?

A.      No

Q.      Okay and you don't remember telling him that somebody else did it?

A.      No.

Q.      Okay do you remember giving another statement that was videotaped
besides the one that we just saw when it first happened?

A.      No.

Q.      Alright, you don't remember talking to another therapist and having her
put you on videotape?

A.      No.

Q.      You remember going to a doctor's office and talking to the doctor about,
let me back up.  Do you remember Ms. Renee ever coming to your house and
taking you to go see, and when I'm talking about Ms. Renee, that's a police
officer, right? Do you remember Ms. Renee, she was one of the police officers on
your case?

A.      No

Q.      Do you remember Ms. Florida?

A.      Yes.

Q.      Do you remember Ms. Kelly?

A.      No.

R.  5365-66.   Indeed,  L.H.  was  not  "available"  to  be  cross-examined  on  any  of  her  prior

statements:

Q.      Okay, do you remember going with any policeman to a doctor's office to
talk about what happened to you?

A.      No.

Q.      Do you remember when Patrick first went to jail?

A.      No.

R. 5267.

Q.      [L.H.], Do you remember the first time that you met with the D.A.'s office
on this case?

A.      No.

Q.      Okay, you met with them before today, right?

A:      Yes.

Q.      Okay and did  you  meet  with  them  around  the  tine  that  you  gave  the
interview to Ms. Amalee?

The time that you made that videotape with Ms. Amalee, did you meet with the
DA's office around that time?

A.      Uhm I don't

Q.      Its not these D.A.'s but anybody else from the DA's office? . . .

A.      I don't remember.

R. 5269.   When defense counsel attempted to show L.H. a card she had written to Mr. Kennedy,

again she invoked her lack of memory:

Q.      [L.H.], I'm going to ask you if you recognize this? I'm going to ask you to open it up and look at it and see if you recognize that. Alright, for the record you're shaking your head. You don't recognize this card?

A.      No

R. 5370.

"A witness may actually be present in the courtroom, and yet be considered unavailable. The critical factor emerging from these cases in making the determination of whether to apply the exception is not the unavailability of the witness himself, but the unavailability of his testimony." *State v. Nall*, 439 So. 2d 420, 423-24 (La. 1983) (citing MᴄCORMICK, EVIDENCE (2d ed. 1972)).

In *Nall*, the Louisiana Supreme Court observed that there was some "disagreement among jurisdictions" concerning whether a witness who testifies to a lack of memory should be considered "available" or "unavailable".  The Court, on behalf of the prosecution, in that case, held that the loss of memory effectively rendered the witness unavailable:

> The witness gave former testimony to establish the defendant's participation in the killing of her husband and her efforts to cover up her lover's involvement. At the second trial, and after her plea of guilty to the conspiracy, she could no longer remember or recall what had happened at the time of the murder. Thus her loss of memory effectively prevented the state from presenting to the jury evidence of the defendant's statements to her concerning the murder. State v. Nall, 439 So. 2d 420, 423-424 (La. 1983).  This decision is consistent with the definition of the legislature, in La. C. E. Art. 804, discussed above.

*Id.*

The Louisiana Supreme Court has observed the practical and constitutional issues that arise when child-witnesses are called as witnesses.  *See Folse v. Folse*, 98-1971 (La. 06/29/99), 738 So. 2d 1040, 1049 (citing Michael H. Graham, *The Confrontation Clause, the Hearsay Rule, and Child Sexual Abuse Prosecutions: The State of the Relationship*, 72 MINN. L. REV. 523, 560 n. 192 (1988). The article by Professor Graham specifically addresses the issue of availability as

well as the constitutionality of a statute similar to the one at issue here.  Concerning availability,

Professor Graham observed:

> To be a testifying witness under availability analysis, a witness must actually testify at trial concerning the witnessed event. If a witness claims not to recall, asserts a privilege, or is unable or unwilling to testify, the witness is in fact unavailable and considered nontestifying.

*Id*, at 539.   Indeed, in criticizing a statute that is analogous to the one at issue here, Professor

Graham noted that a child's inability to "remember the details of the events" would render cross-

examination meaningless.  *See id.* at 601, n. 337.

### d. Due to L.H.'s Unavailability, the Admission of the Videotape Violated the Confrontation Clause

Regardless of the videotape's status as hearsay or its inadmissibility under La. R.S. §

15:440.5, L.H.'s unavailability rendered the evidence inadmissible under the Confrontation

Clause.  In criminal trials, a defendant's right to confront the witnesses brought against him is

near absolute, and exits independently of other evidentiary concerns.  *Crawford v. Washington*

clearly established that all testimonial evidence is subject to confrontation.  "Where testimonial

statements are at issue, the only indicia of reliability sufficient to satisfy constitutional demands

is the one the Constitution actually prescribes: confrontation."  *Crawford v. Washington*, 541

U.S. 36, 68 (2004).

The Court went on to hold that the only acceptable method by which testimonial evidence

could be admitted absent live testimony was if opposing counsel had a previous opportunity to

meaningfully cross-examine the witness regarding the statements in question: "the Framers

would not have allowed admission of testimonial statements of a witness who did not appear at

trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-

examination."  *Id.* at 69 (emphasis added).  In this case, the videotaped interview was a textbook

case of a testimonial statement, therefore the unavailability of L.H. to testify at trial (as

established above) combined with defense counsel's lack of opportunity to meaningfully cross-examine her previously renders the videotape undoubtedly inadmissible under *Crawford*.

To the extent the State claims that the request to assess L.H.'s competency was not sufficient to require a hearing on availability or taint, counsel was patently ineffective for failing to request such a hearing prior to stipulating to the admissibility of the statement.

### 2. Counsel's Failure to Object to the Introduction of the Videotape Prejudiced Mr. Kennedy

Failure on the part of the defense to object to inadmissible videotape certainly prejudiced Mr. Kennedy, and affected the outcome of the case. The centerpiece of the State's case was L.H.'s videotaped accusation. Without the tape, the accusation would have consisted merely of L.H. appearing on the witness stand and answering several leading questions from the prosecutor. She then was unable to answer almost all of defense counsel's questions, nullifying the prospect of cross-examination.

Beyond the specter of the child crying on the witness stand, and her eventual consent to State's allegation that Patrick Kennedy raped her, the videotape was the crucial testimony introduced at trial. Indeed, without an accusation by the victim, there would be no case at all. Had defense counsel properly prevented the introduction of the tape leaving the State to rely on L.H.'s incoherent, incomplete, and suspicious live testimony, it is clear that there is—at the very least—a reasonable probability that the jury would have found reasonable doubt of Mr. Kennedy's guilt.

### G. Failure to Impeach Lee and Subpoena Messina

Despite having exculpatory reports authored by Dr. Debra Messina, the defense failed to subpoena her. Ultimately, the State called her supervisor, Dr. Henry Lee, to testify in order to verify those same reports. Among the items to which Dr. Lee testified was a pair of black shorts

that L.H. was wearing during the incident.  L.H. originally stated that she was dragged from her garage to the backyard; however, the report indicated that the shorts were not tested for grass or soil deposits.  *See* Connecticut Lab Report.  Nonetheless, during a hearing, Dr. Lee testified that testing indicated that there were no soil or grass stains on the shorts, claiming that those results had been inadvertently left out of the report.   Although such testimony blatantly lacked foundation and contradicted the submitted reports, defense counsel failed to impeach Dr. Lee on this issue, allowing him to testify to the lack of grass and soil stains uncontested.  This omission clearly constituted ineffective assistance of counsel as it both fell below objective standards for reasonable performance, and also prejudiced Mr. Kennedy.

1.  **Trial Counsel's Failure to Impeach Dr. Lee Fell Below an Objective Standard of Reasonable Performance**

The failure to impeach Dr. Lee on testimony that was an outright contradiction of his own reports fell below objective standards of reasonable performance by defense counsel.  It is generally agreed upon that failure to impeach a witness with readily available contradictory statements may constitute ineffective assistance of counsel.  *See*, *e.g.*, *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001) (finding ineffective assistance of counsel where counsel failed to effectively challenge the credibility of prosecution witness); *Berryman v. Morton*, 100 F.3d 1089, 1099 (3d Cir.1996) (same); *Tomlin v. Myers*, 30 F.3d 1235, 1238 (9th Cir. 1994) (same); *Nixon v. Newsome*, 888 F.2d 112, 115 (11th Cir.1989) (same); *Blackburn v. Foltz*, 828 F.2d 1177, 1183 (6th Cir.1987) (same); *Beltran v. Cockrell*, 294 F.3d 730, 734 (5th Cir. 2002) (same); *Higgins v. Renico*, 470 F.3d 624 (6th Cir. 2006) (same); *Reynoso v. Giurbino*, 462 F.3d 1099 (9th Cir. 2006) (same).

In this case, counsel could have significantly undermined Dr. Lee's credibility by highlighting for the jury the fact that the soil stains to which he testified never appeared in the

reports.  This would have left the jury with a choice between two conclusions: either that Dr. Lee was lying about the soil stains, or that the Connecticut Crime Lab procedures were inadequate and inaccurate.  Whichever option the jury chose to believe would have been highly detrimental to the State's case, calling into question not just the accuracy of the testing on the shorts, but the veracity of the report as a whole.

There is no strategic justification for trial counsel's failure to impeach Dr. Lee.  Indeed, Mr. Armato went as far as to admit that he was thoroughly unprepared to effectively cross-examine Dr. Lee.[26]   Allowing Dr. Lee to add uncorroborated, and potentially fabricated, inculpatory data to his report without the slightest challenge falls within no conceivable ambit of trial strategy.  Moreover, defense counsel was made aware during Dr. Lee's qualification hearing that he was making an off-the-cuff addition to his report.[27]  The failure to use this readily available and obviously inconsistent report to impeach Dr. Lee's credibility constituted a total abdication of responsibility and reasonable performance.

### 2.  Trial Counsel's Failure to Impeach to Dr. Lee Prejudiced Mr. Kennedy.

Given the fact the L.H. provided two contradictory accounts of the incident, evidence that tended to corroborate one version of her story was of exceptional import.  Indeed, considering that the rest of the physical evidence provided by the state was of little consequence, the presence (or lack thereof) of grass stains on the shorts became critically decisive.[28]   If Dr. Lee

---

[26] MR ARMATO: "…I am now denied the ability to effectively cross examine him on those opinions, because I was never presented with those opinions before, and in addition, I reiterate my previous request for a recess, because I do not have the tools to cross examine him adequately…" R. 5600.

[27] Questioning by Mr. Armato: "A. Actually, you know, I failed to mention, no grass and no soil-like stain was found on the shorts either. Q. Oh, are you saying that you failed to mention that in your report? Yes, sir. All right. Okay…He, I believe, is adding something to his report, I think is what he's saying."  R. 5538.

[28] Indeed, the prosecution highlighted this point in their closing argument: "[Dr. Lee] told you [L.H.] didn't have any soil or any grass on her panties, which would have to have been pulled down in the grass;

neglected to include the fact that a soil/grass stain test was performed on the shorts in his report, the State was able to avoid the consequences of an egregious error due to the incompetence of the defense team.  Alternatively, if the test was in fact never performed (as indicated by report), then the State performed an act of grand larceny on the defense's inadequate watch.

Regardless, defense counsel failed to pose an obvious question to the jury: if the reports from the Connecticut Crime Laboratory ought to be considered reliable, why, then, was such a critical test omitted?  Given that the strategy of the defense was to show that there was a conspiracy against Mr. Kennedy, just such a credibility impeachment would have been vital to their theory.  Dr. Lee's eleventh-hour addition to his testimony was suspicious to say the least.  Had the defense effectively impeached Dr. Lee with this information, there is at least a reasonable probability that the jury would have found reasonable doubt.

### H.  Failure to Request a Taint Hearing

The testimony provided by L.H. at trial was tainted by State coercion, rampantly inconsistent, and ultimately false.  Failure by defense counsel to raise the issue of taint pre-trial followed by their failure to cross-examine L.H. on the inconsistencies in her testimony constituted ineffective assistance of counsel.

During a pre-trial hearing on 404(b) "other crimes" evidence, L.H., then ten years old, was called to the stand to testify regarding her previous interactions with Mr. Kennedy.  On cross-examination defense counsel attempted to attack L.H.'s credibility over State objections by impeaching her with numerous prior inconsistent statements made about the March 2, 1998

---

on her white T-shirt, which she would have been dragged on if she were being pulled by the leg; or on her pants, which also would have made a friction point as she was being dragged through the cement and through the grass. She should have had scuff marks, soil and grass stains."  R. 5874-75.  The fact of the matter is that despite the State's unwarranted implication that grass stains would have had to exist on multiple articles of clothing, it is entirely plausible that the only grass stains present would have been on the shorts – the absence of which ought never to have been admitted into evidence.

incident.  The trial court ruled in the State's favor, and the defense was prevented from attacking L.H.'s credibility.  Although L.H. testified that she does not always tell the truth, defense counsel did not raise any questions of competency, nor did defense counsel argue that evidence of coaching by the State necessitated such an evaluation.

Some three years later, defense counsel filed a motion to assess competency, arguing that "a hearing prior to the trial of this matter should be convened, so that this court may make a determination as to whether L.H. is competent to testify as to events which occurred when she was at an age at which her understanding would have been challenged, and for which her memory now is significantly impaired."  R. 627.  The judge denied the motion. Referring to the 404(b) hearing, the judge stated:

> I found it also interesting that no one, that is no one from the State nor the Defense, and the Court for that matter, put the issue of competency before the Court at that particular time. We just proceeded right on through testimony, assuming that the young lady was competent to testify.

R. 2469.  The judge went on to say that "Unless you can show me today some circumstances that have manifested themselves between that testimony in April of 2000 and today that would cause me to concern myself about her competency to testify—unless you can do that today, your Motion is denied."  R. 2470.  Again, defense failed to raise the issue of witness taint from State coaching and coercion.

On direct examination at trial, L.H. testified that she was raped by Mr. Kennedy in her bed, stating that "I woke up one morning and Patrick was on top of me." R. 5336.   On cross-examination, even though L.H. exhibited 10 distinct instances of memory loss, defense made but one attempt to refresh her memory or attack her credibility despite the myriad extrinsic evidence in their possession. Moreover, counsel failed to question L.H. whatsoever on her revised account of the events of March 2, despite holding countervailing physical evidence.

101

1.  **Trial Counsel's Failure to Argue That L.H.'s Testimony was Tainted and to Cross-Examine Her Effectively Fell Below Objective Standards for Reasonable Performance**

Defense counsel's failure to timely move that L.H. was incompetent to testify and subsequent failure to argue that prima facie evidence of taint was sufficient grounds to evaluate competency fell bellow objective standards for reasonable performance. The leading case on the issue of taint in child sexual abuse cases is *State v. Michaels*, 642 A.2d 1372 (N.J. 1994), (cited in *State ex rel. H.H.*, Slip. Op. 09-0073, p. 5, (La.App. 1 Cir. 10/27/09); 2009 WL 3447389).  In *Michaels*, the New Jersey Supreme Court recognized the particular susceptibility of child abuse victims to taint, stating

> That an investigatory interview of a young child can be coercive or suggestive and thus shape the child's responses is generally accepted. If a child's recollection of events has been molded by an interrogation, that influence undermines the reliability of the child's responses as an accurate recollection of actual events.

*Michaels*, 642 A.2d at 1377.  The court went on to note a number of factors that may cause or contribute to taint:

> lack of investigatory independence, the pursuit by the interviewer of a preconceived notion of what has happened to the child, the use of leading questions, and a lack of control for outside influences on the child's statements...[t]he use of incessantly repeated questions...[t]he explicit vilification or criticism of the person charged with wrongdoing.

*Id.* If the defendant establishes the presence of these factors, the burden shifts to the prosecution to prove by clear and convincing evidence the reliability of the child's statements.  *Id.* at  321.

In this case, all of the *Michaels* factors were present.  L.H. was subjected not only to police interrogations in which she was repeatedly questioned about her version of the events, but also to two interviews conducted by OCS at the behest of the JPSO.  As discussed above, OCS had been told by the JPSO that Mr. Kennedy was guilty.  Indeed, during her first OCS interview,

L.H. was faced with a veritable barrage of antagonistic questioning—in the presence of a police officer—for the clear purpose of undermining her original story.

By the time of her second OCS interview, in which she accused Mr. Kennedy, L.H. had been removed from the custody of her mother for having had contact with her step-father – the implications of which were undoubtedly not lost on her – and was well aware that Mr. Kennedy was in jail awaiting trial for her rape.  For the years in between the incident and her accusation, L.H. lived in an environment that collectively presumed Mr. Kennedy's guilt.  Indeed, "helping" L.H. to come to the realization that evidence pointed to Mr. Kennedy's guilt was one of the predicates for her reunification with her mother.   Pressure to accuse Mr. Kennedy came from all sides, including Carolyn Kennedy's family, who make no secret of the fact that they presumed Mr. Kennedy's guilt.  The pressure was so great, in fact, that she once said to Carolyn Kennedy "[m]ama, you be crazy like th[e] rest of them. You're trying to get me to change my story like everyone else and my Daddy didn't do this to me. I'm not going to lie."

Defense counsel's failure to timely present such sweeping evidence of taint pre-trial was an obvious and egregious oversight.  Obviously this was not a strategic maneuver by defense counsel, as they eventually attempted to argue incompetency.  Even at that juncture, however, counsel compounded their mistake by yet again failing to raise the issue of taint, instead arguing that L.H.'s memory was impaired.  Given that establishing L.H.'s accusation was false was central to the defense, failure to argue that she had been coerced clearly fell below objective standards of reasonable performance.

Clearly established federal law provides that the failure to effectively cross-examine key witnesses falls below objective standards for reasonable representation.  *Higgins v. Renico*, 470 F.3d 624 (6th Cir. 2006) (holding that counsel's failure to cross-examine the State's key witness

was constitutionally deficient performance and prejudiced the defendant; the witness was the

only eyewitness to the murder and a suspect himself, and the failure to cross-examine him

allowed the State's case to go untested and produced an unreliable outcome); *Reynoso v.*

*Giurbino*, 462 F.3d 1099 (9th Cir. 2006)  (holding that, where the government had offered a

reward for evidence leading to conviction, counsel's decision not to cross-examine witnesses

about their motivation for testifying was not reasonable trial strategy and prejudiced the

defendant).

        In *Brown v. State*, 877 P.2d 1071 (Nev. 1994), the Nevada Supreme Court held that

defense counsel rendered ineffective assistance in failing to examine the victim during the

defendant's sexual assault trial. Defense counsel testified that he felt the victim was lying about

the alleged assault by the defendant, but that attacking the victim on cross-examination would

create sympathy for her with the jury.  The court found defense counsel's failure to cross-

examine the victim was a clear indication of ineptitude.  *Id.* at 877.

        Here, defense counsel essentially gave the State's most critical witness a pass.  Due to

weak cross-examination, defense counsel was unable to highlight for the jury the significance of

L.H.'s modified accusation: that she recanted a story she told stridently to a variety of sources for

almost two years.  Although counsel was sitting on a multitude of reports and statements from

police, doctors, social workers, and family members in which L.H. maintained that she was

raped by two black teenagers, the topic of her original accusation was covered in all of ten

innocuous questions, half of which she was incapable of answering due to claimed memory

loss.[29]  Despite the fact that defense counsel technically raised the possibility that L.H. changed

---

[29] By Graham DaPonte: "Q.  Okay, do you remember Mr. Armato coming to see you about a year and a
half later? A. No. You don't remember him coming to your house...? A. No. Q. Okay do you remember
telling him that somebody else did it? A. No. Q. Okay, do you remember giving another statement that
was video taped, besides the one that we just saw, when if first happened? A. No. Q. Alright, you don't

her story, the failure to directly confront her with evidence of her former assertion combined with the lackadaisical cross-examination prevented the defense from firmly establishing the sheer peculiarity of her reversal.  Indeed, had counsel confronted L.H. with the full extrinsic evidence at their disposal, the credibility of her new accusation would have been seriously undermined.

More importantly, though, the defense held two pieces of extrinsic physical evidence that proved that L.H.'s revised story was false.  According to L.H., she was raped in her bed and never came into contact with the work blanket that Mr. Kennedy stated he used to carry her upstairs from the yard. However, lab results showed that L.H.'s blood was on the work blanket, and not on her mattress. Considering the blood loss she suffered and the amount of blood at the crime scene it would have been impossible for the rape to have occurred in her bed, as L.H. claimed at trial, without leaving so much as a *trace* of evidence.  Directly confronting L.H. with this testimony in open court would, at the very least, have destroyed her credibility and seriously undermined the veracity of her story.  Whatever did happen on the morning of March 2, it is clear that L.H. was lying when she took the stand and stated that she was raped in her bed.  This revelation alone, had defense counsel effectively presented it through cross-examination, would have been sufficient to guarantee an acquittal.

## 2. Failure to Argue Taint and Effectively Cross-Examine L.H. Prejudiced Mr. Kennedy

L.H. was incontrovertibly the State's most critical witness.  Without her accusation, it would have been impossible for the state to proceed with their prosecution.  As such, failure by

---

remember talking to another therapist and having her put you on the video tape? A. No. Q...Do you remember Ms. Renee...? A. No....Q. Do you remember going with any policeman to a doctor's office to talk about what happened to you? A. No."  R. 5365-67.

defense counsel to effectively undermine her credibility, or prevent the admission of her testimony altogether, undoubtedly prejudiced Mr. Kennedy.

In order to show prejudice, it is necessary to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. This standard "is not a stringent one. It is less demanding than the preponderance standard." *Hull v. Kyler*, 190 F. 3d 88, 110 (3d Cir. 2003). Given the ample evidence of taint there is clearly a reasonable probability that the court would have found L.H.'s testimony inadmissible. Had the court made such a finding it is certain that Mr. Kennedy would have been acquitted.

Furthermore, even if the court allowed L.H.'s testimony after a hearing, there clearly remains that reasonable probability that an effective cross-examination would have undermined L.H.'s credibility to such a degree that the jury would have found reasonable doubt of Mr. Kennedy's guilt. As discussed above, defense counsel had evidence that conclusively proved that L.H.'s story of being raped in her bed was false. Defense counsel's failure to confront L.H. with this evidence, and thereby force her to explain the inconsistencies of her story before the jury, seriously calls into question the reliability of the verdict. The state court's unfounded assumption that this failure was "strategic," *State v. Kennedy*, No. 98-1425, at 4 (24th J.D.C. April 28, 2010), has no basis and must be considered an unreasonable determination of the facts.

## I. Failure to Call Favorable Witnesses

While in recovery at the hospital, L.H. made several statements indicating that Mr. Kennedy was not the perpetrator. She repeatedly asked for her "daddy," and when her biological father arrived, she stated that she was not talking about him; she was talking about Mr. Kennedy. Counsel, however, failed to call any of the health care workers at the hospital to testify as to these statements. L.H.'s statements at the hospital would have been admissible under La. CODE

EVID. art. 803(3) as a statement of her then existing state of mind or emotional condition. Because they were made so soon after the rape, L.H.'s statements at the hospital would have been powerful evidence against the credibility of her later accusation of Mr. Kennedy.

Furthermore, counsel failed to call Mr. Kennedy's stepson, Davell Hammond, as a witness. Davell could have testified that he saw L.H. lying sprawled in the grass soon after the rape. And unlike L.H., he did not change his story over time; thus the defense would have had a strong and consistent eyewitness to rebut L.H.'s inconsistent testimony. Although he was a young child at the time of the crime, he could still have been found to be a competent witness under La. Code Evid. art. 601 (which sets the standard for competency as "proper understanding" rather than age). Counsel's failure to call these exculpatory witnesses constituted ineffective assistance of counsel. Although the state court faulted Mr. Kennedy for not providing the name of the healthcare worker witness, or an affidavit from Davell Hammond, the fact remains that the state court refused to allow Mr. Kennedy to present this evidence at a hearing. For the state court to deny a hearing on one hand, and on the other hand deny Mr. Kennedy's claims for failing to present sufficient evidence, is circular reasoning and had the effect of denying Mr. Kennedy his day in court. Mr. Kennedy respectfully requests an evidentiary hearing in this Court so that the factual disputes left unsettled in state court may be resolved. *See Townsend v. Sain*, 372 U.S. 296, 313 (1963). The state court's perfunctory denial of the ineffective assistance of counsel claim, based upon a refusal to consider facts in support of the claim or conduct an evidentiary hearing, presents no bar to this Court's consideration of the claim. 28 U.S.C. § 2254(d).

**J.   The Effect of Counsel's Unprofessional Errors Must be Viewed Cumulatively Along With the Untimely Disclosure of *Brady* Evidence**

Whether ineffective assistance of counsel or *Brady* violations are under review, the fundamental question is whether the trial was fair; and whether errors committed during the course of the trial, considered together, rendered the trial unfair.  The United States Supreme Court noted in *Strickland,* 466 U.S. at 696, that, as with *Brady* claims, "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." In *Bagley*, 473 U.S. at 674-75 (1985), a progeny of *Brady*, the Court stated: "A fair analysis of the holding in *Brady* indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial." (quoting *United States v. Agurs*, 427 U.S. 97 (1976))."

Given the identical standards *Strickland* prejudice and *Brady* materiality which implicate the same concern to protect the fundamental fairness of the proceeding, the cumulative impact of the above-mentioned constitutional *Brady* and *Strickland* errors should be considered together in determining whether Mr. Kennedy received a fair trial.  *Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992) ("We do not need to decide whether these deficiencies alone meet the prejudice standard because other significant errors occurred that, considered cumulatively, compel affirmance of the district court's grant of habeas corpus"); *Gonzales v. McKune,* 247 F.3d 1066, 1078 (10th Cir. 2001) (the outcome of the trial "would likely have changed in light of a combination of *Strickland* and *Brady* errors, even though neither test would individually support a petitioner's claim for habeas relief"); *Williams v. Quarterman*, 551 F.3d 352 (5th Cir. 2008) (remanding to district court for *de novo* consideration of *Strickland* claim and of the cumulative prejudice of *Brady* and *Strickland* violations).

## V.    THE ELECTION OF JUDGES TRANSFORMED MR. KENNEDY'S PROCEEDING FROM A TRIAL AND APPEAL INTO A PLEBISCITE DENYING HIM DUE PROCESS OF LAW

The election of state court judges in this case operated to deny Mr. Kennedy a fair trial and continued to impact the consideration of his claims in post-conviction, resulting in decisions that unreasonably applied federal law and unfairly deprived Mr. Kennedy of the opportunity to present evidence on his own behalf.   The *elected* district court held that this issue was unpreserved because Mr. Kennedy failed to raise it prior to trial.  To the extent the issue was not raised prior to trial, the cause for that failure was Mr. Kennedy's ineffective assistance of counsel.  It concededly takes some chutzpa to raise the claim in front of the very same trial judge and state supreme court that would then impose justice.   However, in this case, Judge Cusimano recused himself after disseminating campaign literature that vilified former Chief Justice Calogero for his dissent in a case upholding the death penalty for child rape.  R. 908-11.  Clearly any rulings in favor of Mr. Kennedy, accused of the brutal rape of an eight-year-old, would have been a veritable death sentence on the trial judge's hopes for re-election.

An elected judge deciding a capital case, as one California Supreme Court justice famously put it, is "like finding an alligator in your bathtub. Once you notice it while shaving, you might go on with what you're doing, but you're sure not going to take your eyes off of it." *See* Philip Hager, *Kaus Urges Reelection of Embattled Court Justices*, L.A. TIMES, Sept. 28, 1986, at A23.  Trial by a fair and impartial tribunal is the bedrock of our criminal justice system; trial by a judge that has a direct, personal and pecuniary interest in imposing convictions and capital sentences cannot be said to uphold the due process guarantee.

Since Mr. Kennedy's trial, former Justice Sandra Day O'Connor specifically noted the problem with elected judges deciding these significant issues. *See*, *e.g.*, Patrick Marley, JOURNAL SENTINEL,  May 6, 2010,  http://www.jsonline.com/news/statepolitics/93041269.html  ("Former

U.S. Supreme Court Justice Sandra Day O'Connor railed against electing judges Thursday, saying Wisconsin and others states should appoint them instead to restore confidence in the courts. 'The health of our judiciary is intimately tied to how we choose our judges,' she said. 'How can people have faith in the system when such large amounts of money are used to influence elections?'").   The District Court erred in refusing to permit a hearing on this significant constitutional claim.   The Court of Appeal compounded the error by denying the claim without a hearing on procedural grounds.   The state courts' refusal to consider the merits of this substantial issue constitutes an inadequate state procedural bar and as such this Court must consider the claim de novo.

## VI.   PASSION AND PREJUDICE INFLAMED THE JURY WHEN IT WAS FORCED TO ENDURE WATCHING THE VICTIM CRY FOR LONG PERIODS OF TIME, AND THE TRIAL COURT ERRED IN SUSTAINING THE PROSECUTOR'S OBJECTION TO THE COURT'S PROPOSED INSTRUCTIONS TO THE JURY TO CONFINE ITS ATTENTION TO THE EVIDENCE

The most damning evidence presented to the jury had nothing to do with the offense itself, but was the mere drama of watching a young woman sit at the witness stand for almost thirty minutes, while she cried and sobbed uncontrollably.   The district court erred when it denied the defense's motion for a mistrial and when it acceded to the demand of the State: to refrain from instructing the jury to confine its attention to the evidence.

L.H. was brought to the stand by the State, and left for five minutes in front of the jury crying, before the second prosecutor appeared and began questioning.   Defense counsel described the situation:

> before she began testifying, I would note, and I don't know if it's already been
> noted for the record, or it has or hasn't, but I would just note for the record that
> she was brought in and left for five minutes on the witness stand without any
> support from the District Attorney's Office. I guess before the District Attorney's
> Office was ready to begin questioning

R. 5348.  While it is unclear why L.H. brought into the court, the trial court castigated the prosecution for creating this display of emotion.  Still the trial court denied the defense request for a mistrial.

The State proceeded to start a series of questions of L.H., after the third of which she burst again into tears, forcing a recess. R. 5336-37.  The defense again unsuccessfully requested a mistrial again based upon the continued dramatic interplay and emotional outburst.

Thereafter the prosecution played a tape recording of L.H.'s prior statement.  R. 5344.  At the end of the tape, the trial court acknowledged "[o]bviously this is an emotional moment in this trial and I'm saying this to counsel for both sides as well as everybody in the spectator's seats, alright."  R. 5344.  As counsel noted after the playing of the tape:

> The record needs to reflect that during the entire twenty-three or twenty-four minute tape, the victim was on the witness stand crying. I am certainly not impugning, I'm not suggesting anything other than it was prejudicial.

R. 5346.  In response to the defense motion for a mistrial, and the repeated emotional outbursts that occurred, the trial court indicated that it would instruct the jury that

> I'm going to instruct this jury on the record to disregard anything they've seen on the witness stand in terms of, if they saw any emotional displays or outbursts, okay, and confine their attention to the evidence presented and nothing more.

R. 5351-52.  While the defense requested a mistrial, it maintained that at the very least such an instruction was necessary.  The State objected to the instruction. R. 5352. The defense again asked for the instruction.  R. 5352.  At the State's behest, the trial court refused to give the instruction.  R. 5353.

In a variety of circumstances, appellate courts have reversed convictions where emotion has tainted the legitimacy of the proceedings—even where instructions to ignore the emotional outbursts were given by the court.  For instance in *State v. Stewart*, the South Carolina Supreme

Court reversed the conviction even though the trial court had repeatedly instructed the jury to attend to the facts and not the emotional outbursts at issue:

> The right to a fair trial by an impartial jury in a criminal prosecution is guaranteed by the Sixth Amendment to the U.S. Constitution and by Article I, § 14, of the S.C. Constitution. While this right does not require a "perfect" trial, the very heart of a "fair trial" embodies a disciplined courtroom wherein an accused's fate is determined solely through the exercise of calm and informed judgment. . . .
>
> It is the duty of the trial judge to see that the integrity of his court is not obstructed by any person or persons whatsoever.

*State v. Stewart*, 295 S.E.2d 627, 630-31 (S.C. 1982).  Similarly, in *Glenn v. State*, the Georgia Supreme Court reversed a conviction and death sentence where the trial court failed to instruct the jury to ignore the weeping of the victim's widow, where jury was exposed to 5-15 minutes of crying:

> It is contended that no effort of any kind was made by the court to eradicate the injury done to the defendant by this conduct on the part of the widow of the deceased, the court giving no instructions that the conduct was improper, and that the jury should disregard the conduct, and the court giving no rebuke to Mrs. Haddad; and that such conduct was prejudicial to the defendant for the following reasons: it was such as to arouse in the jury sympathy for the widow and revengeful feeling toward the defendant, to arouse in the jury a feeling of hatred toward the defendant, and to inject into the trial feelings and emotions from which the jury should have been free in order to calmly and dispassionately decide the issues. No counter-showing was made by the State as to this ground of the motion for new trial.

*Glenn v. State*, 52 S.E.2d 319 (Ga. 1949) (reversing conviction and sentence); s*ee also Rodriguez v. State*, 433 So. 2d 1273, 1276 (Fla. App. 1983) (reversing conviction where the victim's widow shouted epithets and interspersed her testimony with impassioned statements evidencing hostility); *Price v. State*, 254 S.E.2d 512, 513-14 (Ga. App. 1979) (reversing conviction where defendant's request for mistrial or remedial action were denied where emotional outbursts plagued proceedings).

In this case—whether on purpose or by accident—the prosecution placed L.H. before the jury for five minutes and allowed her to sit there crying while it simply left the court room.  If this visual display of emotion was not sufficient, it then played a videotape for twenty-three minutes to the jury during which time L.H. cried intensely.   It not only vigorously contested defense counsel's motion for mistrial, it then successfully objected to an instruction that the trial court had offered to give, directing the jury to refrain from being influenced by emotion.  There can be no question but that such an instruction was necessary; and that the refusal to give such an instruction was reversible error.  Moreover, the lack of an instruction explicitly allowed the State to argue that L.H.'s crying was evidence of Mr. Kennedy's guilt:

> We've shown you by evidence.  When that little girl came in here to testify and started to cry, and couldn't even look at him.

R. 5837 (State closing argument).

> You saw [L.H.] in the courtroom; how hard it was for her to come here; you can only imagine, she's telling you what happened to her.  She can't go to her Dad because he is a monster.  Only you can protect her.

R. 5883.

> Y'all saw [L.H.].  You heard [L.H.] . . .

R. 5884.  The defense unsuccessfully objected and moved for a mistrial.  R. 5885.

The trial court's decision not to give an instruction–at the State's behest–allowed the prosecution to argue that L.H.'s tears justified a conviction—but tears are not evidence of guilt or innocence but rather a cry for an emotion-based decision. For over one hundred years in Louisiana, it has been incumbent upon the trial court to instruct the jury to confine itself to the facts at hand:

> The error in this ruling is manifest, and it could hardly have failed to prejudice the accused in the minds of the jurors; and prejudicial error in the ruling of the trial judge is reversible error.

. . . There is ample authority in support of the doctrine that it is reversible error for the trial judge to fail, of his own motion, to give such instructions as will efface from the minds of the jurors [that which is] unauthorized and prejudicial, and there are many cases in which it has been held that the wrong done is not remedied even by such instructions.

*State v. Williams*, 40 So. 531, 533 (La. 1906); *State v. Blackman*, 32 So. 334 (La. 1902) ("Where the party who is injured by the wrong calls for the intervention of the court, upon objections, it will not do for the court to remain silent, leaving the matter of misconduct with the offending party and the jury. . . . Had the judge, in the case at bar, on objection made interfered, and either then, or later in his charge, instructed the jury . . . to give no heed to it, and otherwise instructed them as to  their rights and duties with regard to the character of verdict the law authorized them to return, we would hold that this saved the error of the prosecuting officer from vitiating the verdict.").

## VII.    THE INTRODUCTION OF GRUESOME PHOTOGRAPHS VIOLATED MR. KENNEDY'S PRESUMPTION OF INNOCENCE

The introduction of gruesome photographs inflamed the passions of the jury and destroyed Mr. Kennedy's presumption of innocence.  The trial court agreed that the photographs in this case were gruesome.  Indeed some were apparently so horrifically detailed that the forensic expert in charge of them would not release them without a court order, concerned about the graphic nature of them.   The defense moved pre-trial, R. 624, to exclude prejudicial photographs, stipulating:

No argument can be made that the pictures are probative as to the issue of whether [L.H.] was raped, since the testimony of Dr. Scott Benton will establish that fact, as well as graphically detailing [L.H.]'s injuries s a result of the rape, obviating the need for gruesome and disturbing photographs. In such situations, the Louisiana Supreme Court has stated that "where the State has already made out its case and the photographs are . . . not 'substantially necessary to show material facts or conditions' the probability is high that the probative value' of these pictures will be outweighed by their prejudicial effect." State v. Scott, 337 So. 2d 1087, 1089 (La. 1976).

At the hearing on the motion to exclude the evidence, the defense elicited evidence from Dr. Benton that he could describe the extent of the injuries without the photographs, and indeed that a degree in anatomy was necessary to actually understand the significance of the details in the graphic photographs:

> What I'm explaining to Your Honor is that this Doctor can explain to the Jury the injuries and what these gruesome photographs depict, which is worst. And that these photographs - particularly One, Two and Three - are best used by someone with a background in anatomy; that this Doctor can describe, as he did very eloquently in his Report - the extent of the injuries, without showing these photographs, which everyone - even at the bench - look at it and said I don't even know what they are. And they obviously depict what they depict, Your Honor.

R. 2523.  Over defense objection, the trial court authorized their admission.  R. 2525.  This was plain error as the photographs had incredible prejudicial impact and little probative value; i.e., they said nothing about whether the jury should believe the statement made by L.H. for the first eighteen months after the rape or the statement she made at trial.

The error in this case was compounded when, recognizing the prejudicial nature of the photographs, the trial court was adamant that the photographs not be manipulated:

> The Court: No enlargements, no blowups, no nothing; that's it.

R.  2525.  The trial court was quite clear:

> The Court:      Five by seven.
>
> Mr. Rowan:    Yes, sir. Nothing blown up, no.
>
> The Court:      **No eight by tens, but five by sevens.**
>
> Mr. Rowan:    **Five by seven.**

R. 2525.  However, when the case came to trial several weeks later, the prosecution sought to introduce more photographs, and larger ones than had been identified at the hearing.  Defense counsel objected:

> I am told that they are the exact same images that were subject to the hearing that
> we had as to the admissibility of these photographs, but I'm seeing that they are
> blown up quite - - quite a bit larger than the photographs that were presented at
> the hearing as to the admissibility of these, and I would object to that. You see,
> these photographs are being used instead of the ones that were actually used at the
> hearing, because they are much larger.

R. 5459. Although—in the presence of Dr. Benton—the State had agreed to use five by seven

photographs pre-trial, in the midst of trial it now argued: "Well, the jury does need to be able to

see it, Judge, I mean. We're talking about three photographs that are 8 x 10." R. 5460.

Moreover, while defense counsel was told they were the "exact same images," it became

clear that that was not true as well.  Indeed the trial court was the first to observe that the State

had blown up one image considerably.  *See* R. 5461 ("There are too many").  Thereafter, the

State conceded that it had manipulated the photographs:

> I asked Doctor Benton if he needed this as a blow-up, these pictures, he said, - -
> especially since he was the one that introduced the photographs.

R. 5462.   While the prosecution had initially informed the defense that these were the exact

same photographs, simply blown up, when called to the fore on the issue, the prosecution stated:

> You' re not really talking about much difference, other than the new ones are - -
> they're not much - - and I don't think that they are a great deal larger than some of
> the ones that we already had. We're only talking about three photographs, so he
> can explain the injuries that this girl suffered.

R. 5643.   "[P]hotographs should be excluded where their logical relevancy will unquestionably

be overwhelmed by the inherently prejudicial nature of the particular picture; and photographs

which are calculated to arouse the sympathies or prejudices of the jury are properly excluded if

they are entirely irrelevant or not substantially necessary to show material facts or conditions."

*State v. Morris*, 157 So.2d 728, 731 (La. 1963).   Although the admission of gruesome

photographs is not reversible error unless it is clear that their probative value is substantially

outweighed by their prejudicial effect, La. Code Evid. art. 403; *see, e.g., State v. Broaden*, 680

116

So.2d 349, 364 (La. 2001), here, the photographs had no probative weight since the defense stipulated that L.H. was raped, and Dr. Benton testified that he could explain the injuries without the photographs.

The admission of the gruesome photographs operated in conjunction with the other constitutional violations to deprive Mr. Kennedy of a fair trial.   On appeal, the Louisiana Supreme Court held that, although the photos were more gruesome than are typically seen in a rape case, "they are comparable to the photographs that are routinely deemed admissible in other capital cases, and they are directly relevant to prove the extreme brutality of this rape."  Unpub. Appx., at 46-47.  Critically, this case could not be constitutionally tried capitally, and therefore the court's justification of the ghastly nature of the photos falls flat.  In light of the Supreme Court's holding that the death penalty is unconstitutional for rape, this Court must give this claim de novo review.

## VIII.   PROSECUTORIAL MISCONDUCT VITIATED THE VALIDITY OF THE JURY'S VERDICT

The prosecution secured a guilty verdict through misconduct, in violation of the Due Process Clause and Mr. Kennedy's Sixth Amendment right to a fair trial.   It began by encouraging the jury to vote to convict in order to protect the victim.  At the core of its guilt phase argument, the prosecution interspersed a plebiscite argument with a victim impact claim:

> Only you can protect her. . .  This defendant took the childhood from an eight-year old, and took her places she should never be.  And she will live with that for the rest of her life.

R. 5883.  The defense's objection and request for a mistrial on this ground was denied.  R. 5885.

Whether this type of argument could have been admissible at the penalty phase is questionable, but it was clearly improper in the guilt phase of this case.  *See*, *e.g.*, *State v. Prejean*, 379 So. 2d 240, 244 (La. 1980) (victim impact evidence of "the number of the

[widow's] children was irrelevant" at culpability phase). Argument that a jury must convict a defendant in order to protect a victim or the community is highly improper. *State v. Sugar*, 408 So. 2d 1329 (La. 1982) (holding that prosecutors should not turn closing argument into a plebiscite on crime by making overt references to community sentiment.); *State v. Hayes*, 364 So.2d 923 (La. 1978); *Tucker v. Kemp*, 762 F.2d 1496, 1508 (11th Cir. 1985); *Hunter v. State*, 684 So. 2d 625 (Miss. 1996) (prosecutor improperly asked jury during closing to "send a message" with its verdict).

The prosecution's argument also treaded upon Mr. Kennedy's presumption of innocence and his decision not to testify. While the prosecution acknowledged that "they don't have to put on any evidence whatsoever, and you can't hold that against him," it maintained that the reason the defense had failed to present a tape recording of L.H. was because it was unhelpful:

> I suggest you didn't hear a tape recorder. . . . But I suggest you didn't hear that tape recorder because you would have heard the pressure that was being put on that child at that time.

R. 5881. The prosecution also made indirect comments on Mr. Kennedy's failure to testify. R. 5878. The trial court denied the objection and the defense request for a mistrial. R. 5885.

The defense also objected to the prosecutor calling Mr. Kennedy a "monster":

> Ms. Da Ponte: And I believe we object to the prosecutor calling Mr. Kennedy a monster. And I would move for a Mistrial.

> The Court: Motion for a Mistrial is denied.

R. 5886. The defense also objected to the prosecutor's argument that it "tak[es] a man to do this. I believe its prejudicial and prohibited by case law and I object." The trial court said "I don't see any relief. It's denied." R. 5842.

The State also improperly elicited evidence regarding the comparison of this offense to other offenses. At issue in the culpability phase of the trial in this case was not the "severity" of

the offense, but rather whether Mr. Kennedy or—as L.H. initially reported—two young men

committed the rape.  Nevertheless, the State introduced the highly prejudicial testimony of Dr.

Benton, that this was "the worst" rape:

> BY MR. PACIERA:  Doctor, I believe in your report you indicated, or I had a comment as to the severity of this injury that she received, as compared to any other that you had seen in the course of your career up until that point, - -
>
> MR. ARMATO:      Objection, Your Honor. May I approach?
>
> (THE FOLLOWING IS A CONFERENCE AT THE BENCH)
>
> MR. ARMATO:      He's about to say that's the worst injury he's seen in four years, and don't see the relevance of that at all, I object to the relevance.
>
> MR. PACIERA:      And it is what the victim suffered, I think it's relevant for that reason. Secondly, it's relevant so that we can argue about why she would lie or not lie, that this has happened to her by somebody who is a care giver.
>
> THE COURT:      I'm going to allow it.  . . .
>
> MR. ARMATO:      Note my objection.
>
> (END OF CONFERENCE)
>
> BY MR. PACIERA:  Doctor, before we were interrupted, I think I had asked you about the severity, how you would classify this injury that Lavelle sustained.
>
> A.      In my experience?
>
> Q.      In your experience.
>
> A.      At the time I had been in practice for approximately four years, and that was the most serious injury that I had seen as a result of a sexual assault.

R. 5472-5473.[30]

The State had already tried to qualify Dr. Benton as an expert in the "treatment of

pediatric sexual abuse" so that he could "discuss delayed reporting, fabrication" and the trial

court firmly (and appropriately) rejected the request to qualify Dr. Benton in that manner.  The

---

[30] R. cites refer to the record which was lodged on appeal in the Louisiana Supreme Court, No. 05-KA-1981.

trial court also granted the defense objection to testimony concerning the whether the victim was

telling the truth or not:

> I will not allow this witness as a, pardon me, as an expert in pediatric forensic
> medicine to testify on the believability or credibility of this witness relative to her
> statements. I will not allow him to do that and that is my ruling.

R. 5435. Nevertheless, the trial court allowed the State to introduce Dr. Benton's characterization

of the wounds as "the worst ever" to "so that we can argue about why she would lie or not lie,"

and to establish that her testimony was reliable. This is exactly what the trial court had

prohibited, and that is prohibited by Louisiana jurisprudence. *See State v. Chauvin*, 02-1188 (La.

05/20/03); 846 So. 2d 697, 707-08 (finding that state cannot introduce testimony of trauma to

bolster credibility of witness); *State v. Foret*, 628 So. 2d 1116 (La. 1993) (concluding that

evidence of Child Sexual Abuse Accommodation Syndrome (CSAAS) is of highly questionable

scientific validity and fails to pass the *Daubert* threshold test of reliability, and is inadmissible to

establish that child is testifying truthfully in a criminal prosecution).

The Louisiana Supreme Court denied Mr. Kennedy's claim of prosecutorial misconduct

on state law grounds, never referring to or citing federal law.  Mr. Kennedy is entitled to de novo

review of the federal constitutional rights violations.  *See Hameen  v. Delaware*, 212 F.3d 226,

248 (3d Cir. 2000)  (applying pre-AEDPA independent review of constitutional claim where

state court decision rested on state law), cert. denied, 532 U.S. 924 (2001); *DiBenedetto v. Hall*,

272 F.3d 1, 7 (1st Cir. 2001) (de novo review of decision based on state law).

## IX.    THE TRIAL COURT ERRONEOUSLY ALLOWED THE STATE TO ELICIT "EXPERT" TESTIMONY ON GRASS DISCOLORATION

There was no *Daubert*  hearing on the admissibility of expert testimony o the rate of grass

blade brake-age or discoloration.  The trial court has a "gate-keeper" obligation to exclude junk

science, and failed to perform that obligation when it allowed the state to elicit testimony that

grass-fracture rapes established that L.H. was not raped outside on the grass.   In *State v. Robinson*, the Louisiana Supreme Court observed, with respect to gunshot residue:

> In State v. Foret, this Court held that where a trial court is considering the admissibility of proposed expert testimony, the trial court must first make "'a preliminary assessment' 'of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts at issue.'" State v. Foret, 628 So. 2d 1116, 1122 (La. 1993) (quoting Daubert, 509 U.S. at 592-93). The trial court must also determine whether the expert is proposing to testify to (1) "scientific, technical, or other specialized knowledge" that (2) "will assist the trier of fact to understand the evidence or to determine a fact in issue." Foret, 628 So. 2d 1116, 1121; (citing La. CODE EVID. art 702). The ultimate goal of the trial court under this new standard is to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Id. at 1122 (citing Daubert, 509 U.S. at 589).

*State v. Robinson*, 02-1869 (La. 4/14/04), 874 So. 2d 66, 76.   While gunshot residue might have a scientific pedigree, grass blade brake-age rates in Louisiana "winter" certainly does not.  In this case, the State elicited—over the objection of the defense—testimony from Dr. Henry Lee, that there was no "large smear or broken grass, disturbance of the soil. Usually, those are the indicator, say a struggle." R. 5595.   The defense objected based upon surprise nature of the testimony, its reliability and the State's failure to provide a report detailing such a funding prior to trial. *See* R. 5591.   The trial court instead of performing its gate-keeper function, left the defense to ineffectually resolve the matter on cross-examination.   In so doing, the trial court abdicated its gate-keeper role.

In closing arguments, the State hammered home on the lack of grass breakage arguing that L.H.'s initial statement to the police was false because Dr. Lee had found no blades of broken grass:

> I'll tell you; lets get to what's important.  What did Dr. Lee tell you about this, the spot where that was.  What did he tell you.  Think back.  Think back very long and hard about this.  He said to you that he examined this area where they were brought to the police officers; indicated that's where he found his daughter and all those other things.  Indicated to him that when he examined this, none of the blades of grass are broken.  None of the area is disturbed.  . . . its so easy to pull

> grass up in winter time.   That's what's important.  What did he tell you.  He told
> you that in his opinion that nothing happened here.

R. 5835.  Allowing an expert to testify about the rate and significance of broken blades of grass

violates the principles laid out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579

(1993), and constitutes quintessential junk science.  The prosecution presented this evidence as

valid scientific evidence, however, which reasonably would have impacted the jury's

determination of guilt and cannot be harmless.

The Louisiana Supreme Court based its denial of this claim on the fact that defense

counsel had stipulated to Dr. Lee's qualification as an expert, failed to request a *Daubert* hearing,

and failed to object to one of the questions the State asked Dr. Lee.  To the extent that this claim

was waived, defense counsel was ineffective for failing to object to this unfounded and invalid

evidence.

## X.  EXCLUSION OF CITIZENS FROM JURY SERVICE BASED UPON A PRIOR PARDONED FELONY CONVICTION VIOLATES THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION

The Louisiana Supreme Court rejected Mr. Kennedy's claim that the exclusion of citizens

from jury service based upon a prior felony conviction violates the Fourteenth Amendment to the

United States Constitution, based not on federal constitutional law, but instead solely upon the

Louisiana Constitution.   In post-conviction proceedings, the state courts refused to grant a

hearing on this claim or consider the merits.  Mr. Kennedy asserts that this exclusion constitutes

an ongoing badge of racism, and seeks an evidentiary hearing to establish that the felon-

exclusion provision was imposed in similar fashion to the provisions in the Louisiana

Constitution of 1898 which provided limitations on voting based upon the voting status of a

citizen's grandfather, literacy tests, and other purportedly race-neutral tests that were designed to

exclude African-Americans from the civic process.

As noted recently, the purpose of the felon disenfranchisement laws was to limit African-American engagement in the civic processes:

> These legislatures instituted disenfranchisement as a consequence of crimes blacks were thought to be particularly likely to commit: "Narrower in scope than literacy test or poll taxes and easier to justify than understanding or grandfather clauses, criminal disenfranchisement laws provided the Southern states with 'insurance if courts struck down more blatantly unconstitutional clauses.'"53 Mississippi was the first state to take advantage of this strategy, amending its constitution in 1890 to disenfranchise those convicted of many petty crimes that blacks were thought to be more likely to commit than whites. . . . Restrained by the federal constitution from discriminating against the negro race, the convention discriminated against its characteristics and the offenses to which its weaker members were prone. Other Southern states followed Mississippi's strategy, with South Carolina, Louisiana, Alabama, and Virginia all amending their constitutions to include targeted disenfranchisement laws shortly afterwards. . . . These measures, along with other tactics, were successful in reducing the black registration rate. Among eligible blacks in Mississippi, registration fell from almost 70% in1867 to under 6% by 1892, while in Louisiana, blacks went from 44% of the electorate after the Civil War to 1% in 1920.

Jason Schall, *The Consistency of Felon Disenfranchisement with Citizenship Theory*, 22 HARV. BLACKLETTER L. J. 53, 58 (2006) (internal citations omitted).

Article V, § 33 of the Louisiana Constitution provides: "(A) Qualifications. A citizen of the state who has reached the age of majority is eligible to serve as a juror within the parish in which he is domiciled. The legislature may provide additional qualifications."  But suggesting that these qualifications could include grounds that violate other provisions in the constitution is untenable; this is comparable to suggesting that the legislature could truncate the prohibition on race, gender or age discrimination in Article I, § 3, by setting qualifications for jury service that specifically excluded classes of people by race, age or gender.   The Court also excluded jurors who had received first offender pardons.  These jurors were in all legal respects the same as jurors without first offender pardons, but were discriminated under the legislative scheme.  The prohibition on jury service by citizens who have been convicted of a felony violates the civil and political rights of both the citizens prevented from serving and the defendant on trial.  Because

the only state court to consider this claim based its decision solely on the fact that the state constitution allows the legislature to "provide additional qualifications," this Court must apply de novo review of this claim.

## XI.   CUMULATIVE   ERROR   REQUIRES   REVERSAL   OF   MR.   KENNEDY'S CONVICTION

This Court should assess the prejudice from the errors identified herein cumulatively. While some of issues are structural in nature, *e.g. Claim I, Discrimination in the Selection of the Grand Jury Foreperson*, a series of claims require an assessment of the impact of the error on the proceedings.  In this case, without D.N.A. or a confession, it would be unreasonable to assert that any apparent error would did not impact the proceedings.  It would be even more unreasonable to assert that the combination of errors—including the denial of effective assistance of counsel and the government's delayed disclosure of favorable evidence, along with the influence of passion and bias—did not undermine the validity of proceedings.  *See Darden v. McNeel*, 938 F.2d 605, 610 (5th Cir. 1991); *United States v. Diharce-Estrada*, 526 F.2d 637, 640 (5th Cir. 1976).

As the United States Supreme Court made clear in *Kyles v. Whitley*, courts should not look at individual errors in isolation but assess their impact cumulatively.  514 U.S. 419, 440-41 (1995) (explaining that the Fifth Circuit erred by failing to make "an assessment of the cumulative effect of the evidence" and making only "a series of independent materiality evaluations" in a case involving multiple alleged *Brady* violations).  *See also Strickler v. Greene*, 527 U.S. 263, 290 (1999) (stating that courts must consider the effect of the error on "the whole case," and not simply whether the remaining proper evidence is sufficient to support a conviction).

**MR. KENNEDY IS ENTITLED TO AN EVIDENTIARY HEARING**

A petitioner is entitled to an evidentiary hearing in federal court, where he has been denied one in state court if his allegations would warrant habeas relief.  Section § 2254(e) does not bar a hearing in this case, because Petitioner requested a hearing in state court to make out his factual claims was but the hearing was denied.

In *Williams v. Taylor*, 529 U.S. 420, 437 (2000), the Court addressed whether the "failed to" language in 28 U.S.C. § 2254(e)(2) applied when the defendant was denied relief in state court without ever getting a hearing.  In *Williams*, the Court undertook to interpret the term "failed" in Section (e)(2) of 2254:

> By the terms of its opening clause the statute applies only to prisoners who have "failed to develop the factual basis of a claim in State court proceedings." If the prisoner has failed to develop the facts, an evidentiary hearing cannot be granted unless the prisoner's case meets the other conditions of § 2254(e)(2).

*Id.*  Here, as in *Williams*, "There was no hearing in state court on any of the claims for which petitioner now seeks an evidentiary hearing." The Court explained further:

> That, says the Commonwealth, is the end of the matter. In its view petitioner, whether or not through his own fault or neglect, still "failed to develop the factual basis of a claim in State court proceedings." Petitioner, on the other hand, says the phrase "failed to develop" means lack of diligence in developing the claims, a defalcation he contends did not occur since he made adequate efforts during state-court proceedings to discover and present the underlying facts.

*Id.* at 430.  *See also id.* at 437 ("comity is not served by saying a prisoner 'has failed to develop the factual basis of a claim' where he was unable to develop his claim in state court despite diligent effort.").

All of the circuit courts that have addressed this issue, both before and after *Williams*, have held that a district court abuses its discretion in refusing to hold an evidentiary hearing where the defendant was not granted an evidentiary hearing in state court—where the allegations if proven true, warranted habeas relief.  *Hall v. Quarterman*, 534 F.3d 365, 368-69 (5th Cir.

2008) ("A district court abuses its discretion in not holding an evidentiary hearing only if the state court failed to provide a full and fair hearing.") (citing *Moawad v. Anderson*, 143 F.3d 942, 948 (5th Cir. 1998)) ("To find an abuse of discretion which would entitle . . . [petitioner] to discovery and an evidentiary hearing to prove his contentions, we would necessarily have to find that the state did not provide him with a full and fair hearing. . . ."); *Hall v. Quarterman*, 534 F.3d 365, 369 (5th Cir. 2008) ("The facts before us are a core manifestation of a case where the state failed to provide a full and fair hearing and where such a hearing would bring out facts which, if proven true, support habeas relief."); *Williams v. Whitley*, 940 F.2d 132 (5th Cir. 1991) ("Concluding that Williams was entitled to an evidentiary hearing to develop the facts relevant to an unproduced police report, including the knowledge of his trial counsel about the contents thereof, we vacate and remand for an evidentiary hearing and such other proceedings as may be deemed appropriate.").

"AEDPA is not designed to take necessary remedies from a habeas petitioner but to give the State a first opportunity to consider most matters and to insist that federal courts properly respect state-court determinations." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1413 (April 4, 2011) (Breyer, J., concurring). The Supreme Court's recent opinion in *Pinholster* did not address the situation where a petitioner requests—and has a state statutory right to—a hearing at which to present evidence in the state court, and is denied the opportunity. *Pinholster* was a case in which the petitioner had two chances to present evidence in support of his claim in state post-conviction proceedings. Then, in federal habeas, he was granted a hearing and presented different evidence. In this case, in contrast, Mr. Kennedy sought an opportunity from the district court, the intermediate appeals court, and the state supreme court, to present evidence supporting his claims. Each state court denied Mr. Kennedy the chance to present evidence. Mr. Kennedy is a

petitioner "who made a diligent effort to produce in state court the new evidence on which he seeks to rely."  *Pinholster*, 131 S. Ct. at 1411 (Alito, J., concurring); *see* § 2254(e)(2); *Williams v. Taylor*, 529 U.S. 420, 433-34 (2000).

## PRAYER FOR RELIEF

For the foregoing reasons, Petitioner requests that this Court issue a writ of habeas corpus to the State of Louisiana pursuant to 28 U.S.C. § 2254 requiring the State to release him from custody or grant him a new trial.

Respectfully submitted,

/s Cecelia Trenticosta

G. Ben Cohen, La. Bar # 25370
Cecelia Trenticosta, La. Bar #32736

Capital Appeals Project
636 Baronne Street
New Orleans, LA 70113
(504) 529-5955

*Counsel for Patrick Kenendy*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and forgoing was filed electronically with the Clerk of Court using CM/ECF on April 19, 2011.  Additionally, a copy of this Petition was served via U.S. mail on Juliet Clark, Jefferson Parish District Attorney's Office, 200 Derbigny

St., Gretna, LA 70053, and on Warden Burl Cain, Louisiana State Penitentiary, Angola, LA 70712, on this 19th day of April, 2011.

/s Cecelia Trenticosta_____

Cecelia Trenticosta